# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

STATE OF UTAH, *et al.*,

    *Plaintiffs*,

v.

MARTY WALSH and
UNITED STATES DEPARTMENT OF LABOR,

    *Defendants*.

No. 2:23-CV-00016-Z

## MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES..........................................................................................iii

INTRODUCTION ........................................................................................................1

BACKGROUND ...........................................................................................................3

I.    Statutory Background on ERISA .........................................................................3

II.   Prior Administrative Guidance and 2020 Rules ..................................................4

     A.   Pre-*Dudenhoeffer* Sub-Regulatory Guidance on Nonpecuniary Factors.....................4

     B.   *Dudenhoeffer* and Additional Sub-Regulatory Guidance .........................5

     C.   2020 Regulations Regarding Pecuniary Factors .......................................6

III.  2021 Executive Orders, Non-Enforcement of 2020 Rules, and 2022 Rule....................8

     A.   2021 Executive Orders and Non-Enforcement of 2020 Rules..............................8

     B.   2021 Notice of Proposed Rulemaking ......................................................9

     C.   2022 Rule ...................................................................................................9

ARGUMENT.............................................................................................................10

I.    Plaintiffs Have Standing to Challenge The 2022 Rule.........................................10

     A.   Private Plaintiff Standing ........................................................................11

         1.   Liberty and Liberty Services .............................................................11

         2.   Western Energy Alliance....................................................................14

         3.   James R. Copland...............................................................................15

     B.   State Standing ...........................................................................................16

II.   Plaintiffs Are Entitled to a Preliminary Injunction ...............................................18

     A.   The 2022 Rule Violates ERISA ..............................................................18

         1.   The Plain Language of ERISA Requires That Fiduciaries Act for the "Exclusive Purpose" of Providing Financial "Benefits" ............................18

            a.   "Benefits" Means Exclusively Financial Benefits...................................19

            b.   "Exclusive Purpose" and "Solely" Mean Only Purpose ......................20

         2.   The 2022 Rule Exceeds DOL's Statutory Authority and Is Contrary to Law ...................................................................................................22

         3.   The 2022 Rule Also Fails Under the Major Questions Doctrine ...................25

     B.   The 2022 Rule Is Arbitrary and Capricious..............................................26

         1.   The 2022 Rule Fails to Rebut DOL's Prior Finding that Strict Regulations Are Necessary to Protect Participants and Prevent Fiduciary Violations .27

         2.   The Alleged Need for the 2022 Rule is Inadequate .........................................28

3. The 2022 Rule's Changes Are Unreasonable, Internally Inconsistent, and Rely on Impermissible Considerations..........................................................................29

    a. Expanding the Tiebreaker Provision..........................................................30

    b. Authorizing Consideration of Participants' Preferences.......................31

    c. Authorizing Nonpecuniary Factors in Proxy Voting and Other Exercises of Shareholder Rights..............................................................32

    d. Removing Documentation Requirements for Fiduciaries Acting for Collateral Purposes...................................................................................33

    e. Eliminating Specific Restrictions on QDIAs..........................................34

4. The 2022 Rule Unreasonably Removed the Collateral Benefit Disclosure Requirement Included in the NPRM............................................................................35

5. The 2022 Rule Fails to Consider Issuing Sub-Regulatory Guidance Instead of Amending the Regulation Itself................................................................................36

6. The 2022 Rule is the Product of Prejudgment ....................................................37

C. Plaintiffs Will Suffer Irreparable Harm Without an Injunction ...............................38

D. An Injunction Will Not Harm Defendants or Disserve the Public Interest...........40

Conclusion ..................................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*10 Ring Precision, Inc. v. Jones,*
    722 F.3d 711 (5th Cir. 2013)..................................................................27, 37

*AFGE, Loc. 2924 v. FLRA,*
    470 F.3d 375 (D.C. Cir. 2006) ..............................................................29, 36

*Ala. Ass'n of Realtors,*
    141 S. Ct. 2489 (2021)................................................................................26

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982)..............................................................................16, 17

*Bell v. Xerox Corp.,*
    52 F. Supp. 3d 498 (W.D.N.Y. 2014)....................................................11, 15

*Boggs v. Boggs,*
    520 U.S. 833 (1997).....................................................................................40

*Borst v. Chevron Corp.,*
    36 F.3d 1308 (5th Cir. 1994)......................................................................20

*BST Holdings v. OSHA,*
    17 F.4th 604 (5th Cir. 2021)........................................ 10, 12, 38, 39, 40

*Burgess v. FDIC,*
    871 F.3d 297 (5th Cir. 2017).......................................................................39

*Bussian v. RJR Nabisco, Inc.,*
    223 F.3d 286 (5th Cir. 2000).......................................................................21

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,*
    472 U.S. 559 (1985).....................................................................................13

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
    779 F.3d 258 (5th Cir. 2015)....................................................10, 11, 12, 15

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.,*
    894 F.3d 1005 (9th Cir. 2018).....................................................................13

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
    710 F.3d 579 (5th Cir. 2013).......................................................................40

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019).................................................................12, 13, 29

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020).....................................................................27, 28, 37

*Donovan v. Mazzola,*
    716 F.2d 1226 (9th Cir. 1983).....................................................................20

*Duarte ex rel. Duarte v. City of Lewisville,*
   759 F.3d 514 (5th Cir. 2014) ........................................................................ 12

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ................................................................... 29, 33, 35, 36

*Engine Mfrs. Ass'n v. EPA,*
   20 F.3d 1177 (D.C. Cir. 1994) ............................................................... 29, 36

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................................... 27, 28

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) .................................................................................. 26

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ...................................................................................... 25

*Fifth Third Bancorp v. Dudenhoeffer,*
   573 U.S. 409 (2014) ......................................................... 1, 5, 19, 20, 30

*Firestone Tire & Rubber Co. v. Bruch,*
   489 U.S. 101 (1989) ...................................................................................... 20

*Gen. Chem. Corp. v. United States,*
   817 F.2d 844 (D.C. Cir. 1987) ............................................................... 29, 36

*Gould v. Lambert Excavating Inc.,*
   870 F.2d 1214 (7th Cir. 1989) ................................................................ 39, 40

*Gregg v. Transp. Workers of Am. Intern.,*
   343 F. 3d 833 (6th Cir. 2003) ...................................................................... 20

*Halperin v. Richards,*
   7 F.4th 534 (7th Cir. 2021) .......................................................................... 21

*Herman v. S.C. Nat'l Bank,*
   140 F.3d 1413 (11th Cir. 1998) .................................................................... 39

*Hughes v. Nw. Univ.,*
   142 S. Ct. 737 (2022) .................................................................................... 32

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
   804 F.2d 1390 (5th Cir. 1986) ...................................................................... 38

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018) .................................................................................... 21

*Johnson v. Allsteel, Inc.,*
   259 F.3d 885 (7th Cir. 2000) ............................................................ 11, 14, 15

*K.P. v. LeBlanc,*
   627 F.3d 115 (5th Cir. 2010) ........................................................................ 12

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 40

*Louisiana v. Becerra*,
 __ F. Supp. 3d __, 2022 WL 4370448 (W.D. La. Sept. 21, 2022).................................16, 17

*Louisiana v. Horseracing Integrity & Safety Auth., Inc.*,
 __ F. Supp. 3d __, 2022 WL 2960031 (W.D. La. July 26, 2022).........................................17

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)..........................................................................................................10

*Luminant Generation Co. v. EPA*,
 675 F.3d 917 (5th Cir. 2012)....................................................................27, 31, 33, 34

*Massachusetts v. Mellon*,
 262 U.S. 447 (1923)..........................................................................................................17

*Michigan v. EPA*,
 576 U.S. 7431 (2015)........................................................................................................36

*Miss. Comm'n on Env't Quality v. EPA*,
 790 F.3d 138 (D.C. Cir. 2015).........................................................................................37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983). Action..........................................26, 27, 30, 31, 33, 35, 36

*Nat'l Fed'n of Indep. Bus. v. DOL*,
 142 S. Ct. 661 (2022)......................................................................................................2, 26

*NLRB v. Amax Coal Co.*,
 453 U.S. 322 (1981)......................................................................................................21, 24

*OCA-Greater Houston v. Texas*,
 867 F.3d 604 (5th Cir. 2017)...........................................................................................10

*Opulent Life Church v. City of Holly Springs*,
 697 F.3d 279 (5th Cir. 2012)...........................................................................................18

*Partenza v. Brown*,
 14 F. Supp.2d 493 (S.D.N.Y. 1998)................................................................................40

*Perez v. McCreary, Veselka, Bragg & Allen P.C.*,
 45 F.4th 816 (5th Cir. 2022)..................................................................................14, 37, 38

*Perez v. Mortg. Bankers Ass'n*,
 135 S. Ct. 1199 (2015).....................................................................................................27

*Sanchez v. R.G.L.*,
 761 F.3d 495 (5th Cir. 2014)...........................................................................................13

*Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*,
 960 F.3d 190 (5th Cir. 2020).....................................................................................20, 24

*Sierra Club, Inc. v. Sandy Creek Energy Assocs.*,
 627 F.3d 134 (5th Cir. 2010)...........................................................................................18

*Sw. Airlines Co. v. Fed. Energy Regul. Comm'n*,
 926 F.3d 851 (D.C. Cir. 2019).........................................................................................35

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ........................................................................... 12

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ....................................................................... 10, 11

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ....................................................................... 39, 40

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ............................................................................ 18

*Texas v. United States*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ........................................................... 38, 39

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ............................................................................ 39

*Texas v. United States*,
  86 F. Supp. 3d 591 (S.D. Tex. 2015) ............................................................... 17

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015) ......................................................................................... 20

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ..................................................................................... 13

*U.S. Chamber of Com. v. DOL*,
  885 F.3d 360 (5th Cir. 2018) .................................................. 18, 22, 23, 24, 26, 27

*U.S. Steel Corp. v. EPA*,
  595 F.2d 207 (5th Cir. 1979) ............................................................................ 38

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) ......................................................................................... 13

*Wash.-Balt. Newspaper Guild Local 35 v Wash. Star Co.*,
  555 F. Supp. 257 (D.D.C. 1983) ....................................................................... 20

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ................................................................................. 25, 26

*Woods v. City Nat'l Bank & Trust Co.*,
  312 U.S. 262 (1941) ..................................................................................... 21, 24

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ......................................................................................... 16

*Yates v. United States*,
  574 U.S. 528 (2015) ......................................................................................... 26

## U.S. Consitution and Statutes

U.S. Const amd. V ............................................................................................ 37

ERISA, Pub. L. 93-406, 88 Stat. 829 .................................................................... 3

5 U.S.C. § 706 ............................................................................................. 22, 26

26 U.S.C. § 61 ..................................................................................................... 16

26 U.S.C. § 62 ..................................................................................................... 16

26 U.S.C. § 401 ................................................................................................... 20

26 U.S.C. § 408 ................................................................................................... 16

29 U.S.C. § 1001 ................................................................................................. 39

29 U.S.C. § 1002 ............................................................................................. 3, 19

29 U.S.C. § 1103 .............................................................................. 1, 3, 19, 20, 21

29 U.S.C. § 1104 .................................................................................. 1, 3, 19, 20

29 U.S.C. § 1132 ................................................................................................. 15

29 U.S.C. § 1135 ...................................................................................... 4, 18, 26

Ala. Code § 40-18-13 .......................................................................................... 16

Ga. Code Ann. § 48-7-27 ..................................................................................... 16

Ind. Code § 6-3-1-8 ............................................................................................. 16

Kan. Stat. Ann. § 79-32,116 ............................................................................... 16

Kan. Stat. Ann. § 79-32,117 ............................................................................... 16

Mo. Rev. Stat. § 143.124 .................................................................................... 16

Ohio Rev. Code § 5747.01 .................................................................................. 16

Utah Code § 59-10-101 ....................................................................................... 16

Utah Code § 59-10-103 ....................................................................................... 16

Utah Code § 59-10-104 ....................................................................................... 16

Va. Code § 58.1-322 ............................................................................................ 16

W. Va. Code § 11-21-4e ...................................................................................... 16

W. Va. Code § 11-21-11 ...................................................................................... 16

W. Va. Code § 11-21-12 ...................................................................................... 16

**Code of Federal Regulations**

29 C.F.R. § 2550.404a-1 .............................................................................. passim

**Federal Register**

Interpretive Bulletin 94-1,
    59 F.R. 32606 (June 23, 1994) ..................................................................... 4

Interpretive Bulletin 94-2,
    59 F.R. 38860 (July 29, 1994) ...................................................................... 4

Interpretive Bulletin 2008-1,
    73 F.R. 61731 (Oct. 17, 2008) .................................................................. 4, 5

Interpretive Bulletin 2008-2,
    73 F.R. 61731 (Oct. 17, 2008) ...................................................5, 13, 23, 24

Interpretive Bulletin 2015-1,
    80 F.R. 65135 (Oct. 26, 2015) .............................................................5, 6

Interpretive Bulletin 2015-2,
    81 F.R. 95882 (Dec. 29, 2016) ................................................................6

Financial Factors in Selecting Plan Investments,
    85 F.R. 72846 (Nov. 13, 2020) ...........................1, 6, 7, 13, 23, 24, 27

Fiduciary Duties Regarding Proxy Voting and Shareholder Rights,
    85 F.R. 81658 (Dec. 16, 2020) ..............................1, 8, 13, 24, 27

Executive Order 13990, Protecting Public Health and the Environment and
Restoring Science to Tackle the Climate Crisis, 86 F.R. 7037 (Jan. 25, 2021)......................8

Executive Order 14030, Climate Related Financial Risk,
    86 F.R. 27967 (May 25, 2021)................................................................8

Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder
Rights,
    86 F.R. 57272 (Oct. 14, 2021) ....................................................8, 9, 35

Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder
Rights,
    87 F.R. 73822 (Dec. 1, 2022) .........................................................passim

**Other Authorities**

Cong. Rsch. Serv., R45957, Capital Markets: Asset Management and Related
Policy Issues (2019),
    https://crsreports.congress.gov/product/pdf/R/R45957 ...................................3

Cong. Rsch. Serv., R46366, Single-Employer Defined Benefit Pension Plans:
Funding Relief and Modifications to Funding Rules (2020),
    https://crsreports.congress.gov/product/pdf/R/R46366 ...................................3

Cong. Rsch. Serv., R47152, Private-Sector Defined Contribution Pension Plans: An
Introduction (2022), https://crsreports.congress.gov/product/pdf/R/R47152. .............3

Consumers' Research, Comment on Prudence and Loyalty in Selecting Plan
Investments and Exercising Shareholder Rights Employee Benefits Security
Administration (Dec. 13, 2021) ....................................28, 29, 31, 37, 38

Emp. Benefits Sec. Admin, DOL, *Statement Regarding Enforcement of its Final Rules
on ESG Investments and Proxy Voting by Employee Benefit Plans* (Mar. 10, 2021),
https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/
erisa/statement-on-enforcement-of-final-rules-on-esg-investments-and-
proxy-voting.pdf....................................................................8

Emp. Benefits Sec. Admin., DOL, *Fact Sheet: EBSA Restores Over $1.4 Billion to
Employee Benefit Plans, Participants, and Beneficiaries* (2022),
https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/
resource-center/fact-sheets/ebsa-monetary-results-2022.pdf.............................25

James D. Hutchinson & Charles G. Cole, *Legal Standards Governing Investment of Pension Assets for Social and Political Goals*, 124 U. Pa. L. Rev. 1340 (1980) ...................22, 30

James G. McMillan III, *Misclassification and Employer Discretion Under ERISA*, 2 U. Pa. J. Lab. & Emp. L. 837 (2000)..............................................................................3

Jeffrey J. Haas, *Corporate Finance* (2014)..........................................................................24

Jonathan Berry, Comment on Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights Employee Benefits Security Administration       (Dec. 13, 2021) ..................................................................................28

John H. Langbein & Daniel R. Fischel, *ERISA's Fundamental Contradiction, The Exclusive Benefit Rule*, 55 U. Chi. L. Rev. 1105 (1988) .......................................21, 22

*Liberty Oilfield Services Inc. ESG Rating*, CSRHub (last accessed Feb. 14, 2023), https://www.csrhub.com/CSR_and_sustainability_information/Liberty-Oilfield-Services-Inc. ..................................................................................................12

Op. Ky. Att'y Gen. 22-05 (May 26, 2022), https://ag.ky.gov/Resources/Opinions/Opinions/OAG%2022-05.pdf.............................................................21

Pat Toomey, et al., Comment on Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights Employee Benefits Security Administration (Dec. 10, 2021) ........................................................................28, 31

Restatement (Second) of Trusts § 170 ..................................................................................20

Restatement (Third) of Trusts § 107 ....................................................................................14

Restatement (Third) of Trusts § 78 ................................................................14, 20, 21, 24

Restatement (Third) of Trusts § 90 ................................................................................20, 21

Restatement (Third) of Trusts § 94 ......................................................................................15

Sean D. Reyes, Utah Attorney General, Comment on Proposed Rule Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights Employee Benefits Security Administration (Dec. 13, 2021)...................................31

**INTRODUCTION**

Pursuant to Rule of Civil Procedure 65(a), Plaintiffs move for a preliminary injunction of the new U.S. Department of Labor ("DOL") rule that unlawfully subverts protections in the Employee Retirement Income Security Act of 1974 ("ERISA"). As its title states, ERISA safeguards the "retirement income" of 152 million workers, totaling more than $12 trillion in assets. It provides that those assets "shall be held [in trust] for the *exclusive purposes* of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1) (emphasis added). Plan fiduciaries must act "*solely* in the interest of the participants and beneficiaries and . . . for the *exclusive purpose* of . . . providing benefits to participants and their beneficiaries." *Id.* § 1104(a)(1) (emphasis added). The Supreme Court has unanimously held that the term "benefits" "must be understood to refer to . . . *financial* benefits (such as retirement income)" and "does not cover nonpecuniary benefits." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014).

Consistent with ERISA's text and *Dudenhoeffer*, DOL previously promulgated "Financial Factors in Selecting Plan Investments," 85 F.R. 72846 (Nov. 13, 2020) ("2020 Investment Rule"), and "Fiduciary Duties Regarding Proxy Voting and Shareholder Rights," 85 F.R. 81658 (Dec. 16, 2020) ("2020 Proxy Voting Rule"). These rules amended 29 C.F.R. § 2550.404a-1 to reflect ERISA's focus on *financial* benefits. DOL explained that "[p]roviding a secure retirement for American workers is the paramount, and eminently worthy, 'social' goal of ERISA plans." 85 F.R. at 72848.

On December 1, 2022, however, DOL finalized a new regulation titled "Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights," 87 F.R. 73822 ("2022 Rule"), which took effect on January 30, 2023. The rule violates ERISA and unlawfully removes or undermines key regulatory protections to further the Biden Administration's politically driven ESG objectives. First, the rule adopts a new standard for fiduciaries to pursue nonpecuniary considerations, authorizing a fiduciary to select an investment or investment

course of action "based on collateral benefits other than investment returns" whenever the fiduciary "prudently concludes that competing investments . . . equally serve the financial interests of the plan over the appropriate time horizon." 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(c)(2)). Second, the rule removes a prohibition on exercising proxy rights to "promote non-pecuniary benefits or goals unrelated to those financial interests of the plan participants and beneficiaries." 87 F.R. at 73847–48; *compare* 29 C.F.R. § 2550.404a-1(e) (2)(ii)(C) (2021), *with* 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(d)(2)(ii)(C)). These subtle but important changes free fiduciaries to pursue "collateral benefits" and nonpecuniary objectives, contrary to ERISA. Moreover, the loose "tiebreaker" standard will hinder participants and beneficiaries from challenging improper actions by fiduciaries.

The 2022 Rule also fails under the major questions doctrine. The rule applies to the retirement savings of over two-thirds of the U.S. adult population, totaling more than $12 trillion in assets, and its objective is to promote the favored climate-change policy of the current administration. A rule of such "vast economic and political significance" requires clear authorization from Congress, *Nat'l Fed'n of Indep. Bus. v. DOL*, 142 S. Ct. 661, 665 (2022) ("*NFIB*"), which does not exist here.

Further, the 2022 Rule is arbitrary and capricious. Initially, there are two overarching problems. The rule fails to rebut DOL's prior finding that strict regulations are necessary to protect participants from shortcomings that would otherwise result in the prudence and loyalty of some fiduciaries, and the alleged need for the rule is inadequate. Turning to specific provisions, the rule's changes are unreasonable, internally inconsistent, and rely on impermissible considerations. This applies to expanding the tiebreaker, authorizing consideration of participants' nonpecuniary preferences, authorizing nonpecuniary considerations in proxy voting and other exercises of shareholder rights, removing documentation requirements for fiduciaries acting for collateral purposes, and eliminating restrictions on the qualified default investment alternative ("QDIA") for a plan. The rule also unreasonably declined to adopt a proposed collateral-benefit disclosure requirement in the

notice of proposed rulemaking, and it failed to consider the alternative of not amending § 2550.404a-1 and instead issuing sub-regulatory guidance. Finally, the rule is the product of prejudgment.

## BACKGROUND

### I.   STATUTORY BACKGROUND ON ERISA

Congressional concern about retirement plans traces back to the failure of automaker Studebaker, which left thousands of employees with little or none of their promised pension benefits. After nearly a decade of investigations and hearings into pension funds and diversions of those funds by fund managers, Congress enacted ERISA, Pub. L. 93-406, 88 Stat. 829.[1] ERISA protects two types of pension plans: 1) defined benefit plans, which are traditional pensions; and 2) defined contribution plans, also called "individual account plans." 29 U.S.C. § 1002(34), (35).[2] For individual account plans, plan sponsors—who are typically the employer or a group of employers—are responsible for choosing the investment options offered to participants. *See id.* § 1002(16). Plan sponsors may manage the plans themselves or hire investment managers and others to perform various tasks.[3] Plan administrators, investment managers, trustees, and advisors are fiduciaries under ERISA. *See id.* § 1002(21)(A).

Sections 403(c) and 404(a) of ERISA require fiduciaries to act solely in the interests of a plan's participants and beneficiaries, and for the exclusive purpose of providing benefits to them and defraying reasonable expenses of administering the plan. *Id.* §§ 1103(c)(1),

---

[1] *See, e.g.*, James G. McMillan III, *Misclassification and Employer Discretion Under ERISA*, 2 U. Pa. J. Lab. & Emp. L. 837, 840–42 (2000).

[2] *See also* Cong. Rsch. Serv. ("CRS"), R46366, Single-Employer Defined Benefit Pension Plans: Funding Relief and Modifications to Funding Rules 2 (2020), https://crsreports.congress.gov/ product/pdf/R/R46366.

[3] *See* CRS, R45957, Capital Markets: Asset Management and Related Policy Issues 1 (2019) (in defined benefit plans, investment managers may oversee capital allocation or provide investment advice), https://crsreports.congress.gov/product/pdf/R/R45957; CRS, R47152, Private-Sector Defined Contribution Pension Plans: An Introduction 1–2, 6–8 (2022) (in defined contribution plans, fiduciaries design and select the portfolio of investment options and have a duty to monitor), https://crsreports.congress.gov/product/pdf/R/R47152.

1104(a)(1). Section 404(a) also requires fiduciaries to act prudently and diversify investments. *Id.* § 1104(a)(1)(C). These duties can be enforced through private suits or by DOL. *Id.* § 1132.

## II.   PRIOR ADMINISTRATIVE GUIDANCE AND 2020 RULES

### A.   Pre-*Dudenhoeffer* Sub-Regulatory Guidance on Nonpecuniary Factors

ERISA confers rulemaking authority on DOL to carry out the statute. *Id.* § 1135. In 1979, DOL originally promulgated its "Investment Duties" regulation, now codified at 29 C.F.R. § 2550.404a-1, as amended. DOL then used letters and guidance documents to address how fiduciary duties apply to investments selected for reasons apart from their expected financial return, called "economically targeted investments" or "ETIs." The first guidance document, Interpretive Bulletin 94-1 ("IB 94-1"), stated that "an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return." 59 F.R. 32606, 32607 (June 23, 1994). It explained that sections 403 and 404 "prohibit[] a fiduciary from subordinating" retirement-income interests "to unrelated objectives." *Id.*

Interpretive Bulletin 94-2 ("IB 94-2") added that voting proxies fell under ERISA's fiduciary standard and required "the responsible fiduciary" to "consider those factors that may affect the value of the plan's investment and not subordinate the interests of the participants and beneficiaries in their retirement income to unrelated objectives." 59 F.R. 38860, 38863 (July 29, 1994). It approved of actions "intended to monitor or influence" corporate management decisions when motivated by a "reasonable expectation" such activities would "enhance the value of the plan's investment." *Id.*

In 2008, DOL replaced IB 94-1 and 94-2 with Interpretive Bulletins 2008-01 ("IB 2008-01") and 2008-02 ("IB 2008-02"). IB 2008-01 emphasized that "fiduciaries may never subordinate the economic interests of the plan to unrelated objectives" and must first conclude that "alternative options are truly equal" before selecting an ETI. 73 F.R. 61734, 61735 (Oct.

17, 2008). DOL explained the problems with a "less rigid rule" and expressly rejected "a construction of ERISA that would render [its] tight limits on the use of plan assets illusory, and that would permit plan fiduciaries to expend ERISA trust assets to promote myriad public policy preferences." *Id.* It further explained that "fiduciaries who rely on factors outside the economic interests of the plan . . . will rarely be able to demonstrate compliance with ERISA absent a written record demonstrating that a contemporaneous economic analysis showed that the investment alternatives were of equal value." *Id.* at 61735–36.

IB 2008-2 reiterated ERISA's pecuniary focus as related to proxy voting and explained that fiduciaries can only consider factors relevant to the plan's economic interest when deciding to cast a proxy vote. 73 F.R. 61731, 61732 (Oct. 17, 2008). DOL added that "[p]lan fiduciaries risk violating the exclusive purpose rule when they exercise their fiduciary authority in an attempt to further legislative, regulatory, or public policy issues through the proxy process," and attempting "to further policy or political issues . . . that have no connection to enhancing the economic value of the plan's investments" is prohibited. *Id.* "The mere fact that plans are shareholders. . . does not itself provide a rationale for a fiduciary to spend plan assets to pursue, support, or oppose such proxy proposals." *Id.*

### B.  *Dudenhoeffer* **and Additional Sub-Regulatory Guidance**

In 2014, the Supreme Court in *Dudenhoeffer* interpreted section 404(a)(1)(A)'s requirement that fiduciaries must act "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." The Court unanimously held that the term "benefits" "must be understood to refer to . . . *financial* benefits (such as retirement income)" and "does not cover nonpecuniary benefits like those supposed to arise from employee ownership of employer stock." 573 U.S. at 421.

DOL nonetheless replaced IB 2008-01 the next year with Interpretive Bulletin 2015-01 ("IB 2015-01"), which signaled openness to consideration of ESG factors by plan fiduciaries. 80 F.R. 65135 (Oct. 26, 2015). DOL was "concerned that the 2008 guidance may be dissuading

fiduciaries from (1) pursuing investment strategies that consider [ESG] factors, even where they are used solely to evaluate the economic benefits of investments and identify economically superior investments, and (2) investing in ETIs even where economically equivalent." *Id.* at 65136. The guidance continued that "fiduciary standards applicable to ETIs are no different than the standards applicable to plan investments generally. Therefore, if the above requirements are met, the selection of an ETI . . . will not violate section 404(a)(1)(A) and (B) and . . . section 403." *Id.* at 65137. Although purporting to limit ESG to financial considerations and economic equivalence, IB 2015-01 conspicuously lacked both warnings against pursing nonpecuniary factors and failed to cite *Dudenhoeffer*.

DOL also replaced IB 2008-02 with Interpretive Bulletin 2016-01 ("IB 2016-01") to again loosen restrictions on ESG considerations, this time in proxy voting. 81 F.R. 95882 (Dec. 29, 2016). DOL stated that "focusing on a 'cost-benefit analysis' demonstrating a 'more likely than not' enhancement in the economic value of the investment . . . may be read as discouraging fiduciaries from recognizing the long-term financial benefits that, although difficult to quantify, can result from thoughtful . . . engagement when voting proxies, establishing a proxy voting policy, or otherwise exercising rights as shareholders." *Id.* at 95881. This included "engaging companies on ESG issues," because DOL was concerned with being "out of step" with the actions of asset management organizations and "important domestic and international trends." *Id.* at 95881–84. IB 2016-01 neither cited *Dudenhoeffer* nor had substantive analysis of the "exclusive purpose" requirement.

### C.   2020 Regulations Regarding Pecuniary Factors

In 2020, recognizing the shortcomings of prior guidance, DOL replaced its sub-regulatory guidance by engaging in notice-and-comment rulemaking to amend the 1979 Investment Duties regulation codified at 29 C.F.R. § 2550.404a-1. These rules, the 2020 Investment Rule and 2020 Proxy Voting Rule, followed *Dudenhoeffer*'s focus on financial benefits and did not improperly single out ESG.

The 2020 Investment Rule adopted several changes to make clear that ERISA plan fiduciaries must evaluate investments "based only on pecuniary factors," weighed according to "impact on risk-return." 85 F.R. at 72846. The rule explained that "[p]roviding a secure retirement for American workers is the paramount, and eminently worthy, 'social' goal of ERISA plans." *Id.* at 72848. It also stated that "the duty of loyalty—a bedrock principle of ERISA, with deep roots in the common law of trusts—requires those serving as fiduciaries to act with a single-minded focus on the interests of beneficiaries," and "plan fiduciaries . . . must focus solely on the plan's financial risks and returns." *Id.* DOL found "sufficient reasons to justify the promulgation of the final rule, including the lack of precision and consistency in the marketplace with respect to defining ESG investments and strategies, shortcomings in the rigor of the prudence and loyalty analysis by some participating in the ESG investment marketplace, and perceived variation in some aspects of [DOL's] past guidance on the extent a fiduciary may consider non-pecuniary factors in making investment decisions." *Id.* at 72850.

The rule did not mention ESG factors in § 2550.404a-1's text, instead providing that a "fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives," and "may not sacrifice investment return or take on additional investment risk to promote non-pecuniary benefits or goals." *Id.* at 72884 (previous 29 C.F.R. § 2550.404a-1(c)(1) (2021)). The rule included a narrow tiebreaker provision that applied only to "economically indistinguishable" investment alternatives. *Id.* at 72860–61, 72884 (previous 29 C.F.R. § 2550.404a-1(c)(2) (2021)). To protect beneficiaries, it required documentation "to prevent fiduciaries from improperly finding economic equivalence." *Id.* at 72851; *see id.* at 72884 (previous 29 C.F.R. § 2550.404a-1(c)(2)(i)-(iii) (2021)). It also prohibited selecting a QDIA when its "investment objectives or goals or its principal investment strategies include, consider, or indicate the use of one or more non-pecuniary factors." *Id.* at 72884 (previous 29 C.F.R. § 2550.404a-1(d)(2)(ii) (2021)). "Pecuniary factor" meant "a factor that a fiduciary prudently determines is expected to have a material effect on [the risk-return] of an investment based on appropriate investment

horizons" under the plan's objectives and policy. *Id.* at 72884 (previous 29 C.F.R. § 2550.404a-1(f)(3) (2021)).

The 2020 Proxy Voting Rule aimed to clarify voting requirements, allaying concerns that fiduciaries must vote every proxy. This rule was also clear that plan fiduciaries must "not subordinate" participant or beneficiary financial interests or "promote non-pecuniary benefits or goals unrelated to th[e] financial interests of the plan's participants and beneficiaries." 85 F.R. at 81694 (previous 29 C.F.R. § 2550.404a-1(e)(2)(ii)(C) (2021)). In addition, the rule required fiduciaries to maintain records on proxy voting and other exercises of shareholder rights. *Id.* at 81694 (previous 29 C.F.R. § 2550.404a-1(e)(2)(ii)(E) (2021)).

### III. 2021 EXECUTIVE ORDERS, NON-ENFORCEMENT OF 2020 RULES, AND 2022 RULE

#### A. 2021 Executive Orders and Non-Enforcement of 2020 Rules

On January 20, 2021, President Biden issued Executive Order ("E.O.") 13990, directing agencies to consider suspending, revising, or rescinding regulations from the prior administration that were inconsistent with the E.O.'s new environmental policies. "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," 86 F.R. 7037 (Jan. 25, 2021). DOL subsequently announced it would pause enforcing the 2020 rules. Emp. Benefits Sec. Admin., DOL, *Statement Regarding Enforcement of its Final Rules on ESG Investments and Proxy Voting by Employee Benefit Plans* (Mar. 10, 2021), https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/erisa/statement-on-enforcement-of-final-rules-on-esg-investments-and-proxy-voting.pdf.

On May 20, 2021, President Biden issued E.O. 14030, titled "Executive Order on Climate-Related Financial Risk," 86 F.R. 27967 (May 25, 2021). It included policies related to the alleged "intensifying impacts of climate change" and "failure of financial institutions to appropriately and adequately account for and measure these physical and transition risks." *Id.* at 27967, sec. 1. It then directed DOL to consider superseding the 2020 rules. *Id.* at 27968–69, sec. 4(b).

### A.    2021 Notice of Proposed Rulemaking

DOL subsequently published a notice of proposed rulemaking ("NPRM") to amend 29 C.F.R. § 2550.404a-1, titled "Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights," 86 F.R. 57272 (Oct. 14, 2021). Notwithstanding ERISA's clear focus on financial returns and the absence of any mention of ESG in § 2550.404a-1, DOL "intended to address uncertainties . . . regarding the consideration of climate change and other ESG issues by fiduciaries." 86 F.R. at 57299.

The NPRM proposed multiple changes, including the addition of language that a fiduciary's duty of prudence "may often require an evaluation of the economic effects of climate change and other ESG factors," *id.* at 57276, expanding the narrow tiebreaker provision allowing consideration of "collateral factors," *id.* at 57278, and deleting the term "pecuniary factor" that required fiduciaries to prioritize financial considerations over collateral goals, consistent with *Dudenhoeffer. Id.* at 57278 & n.37. It also proposed changes to proxy voting rules, *id.* at 57280, eliminating certain record-keeping requirements, *id.* at 57282, and requiring fiduciaries to identify investment options chosen for collateral-benefit characteristics. 86 F.R. at 57279, 57303.

ERISA investment advisors understood that the proposed rule "would remove barriers to plan fiduciaries' ability to consider climate change and other ESG factors when selecting plan investments." APP151-52, *Fingage Advisors and OWL Analytics Partner to Bring Custom ESG Solutions to the Retirement Space*, Newsroom, Fingage (Nov. 16, 2021), https://www.fingage.com/newsroom/2021/11/16.

### B.    2022 Rule

The final 2022 Rule reflects many of the changes proposed in the NPRM, broadening the role that nonpecuniary factors may play in a fiduciary's analysis and eliminating recordkeeping protections. It removes the pecuniary/nonpecuniary distinction that tracked *Dudenhoeffer. See* 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(c)(1), (e)). It removes the "economically indistinguishable" standard, replacing it with a tiebreaker threshold that allows

pursuit of collateral benefits if "competing investments . . . equally serve the financial interest of the plan over an appropriate time horizon." *Id.* (new 29 C.F.R. § 2550.404a-1(c)(2)). It does not retain the disclosure requirement for when fiduciaries select investments for "collateral benefits," adopting reasoning that such "collateral" factors have "no economic relevance" and "will not advance intelligent investment behavior." *Id.* at 73840–41. It removes the limitation on QDIAs and authorizes consideration of "participants' preferences." *Id.* at 73885. And it deletes the express requirement that proxy voting and exercise of other shareholder rights not "promote non-pecuniary benefits or goals," along with the requirement that fiduciaries must "[m]aintain records on proxy voting activities and other exercises of shareholder rights." *Compare* 29 C.F.R. § 2550.404a-1(e)(2)(ii)(C), (E) (2021), *with* 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(e)(ii)(C), (E)). Most provisions became effective January 30, 2023. *Id.* at 73886.

## ARGUMENT

### PLAINTIFFS HAVE STANDING TO CHALLENGE THE 2022 RULE

A party satisfies Article III standing by "showing that it has suffered an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (cleaned up). "If, in a suit challenging the legality of government action, the plaintiff is himself an object of the action[,] there is ordinarily little question that the action or inaction has caused him injury, and that a [favorable] judgment will redress it. Whether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Id.* (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264–65 (5th Cir. 2015)). "An increased regulatory burden [also] typically satisfies" injury in fact. *Id.* The injury "need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (cleaned up). One party with standing is sufficient for the Court to address the merits of a rulemaking under the APA. *BST Holdings v. OSHA*, 17 F.4th 604, 610 n.6 (5th Cir. 2021).

### A. Private Plaintiff Standing

#### 1. Liberty and Liberty Services

Liberty Oilfield Services LLC ("Liberty Services") is a subsidiary of Liberty Energy Inc. ("Liberty"), a publicly traded energy company. APP003, Stock Decl. ¶ 1. Liberty Services has operations throughout the United States, including in the Haynesville shale located in Eastern Texas and Western Louisiana, and it sponsors a defined contribution 401(k) plan for its employees, covered by ERISA. APP004, Stock Decl. ¶¶ 2-3. Liberty Services firmly wants its 401(k) plan to be managed for the sole purpose of maximizing financial benefits for its employees and not to pursue collateral goals, both because it believes this is the best outcome for its employees and because it offers the 401(k) plan to attract quality employees and help them retire with financial security. APP004, Stock Dec. ¶ 3; *see also* APP011, Poppel Decl. ¶ 3 Accordingly, Liberty Services expends resources to identify and hire quality investment advisors to help manage its 401(k) plan. APP004–05, Stock Decl. ¶ 4–7.

Liberty Services has standing, including on behalf of its investment committee, as an object of the regulation. *See EEOC*, 933 F.3d at 446. Under the 2022 Rule, Liberty Services (and its employees) will be forced to expend additional time and resources monitoring and reviewing recommendations from the plan's investment advisors, without the benefit of recordkeeping requirements or strict regulations, to ensure the advisors are focusing only on pecuniary considerations and not collateral ESG factors. APP006, Stock Decl. ¶ 10–15; *see also* APP010–11, Poppel Decl. ¶¶ 3–8. Increased fiduciary discretion "renders 'less solid' the participants' benefits by shifting the risk to the participant," resulting in "an injury-in-fact." *Johnson v. Allsteel, Inc.*, 259 F.3d 885, 888 (7th Cir. 2000) (citation omitted); *see also Bell v. Xerox Corp.*, 52 F. Supp. 3d 498, 505 (W.D.N.Y. 2014) (adding a reservation-of-rights clause to an employee benefit plan created injury for ERISA suit). In addition, ESG is undefined by the 2022 Rule, as is the time period over which the investments should be considered, which makes ESG value propositions difficult, if not impossible, to quantify. APP006, Stock Decl. ¶ 14. Considering ESG factors will greatly complicate management of the 401(k) plan, again

requiring additional resources. *Id.*

Liberty similarly has standing as an object of the regulation, which "is a flexible inquiry rooted in common sense." *Contender Farms*, 779 F.3d at 265. This Court has held, for example, that the "practical impact" on family members of a regulated party, and the "interference as to their lives," is sufficient for standing. *Id.* (quoting *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 518 (5th Cir. 2014)). Regulation of a subsidiary likewise has practical impact on the parent company and interferes with its business operations.

Liberty will likely be further harmed by decreased interest from investors and access to investment capital. Liberty's funding costs are determined, in large part, by its performance in public equity markets. APP007, Stock Decl. ¶ 21. With increased ability to consider ESG factors under ERISA, plan fiduciaries can and likely will steer investment away from oil and gas companies like Liberty to ESG-aligned funds, raising Liberty's costs and placing it at a competitive disadvantage for funding. APP007–10, Stock Decl. ¶¶ 22–26; *see* APP055-59, Dismukes Decl. ¶¶ 16–20, 24–25.[4] Plan fiduciaries also have increased latitude to engage Liberty on collateral ESG considerations and vote plan assets in support of such proposals (or otherwise make investments that will have the same result), inviting explicitly nonpecuniary activists to wage costly campaigns against Liberty and divert its focus from maximizing shareholder value. APP006-8, Stock Decl. ¶ 15–20. Given the dominance of ESG investment among institutional shareholders and proxy advisors, it is likely they will exercise their new discretion to prioritize ESG considerations. APP059, Dismukes Decl. ¶ 24.

Both increased costs and potential loss of funding, even if indirect, are sufficient injury to establish standing. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019) (loss of funding); *BST Holdings*, 17 F.4th at 618 (compliance and monitoring costs); *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (competitive

---

[4] According to CSRHub, Liberty (formerly Liberty Oilfield Services Inc.) has an ESG score in the 25th percentile. *Liberty Oilfield Services Inc. ESG Rating*, CSRHub (last accessed Feb. 14, 2023), https://www.csrhub.com/CSR_and_sustainability_information/Liberty-Oilfield-Services-Inc.

disadvantage); *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010) (being denied legal protections results in direct pecuniary injury).

These injuries are fairly traceable to the 2022 Rule. Traceability "requires no more than de facto causality," *Dep't of Com.*, 139 S. Ct. at 2565–66, and neither company would incur these injuries but for changes implemented by the new rule. It makes no difference that some of the injuries involve third parties, because injuries from even "unfounded" and "unlawful third-party action" provides standing if it is the "likely" and "predictable" consequence of government action. *Id.* This Court need look no further than DOL's own flip-flopping for nearly 30 years, which demonstrates concern that plan fiduciaries were breaching their obligations and considering collateral factors in violation of the strict requirements of ERISA. *See supra* Background Parts II–III. DOL was even explicit that before the clear limitations articulated in the 2020 rules, it observed "shortcomings in the rigor of the prudence and loyalty analysis by some participating in the ESG investment marketplace." 85 F.R. at 72850; 85 F.R. at 81678; *see also* 73 F.R. at 61735 ("A less rigid rule would allow fiduciaries to act on the basis of factors outside the economic interest of the plan.").

These injuries are also redressable by this Court. "[C]ausal connection and redressability are two sides of the same coin." *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012 n.2 (9th Cir. 2018) (cleaned up). Plaintiffs "need only show that a favorable ruling could potentially lessen [the] injury, . . . not definitively demonstrate that a victory would completely remedy the harm." *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014). The 2022 Rule loosens protections against unlawful fiduciary activity, removes reporting requirements to ensure compliance, and changes requirements for proxy voting, so enjoining the changes and vacating the 2022 Rule will logically halt the harms it threatens, restoring the more rigid 2020 rules.

This standing analysis is confirmed by the common law of trusts. ERISA incorporates common law trust principles, *see Varity Corp. v. Howe*, 516 U.S. 489, 496–97 (1996); *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985); *infra* Argument Part

13

II.A.1.b, and those principles establish a traditional injury that supports standing, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) (explaining injury is sufficient for standing if closely related to "harm traditionally recognized as providing basis for lawsuit in American courts"); *Perez v. McCreary, Veselka, Bragg & Allen P.C.*, 45 F.4th 816, 822 (5th Cir. 2022) (recognizing "harm . . . similar in kind to a type of harm that the common law has recognized as actionable"). Trustees have historically been authorized to sue to vindicate the interests of a trust and its beneficiaries, including to prevent a breach of trust. *See, e.g.*, Restatement (Third) of Trusts § 107(1). While "the policy of the trust law is to prefer (as a matter of default law) to remove altogether the occasions of temptation rather than to monitor fiduciary behavior and attempt to uncover and punish abuses when a trustee has actually succumbed to temptation," *id.* § 78 cmt. b, the 2022 Rule loosens the restrictions and reporting requirements placed on fiduciaries, increasing fiduciary flexibility and the likelihood of mixed motives, imprudent investment options, and increased monitoring costs, to the detriment of Liberty Services, its 401(k) plan, and its participants and beneficiaries. This creates redressable injury for standing purposes. *See also Johnson*, 259 F.3d at 888.

## 2. Western Energy Alliance

Western Energy Alliance has standing for reasons similar to Liberty and Liberty Services. It sponsors a defined contribution 401(k) plan for its employees, hires an investment advisor to manage that plan, and will incur additional monitoring costs because of the 2022 Rule. APP015–17, Sgamma Decl. ¶ 11, 13–20. Alliance members also maintain 401(k) and other retirement plans covered by ERISA for their employees and will be further harmed when plan fiduciaries make investment decisions or recommendations that discriminate against oil and natural gas companies, or otherwise pursue objectives, based on nonpecuniary factors such as politicized ESG criteria. APP014–15, Sgamma Decl. ¶¶ 7–10; APP055-59, Dismukes Decl. ¶¶ 16–20, 24–25.

### 3.   James R. Copland

James R. Copland is a plan participant in ERISA retirement plans and will be injured by the 2022 Rule because the ERISA statute and regulations are instrumental in establishing the basic requirements for a retirement plan trust and the standards of conduct for plan fiduciaries, impacting the rights of plan participants and beneficiaries. APP022–23, Copland Decl. ¶¶ 2, 11–12; *see also Contender Farms*, 779 F.3d at 265 (horse show participants had standing as objects of regulation to challenge rule that required amending rulebook). Copland is just "as much [an] object[] of the Regulation" as fiduciaries to challenge the 2022 Rule. *Id.*

Copland's standing is further established by common law trust principles. *See supra* pp. 13–14 (citing cases). "A suit against a trustee of a private trust to enjoin or redress a breach of trust or otherwise to enforce the trust may be maintained only by a beneficiary or by a co-trustee, successor trustee, or other person acting on behalf of one or more beneficiaries." Restatement (Third) of Trusts § 94(1); *see id.* cmt. b ("A suit to enforce a private trust ordinarily . . . may be maintained by any beneficiary whose rights are or may be adversely affected by the matter(s) at issue."). ERISA incorporates this right of action by permitting suits "by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms to enforce his rights under the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this title or the terms of the plan." 29 U.S.C. § 1132(a)(3).

The 2022 Rule loosens the restraints and recordkeeping requirements placed on plan fiduciaries, thereby allowing them more discretion than ordinarily permitted, and certainly more discretion than under the 2020 rules. *Johnson*, 259 F.3d at 888; *Bell*, 52 F. Supp.3d at 505. Hence, the 2022 Rule increases the burden on Copland to monitor and hold accountable plan fiduciaries for breaches of conduct. *See supra* p. 12 (cases on injury).

Just as with the other plaintiffs, Copland's injuries are traceable to the regulation and redressable by favorable action by the Court because enjoining the 2022 Rule will restore the protections of the 2020 rules to him and other ERISA plan participants. *See supra* p. 13.

### B.   State Standing

Plaintiff States have standing to challenge the 2022 Rule because it harms their proprietary and *parens patriae* interests. And although the Plaintiff States have standing under the traditional analysis, their claim for standing is also entitled to "special solicitude."

First, Plaintiff States suffer a proprietary injury in the form of diminished tax revenues. This is a cognizable proprietary injury conferring Article III standing, as long as a State can identify "a loss of specific tax revenues" as opposed to "a decline in general tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 447–48 (1992). Here, many of the Plaintiff States treat retirement distributions as State taxable income to the extent they collect an income tax.[5] The 2022 Rule, however, will likely result in a decrease in the amount of retirement distributions for State residents, and thus tax revenue from those distributions, by increasing ESG investing, which (1) does not perform as well as non-ESG investing, and (2) involves higher management fees. APP028–31, Bhagat Decl. ¶¶ 8–14. Further, Plaintiff States suffer a proprietary injury from the fact that the higher cost of capital will affect businesses in their States (such as Liberty and Liberty Services), *see supra* Argument Part I.A.1, which will result in lost tax revenue, investments, and jobs. *See* APP059-64, Dismukes Decl. ¶¶ 24–42; *see also Louisiana v. Becerra*, __ F. Supp. 3d __, 2022 WL 4370448, at *6 (W.D. La. Sept. 21, 2022) (standing based on "the alleged loss of jobs [and] businesses").

Second, Plaintiff States have standing to challenge the 2022 Rule as *parens patriae* because the Rule will harm the economic well-being of their residents. *Parens patriae* standing allows a State to sue a defendant to protect the interests of its citizens at large. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600–02 (1982). To invoke *parens patriae* standing, a State "must assert an injury that has been characterized as a *quasi-sovereign* interest." *Becerra*, 2022 WL 4370448, at *5 (citing *Alfred L. Snapp*, 458 U.S. at 601). "[A] State has a quasi-sovereign interest

---

[5] *See, e.g.*, Ala. Code § 40-18-13(a); Ga. Code Ann. § 48-7-27(a), (a)(4), (a)(5.1), (a)(7); Ind. Code § 6-3-1-8; Kan. Stat. Ann. §§ 79-32,116, 79-32,117; Mo. Rev. Stat. § 143.124; Ohio Rev. Code § 5747.01(A); Utah Code §§ 59-10-101(z), 59-10-103(1)(a), 59-10-104(2)(b); Va. Code § 58.1-322; W. Va. Code §§ 11-21-4e, 11-21-11, 11-21-12; *see also* 26 U.S.C. §§ 61, 62, 408(d)(1) (distributions from retirement plans generally included in federal gross income).

in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp*, 458 U.S. at 607. Given that its citizens and businesses are injured by the 2022 Rule, *see* APP028–31, Bhagat Decl. at ¶¶8–14, the Plaintiff States have *parens patriae* standing to bring this action, *see, e.g.*, *Louisiana v. Horseracing Integrity & Safety Auth., Inc.*, __ F. Supp. 3d __, 2022 WL 2960031, at *7 (W.D. La. July 26, 2022).[6]

Third, several of Plaintiff States have significant oil and gas deposits, and fossil fuel companies have a substantial presence in those States for the purpose of oil and gas exploration and extraction. Several Plaintiff States—including at least Louisiana, Texas, and Utah—also share in proceeds from oil and gas leasing on federal lands or adjoining federal waters under the Outer Continental Shelf Lands Act, the Gulf of Mexico Energy Security Act, and/or the Mineral Leasing Act. *See* APP062–64, Dismukes Decl. at ¶¶ 35–42. The 2022 Rule will result in reduced investment in the fossil fuel industry, which will reduce the revenue that accrues to the Plaintiff States through oil and gas extraction on State lands, federal property in those States, or federal waters adjoining those States. *Id.* at ¶¶ 33–34. Reduced investment in the fossil fuel industry will also decrease employment, adversely impact industries that support fossil fuel development, and decrease overall economic activity and tax revenue. *Id.* at ¶¶ 31–42.

Finally, Plaintiff States warrant special solicitude in the standing analysis. "'States are not normal litigants for the purposes of invoking federal jurisdiction' and may be 'entitled to special solicitude.'" *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) (citation omitted)). "When special solicitude is appropriate, a state can establish standing 'without meeting all the

---

[6] *Parens patriae* standing exists even though the Plaintiff States are suing the federal government. As a general matter, a State "does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp*, 458 U.S. at 609 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-85 (1923)). An important exception to that rule, however, is that "states have *parens patriae* standing where the state is bringing an action on behalf of citizens to enforce rights guaranteed by a federal statute," including when "Plaintiff States allege the Agency Defendants violated the APA." *Becerra*, 2022 WL 4370448, at *5 (citing *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015)). Here, because the Plaintiff States' claims concern how the DOL's 2022 Rule violates ERISA and the APA, Plaintiff States can proceed on a *parens patriae* theory of standing against the federal defendants.

normal standards for redressability and immediacy.'" *Id.* (citation omitted). Special solicitude has "two requirements": "(1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Id.* The Plaintiff States satisfy the first requirement because they are asserting "a procedural right under the APA to challenge agency action." *Id.* They also satisfy the second because, as discussed above, the 2022 Rule affects the Plaintiff States' quasi-sovereign interest in the economic well-being of their residents.

## II.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, Plaintiffs "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). Here, each factor weighs in the Plaintiffs' favor.

### A. The 2022 Rule Violates ERISA

The 2022 Rule violates ERISA because it permits fiduciaries to act with nonfinancial objectives even though the statute requires them to act exclusively for the purpose of obtaining financial benefits. DOL has authority to "carry out" the provisions of ERISA, 29 U.S.C. § 1135, but "[i]t is a fundamental precept of administrative law that an agency action, rule, or regulation 'cannot overcome the plain text enacted by Congress.'" *Sierra Club, Inc. v. Sandy Creek Energy Assocs.,* 627 F.3d 134, 141 n.9 (5th Cir. 2010) (citation omitted). DOL thus "attempts to rewrite the law that is the sole source of its authority. This it cannot do." *U.S. Chamber of Com. v. DOL*, 885 F.3d 360, 373 (5th Cir. 2018).

#### 1.   The Plain Language of ERISA Requires That Fiduciaries Act for the "Exclusive Purpose" of Providing Financial "Benefits"

ERISA requires that "the assets of a plan . . . shall be held [in trust] for the *exclusive purposes* of providing benefits to participants in the plan and their beneficiaries and defraying

18

reasonable expenses of administering the plan" 29 U.S.C. § 1103(a), (c)(1) (emphasis added). It also requires that fiduciaries act "*solely* in the interest of the participants and beneficiaries and . . . for the *exclusive purpose* of . . . providing benefits to participants and their beneficiaries." *Id.* § 1104(a)(1) (emphasis added). Congress was clear in what it meant by "exclusive purpose," "solely," and "benefits."

### a.   "Benefits" Means Exclusively Financial Benefits

In 2014, the Supreme Court unanimously concluded in *Dudenhoeffer* that ERISA requires fiduciaries to pursue "financial benefits," not "nonpecuniary benefits." The Court considered in that case whether it was presumptively prudent to use ERISA assets to purchase company stock as part of an employee stock ownership plan since Congress had elsewhere authorized these plans "to promote employee ownership of employer stock, a goal that Congress views as important." 573 U.S. at 420. The Court rejected the presumption because the term "benefits" when used to describe ERISA's fiduciary duties "refer[s] to the sort of *financial* benefits (such as retirement income) that trustees who manage investments typically seek to secure for the trust's beneficiaries." *Id.* at 421. The Court then cited ERISA's definitions of "employee pension benefit plan" and "pension plan," which focus on "retirement income" or other "deferral of income," *id.* (citing 29 U.S.C. § 1002(2)(A)), thereby tying the term "benefits" to "income." And the Court further stated that "benefits" "does not cover nonpecuniary benefits like those supposed to arise from employee ownership of employer stock." *Id.*

*Dudenhoeffer* is particularly informative for analyzing the 2022 Rule and its explicit recognition of ESG investing. Like the goal of increasing "employee ownership of employer stock," ESG considerations outside a risk-return analysis aim to achieve "collateral benefits," such as preferred social policies and benefits to third parties. Pursuing these "nonpecuniary benefits" exceeds the plain language of ERISA. *Id.* at 421. Such ESG investing is even easier to classify as outside of ERISA's approved purposes because employee ownership of employer

stock at least was tied to plan participants and associated statutes. *See id.* at 420–21.

### a. "Exclusive Purpose" and "Solely" Mean Only Purpose

*Dudenhoeffer* also recognized that ERISA requires the "benefits" discussed above to be the "'exclusive purpose' to be pursued by all ERISA fiduciaries." 573 U.S. at 421 (quoting 29 U.S.C. § 1104(a)(1)(a)(i), (ii)). By using "exclusive purpose" and "solely" in sections 403 and 404, Congress directly spoke to the purposes for which ERISA fiduciaries may act.

As discussed above, ERISA's fiduciary duties derive from the common law of trusts. *See supra* pp. 13–14. ERISA requires undivided loyalty from fiduciaries in the form of the "sole interest" rule, also known as the "sole benefit" or "exclusive benefit" rule. *See* Restatement (Third) of Trusts § 78(1) cmt. a (the sole interest standard "states the trust law's fundamental principle of undivided loyalty"); *see also* Restatement (Second) of Trusts § 170(1) (same).[7] Under that rule, "ERISA requires that the fiduciary of a plan discharge his duties solely for the benefit of the plan participants and beneficiaries and that the assets of an employee benefit plan 'shall never inure to the benefit of the employer.'" *Wash.-Balt. Newspaper Guild Local 35 v Wash. Star Co.*, 555 F. Supp. 257, 259 (D.D.C. 1983) (citing 29 U.S.C. §§ 1104(a)(1)(A), 1103(c)(1)), *aff'd without opinion*, 729 F.2d 863 (D.C. Cir. 1984)); *see also Borst v. Chevron Corp.*, 36 F.3d 1308, 1320 (5th Cir. 1994) ("Both tax law and ERISA require the funds of a pension plan be used 'for the exclusive benefit of' the plan participants." (citing 26 U.S.C. § 401(a)(2); 29 U.S.C. § 1103(c)(1)). Fiduciaries must act with "complete and undivided loyalty to the beneficiaries," *Donovan v. Mazzola*, 716 F.2d 1226, 1238 (9th Cir. 1983) (citation omitted), and with "single-minded devotion," *Gregg v. Transp. Workers of Am. Intern.*, 343 F. 3d 833, 840 (6th Cir. 2003) (citation omitted). The Fifth Circuit has described these fiduciary duties as "the highest known to the law." *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190, 194 (5th Cir. 2020).

---

[7] The Restatements of Trusts are authoritative in the ERISA context. *See Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (citing Restatement (Third) of Trusts § 90 cmt. b); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-12, 115 (1989) (citing Restatement (Second) of Trust § 187 (1959)).

The "exclusive benefit" rule means that "the trustee has a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust." Restatement (Third) of Trusts § 78 cmt. f. This includes "advancing or expressing the trustee's personal views concerning social or political issues or causes." *Id.* § 90 cmt. c. The Supreme Court has long held that "[a] fiduciary cannot contend 'that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" *NLRB v. Amax Coal Co.*, 453 U.S. 322, 330 (1981) (quoting *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 269 (1941)); *see also id.* at 332 ("ERISA essentially codified the strict fiduciary standards that a § 302(c)(5) trustee must meet."). Mixed motives thus result in "an irrebuttable presumption of wrongdoing." *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021) (quoting John H. Langbein & Daniel R. Fischel, *ERISA's Fundamental Contradiction, The Exclusive Benefit Rule*, 55 U. Chi. L. Rev. 1105, 1114–15 (1988)); *see Amax Coal Co.*, 453 U.S. at 330; Op. Ky. Att'y Gen. 22-05, at 5 (May 26, 2022), https://ag.ky.gov/Resources/Opinions/Opinions/OAG%2022-05.pdf. Trust law "prefer[s] (as a matter of default law) to remove altogether the occasions of temptation rather than to monitor fiduciary behavior and attempt to uncover and punish abuses when a trustee has actually succumbed to temptation." Restatement (Third) of Trusts § 78 cmt. b.

The structure of ERISA confirms that when Congress wanted to create exceptions to the exclusive benefit rule, it did so explicitly. ERISA expressly provides exceptions to the exclusive benefit rule for removal of trust assets. *See Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000). Section 403(c) similarly lists exceptions. 29 U.S.C. § 1103(c). In addition, section 406 forbids "prohibited transactions" and proscribes various types of self-dealing and other conflicts of interest, *id.* § 1106, again with enumerated exceptions in section 408, *id.* § 1108. The expression of these exceptions implies the exclusion of others. *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).

Legislative history also confirms that the purpose of the "exclusive purpose" and "solely"

language was to enact an "exclusive benefit" rule into ERISA. *See* Langbein & Fischel, *supra*, at 1108 n.20; James D. Hutchinson & Charles G. Cole, *Legal Standards Governing Investment of Pension Assets for Social and Political Goals*, 124 U. Pa. L. Rev. 1340, 1365–67 (1980) (cataloging rejected legislative proposals to show Congress's intent to narrow the scope of a fiduciary's discretion). Moreover, "ERISA's exclusive benefit rule has a half-century of prehistory in other federal pension legislation" to support the same conclusion. Langbein & Fischel, *supra*, at 1109 (citing statutes).

In sum, Congress spoke clearly that financial "benefits" are the *only* purpose for which ERISA fiduciaries may act. ESG is treated as any other factor and is permissible only when the fiduciary reasonably concludes the factor will benefit the beneficiary directly by improving risk-adjusted return of a particular investment, *and* the fiduciary's exclusive motive is to obtain this direct benefit.

### 2. The 2022 Rule Exceeds DOL's Statutory Authority and Is Contrary to Law

Despite ERISA's clear commands, the 2022 Rule expressly authorizes fiduciaries to act, or removes prohibitions on acting, for nonpecuniary purposes. DOL cannot adopt a rule that is contrary to ERISA. *See* 5 U.S.C. § 706(2)(A), (C); *Chamber of Com.*, 885 F.3d at 373.

First, the 2022 Rule purports to authorize a fiduciary to select an investment or investment course of action "based on collateral benefits other than investment returns" whenever the fiduciary "prudently concludes that competing investments . . . equally serve the financial interests of the plan over the appropriate time horizon." 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(c)(2)). Any nonpecuniary tiebreaker is not authorized by ERISA and violates its strict "exclusive benefit" rule.

The new standard also falls short of requiring fiduciaries to select the best available investments for risk-adjusted return. This is particularly apparent when compared to the 2020 Investment Rule, which required a fiduciary to be "unable to distinguish on the basis of pecuniary factors alone" before he could consider a tiebreaker. 29 C.F.R. § 2550.404-1(c)(2)

(2021). Indeed, relaxing this standard was intentional in the 2022 Rule and exactly why some commenters requested the change. *See* 87 F.R. at 73835 (describing tiebreaker circumstances as "unrealistically difficult and prohibitively stringent" and "rare and unreasonably difficult to identify"); *id.* at 73836–37 (standard is "impractical"). This, too, violates ERISA. Only Congress can change its policy decision. *See Chamber of Com.*, 885 F.3d at 379.

This relaxed standard over an undefined "time horizon" will also be hard, if not impossible, to assess with any certainty, increasing the likelihood of suboptimal investments. And it creates a slippery slope that leads to false equivalence and abuse that will be equally difficult to disprove, especially with the elimination of recordkeeping requirements, discussed below.[8] DOL has previously recognized the risk of loose tiebreaker standards. *See, e.g.*, 85 F.R. at 72850; 73 F.R. at 61735.

Second, the 2022 Rule deletes the prohibition on exercising proxy rights to "promote non-pecuniary benefits or goals unrelated to those financial interests of the plan participants and beneficiaries." *Compare* 29 C.F.R. § 2550.404a-1(e)(2)(ii)(C) (2021), *with* 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(d)(2)(ii)(C)). The purpose of this deletion is to eliminate a clear regulatory command, but that command follows directly from the ERISA's text and *Dudenhoeffer*.

Both of these changes in the 2022 Rule authorize fiduciaries to consider and promote "nonpecuniary benefits," even though as explained in *Dudenhoeffer* and elsewhere, ERISA fiduciaries may *only* act with the motive to further the *financial* benefits of the plan assets. Contrary to ERISA and Congress's clearly expressed intent, the changes make it easier for fiduciaries to act with mixed-motives and harder for beneficiaries to police such conduct.

It doesn't matter that DOL insists fiduciaries must adhere to their duties and can never subordinate the financial interests of plan participants and beneficiaries. 87 F.R. at 73853 (claiming rule "emphatically addresses potential loyalty breaches"). Elsewhere DOL admits

---

[8] This change transforms the 2020 Investment Rule's strict tiebreaker into something that occurs regularly, and thus broadly authorizes acting for the purpose of collateral benefits.

that such hortatory language cannot compensate for the lack of strict regulation. 85 F.R. at 72847, 72850; 85 F.R. at 81678; 73 F.R. at 61735. And "the policy of the trust law is to prefer (as a matter of default law) to remove altogether the occasions of temptation rather than to monitor fiduciary behavior and attempt to uncover and punish abuses when a trustee has actually succumbed to temptation." Restatement (Third) of Trusts § 78 cmt. b. Again, "a fiduciary cannot contend 'that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" *Amax Coal*, 453 U.S. at 330 (quoting *Woods*, 312 U.S. at 269).

It likewise makes no difference that DOL has issued sub-regulatory guidance permitting the use of ESG (formerly ETI) factors in the past. The guidance has been far from consistent, never grappled with *Dudenhoeffer*; and, unlike the present regulation, was more often aimed at stating that ESG could be used as a financial factor rather than for its collateral benefits. *See supra* Background Part II. And it does not appear that a court has ever held that an exception for tiebreakers is lawful. In any event, DOL cannot change ERISA's plain meaning. *See Chamber of Com.*, 885 F.3d at 373.

The idea of a generally applicable tiebreaker is also wrong because if two assets (or funds) have returns that are less than perfectly correlated (correlation is less than 1.0), then financial economics teaches that the investor should invest in both to diversity the portfolio, putting aside liquidity constraints and transaction costs. *See* APP031, Bhagat Decl. at ¶¶ 15–16.; *Schweitzer*, 960 F.3d at 197 n.36 ("By the Efficient Market Hypothesis and modern portfolio theory, stock prices in efficient markets do not reflect risks that an investor could eliminate through diversification. [And] 'the market does not reward investors who fail to diversify [business-specific] risk down to zero.'" (quoting Jeffrey J. Haas, *Corporate Finance* 113 (2014))). DOL itself even undermines the need for a tiebreaker: "no two investments are the same in each and every respect." 87 F.R. at 73837.

The "exclusive purpose" and "solely" language in ERISA shows Congress's concern was to mandate prudent financial investment based on risk-return full stop, and it did not delegate

authority to DOL to permit fiduciaries to act for nonpecuniary purposes.

### 3.    The 2022 Rule Also Fails Under the Major Questions Doctrine

The major questions doctrine confirms that DOL cannot authorize or allow ERISA fiduciaries to consider nonpecuniary factors. The key question is "whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). In certain "extraordinary cases," specifically those where the claimed authority carries substantial "economic and political significance," courts should "hesitate before concluding that Congress meant to confer such authority." *Id.* Nothing overcomes that hesitation here.

The 2022 Rule has vast economic significance. ERISA covers approximately 747,000 retirement plans, 2.5 million health plans, and 673,000 other welfare benefit plans. Emp. Benefits Sec. Admin., DOL, *Fact Sheet: EBSA Restores Over $1.4 Billion to Employee Benefit Plans, Participants, and Beneficiaries* (2022), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/ebsa-monetary-results-2022.pdf.   Employee benefit plans cover about 152 million workers and more than $12 trillion in assets, equivalent to more than two-thirds of the U.S. adult population and half of the nation's gross domestic product. *Id.* ESG and climate change are also issues of vast political significance. DOL promulgated the 2022 Rule to allow or encourage ERISA fiduciaries to manage plan assets consistent with the Biden Administration's expressed priorities to address the "climate crisis." 87 F.R. at 73823, 73825–26 (explaining 2022 Rule was drafted in response to E.O. 13990 and E.O. 14030). America's climate change policy, and ESG more generally, is "the subject of an earnest and profound debate across the country." *West Virginia*, 142 S. Ct. at 2614.

Two analogous cases demonstrate the applicability of the major-questions doctrine here. When the Occupational Safety and Health Administration, a DOL agency, claimed authority to require COVID-19 vaccination for 84 million Americans, the Court stayed the action because OSHA sought "to exercise powers of vast economic and political significance"

without clear authorization from Congress. *NFIB*, 142 S. Ct. at 665 (citing *Ala. Ass'n of Realtors*, 141 S. Ct. 2489 (2021)). The number of affected persons here is much greater, and the action no less controversial. Similarly, when DOL previously tried to reinterpret the reach of fiduciary duties under ERISA, a decision with "monumental significance to the financial services and insurance sectors of the economy," the Fifth Circuit recognized the doctrine's applicability to DOL's "intent to transform the trillion-dollar market for IRA investments." *See Chamber of Com.*, 885 F.3d at 366, 387–88.

The 2022 Rule thus requires clear authorization from Congress. *See NFIB*, 142 S. Ct. at 665. DOL based its authority on 29 U.S.C. § 1135, a general rulemaking provision that authorizes the Secretary to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of [ERISA]. Among other things, such regulations may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records." *See* 87 F.R. at 73855. This general language is insufficient to support DOL's claimed authority. *West Virgina*, 142 S. Ct. at 2609. Moreover, the included list of specific exercises of authority (*e.g.*, "defin[ing] accounting, technical, and trade terms") shows that Congress did not intend this housekeeping provision to effect changes of vast economic and political significance. *See Yates v. United States*, 574 U.S. 528, 544 (2015) (discussing *noscitur a sociis*). In other words, Congress did not hide an elephant in this mousehole. *See id.*

### B.   The 2022 Rule Is Arbitrary and Capricious

The 2022 Rule also fails because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A). "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (cleaned up). "[S]ignificant and viable alternatives" to a proposed regulatory action must be considered, *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (citation omitted), and the agency must articulate a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. If the agency fails to "cogently explain why it has exercised its discretion in a given manner," its action will be invalidated. *Id.* at 48.

In addition, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). An agency must consider a danger that is "within the ambit of the existing policy." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *State Farm*, 463 U.S. at 51. If an agency does not do so, then it "fails to supply the requisite 'reasoned analysis.'" *Regents*, 140 S. Ct. at 1899 (quoting *State Farm*, 463 U.S. at 57).

The 2022 Rule "bears hallmarks of 'unreasonableness' . . . and capricious exercises of administrative power," *Chamber of Com.*, 885 F.3d at 388, for at least six reasons.

### 1. The 2022 Rule Fails to Rebut DOL's Prior Finding that Strict Regulations Are Necessary to Protect Participants and Prevent Fiduciary Violations

The 2020 rules were adopted in part because, notwithstanding the general duties of prudence and loyalty, there were "shortcomings in the rigor of the prudence and loyalty analysis by some participating in the ESG investment marketplace." 85 F.R. at 72847, 72850; 85 F.R. at 81678. The 2022 Rule fails to rebut this prior DOL finding that strict regulations are necessary to protect participants and beneficiaries from financial harm due to these

shortcomings.

As the comment to the NPRM from Senate ranking members made clear, APP071–72, Senators' Letter 2–3, DOL needed to consider the 2022 Rule's effect on this danger to participants and beneficiaries—a danger well "within the ambit of the existing policy" and, indeed, its purpose. *Regents*, 140 S. Ct. at 1913. And because DOL was departing from the 2020 rules' factual finding, it was further required to provide "a more detailed justification" for its decision. *Fox*, 556 U.S. at 515.

Yet, as in the NPRM, the 2022 Rule does not repudiate the 2020 finding or even discuss it. Instead, the rule states that it "emphatically addresses potential loyalty breaches by forbidding subordination of participants' financial benefits under the plan to ESG or any other goal." 87 F.R. at 73853. But this general duty was the backdrop against which the 2020 rules were issued, and DOL nonetheless found it inadequate to protect participants, especially in the context of ESG. Critically, DOL does not call that finding into question. Nor does it dispute that the portions of the 2020 rules it rescinds were helpful and effective in protecting against this danger. Failure to consider and adequately explain departure from this finding renders the entire rulemaking arbitrary and capricious. *Fox*, 556 U.S. at 515. In fact, failure to consider the need to protect plan participants and beneficiaries is a common thread throughout the 2022 rulemaking.

### 1.  The Alleged Need for the 2022 Rule is Inadequate

DOL justified the 2022 Rule because the 2020 rules allegedly created a "chill" or "confusion" about consideration of ESG factors under ERISA. But DOL never identified who specifically was confused, what the source of confusion was, or that any such confusion or negative perceptions reduced *financial* returns for participants and beneficiaries. *See, e.g.*, APP083, Berry Letter 8 (raising this issue). "The NPRM thus proposes to fix a problem that does not exist by exacerbating a problem that does, but fails to weigh the benefits and burdens of doing so." APP108, Consumers' Research ("CR") Letter 9. The 2020 rules were clear that

ESG factors, just like any other factors, may and must be prudently considered insofar (and only insofar) as they affect the financial interests of participants and beneficiaries. Rather than include the term "ESG" or equivalents in the text, the 2020 rules included requirements of single-minded loyalty, exclusive focus on pecuniary factors, comparison among possible investments, and documentation of using the tiebreaker provision. APP109, CR Letter 10.

DOL also admits that its NPRM "created a misimpression" that it favored ESG factors. 87 F.R. at 73854. To cure that, the 2022 Rule deleted proposed text indicating that ERISA "may often require" consideration of ESG factors. *Id.* at 73830–31. But DOL left other references to ESG in the 2022 Rule, specifically countenancing those considerations. If the 2022 Rule's partial deletion of ESG-references from the NPRM, combined with preamble assurances of equal treatment, is enough to assuage concerns about pro-ESG bias, then the 2020 rules, which also included assurances of equal treatment and went even further by eliminating *all* references to ESG in the regulatory text, must necessarily have been enough to assuage concerns and any "chilling effect" about anti-ESG bias. Either there was no actual "chill" from the 2020 rules, or the 2022 Rule is internally inconsistent.

The 2022 Rule thus "cannot be adequately explained" by its alleged justification and "reveal[s] a significant mismatch between the decision the Secretary made and the rationale he provided." *Dep't of Com.*, 139 S. Ct. at 2575; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016) ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change." (cleaned up)); *AFGE, Loc. 2924 v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) (similar); *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994) (similar); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (similar). This also exposes the real motivation of the 2022 Rule—to allow use of ERISA funds to push President Biden's climate agenda.

### 2. The 2022 Rule's Changes Are Unreasonable, Internally Inconsistent, and Rely on Impermissible Considerations

The 2022 Rule is further arbitrary and capricious because many of its provisions are

unreasonable, internally inconsistent, fail to consider relevant factors, and "rel[y] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. This includes expansion of the tiebreaker that existed under the 2020 rules, express authorization to consider participants' preferences in selecting investments for participant-directed individual account plans, implicit authorization to pursue nonpecuniary factors in proxy voting and other exercises of shareholder rights, removal of documentation requirements, and elimination of protections for QDIAs.

### a. Expanding the Tiebreaker Provision

The 2022 Rule substantially expands the tiebreaker test. Even if collateral considerations were permissible under ERISA in tiebreaker situations—which they're not, *see supra* Argument Part II.A.2—the 2022 Rule fails to give any permissible reason for broadening that exception, 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(c)(2)). As *Dudenhoeffer* emphasizes, ERISA imposes strict fiduciary duties to protect the *financial* interests of plan participants. 573 U.S. at 421. Congress rejected proposals that would have allowed consideration of collateral factors in investing and expressed zero interest in allowing fiduciaries to achieve social or political objectives. *See, e.g.*, Hutchinson & Cole, *supra*, at 1365–67 (rejected legislative proposals).

DOL justified the tiebreaker provision in the 2022 Rule because there has been a tiebreaker provision in previous iterations of DOL guidance, including IB 94-1, and the tiebreaker provision in the 2020 rules was "impractical," 87 F.R. at 73836, citing comments that it set an "unrealistically difficult and prohibitively stringent standard" that was "rare and unreasonably difficult to identify," *id.* at 73835. But neither of these is a financial reason. Instead, DOL's reasons are circular and do not explain how the need for an expanded tiebreaker is based on participants' financial interests rather than desire to incorporate collateral considerations. Because, even on DOL's telling, the tiebreaker rule comes into play only as between options that are equally beneficial for participants' financial well-being, its use cannot advance Congress's purpose in enacting ERISA. Even if there were no reason to

believe the tiebreaker harmed participants' interests, it would be arbitrary to include and expand it, because the only reason to do so is to advance a factor Congress did not intend for consideration. *See, e.g.*, *State Farm*, 463 U.S. at 43; *Luminant*, 675 F.3d at 925–26, 930–32.

Further, the tiebreaker rule *does* harm participants from a financial perspective. The expanded, vague tiebreaker plays right into the "shortcomings in the rigor" of fiduciaries' prudence and loyalty analyses that DOL found in 2020, but DOL never analyzes this problem. *See also supra* Argument Part II.B.1. It also harms participants by failing to consider that "the possibility of pursuing collateral benefits gives fiduciaries an incentive to conclude that an investment that furthers such benefits is equivalent to an investment that does not, even when a candid review would find the latter investment superior." APP121–22, CR Letter 22–23; *see also supra* pp. 22–23.

Moreover, a fiduciary confronted with two equally beneficial investment options typically advances the participants' financial interests if he diversifies by investing in both options. *See supra* p. 24; APP031, Bhagat Decl. at ¶¶ 15–16; APP074, Senators' Letter 5; APP141, Utah Letter 3. In contrast, the tiebreaker rule would allow the fiduciary to make a single (more concentrated and thus riskier) investment. DOL attempts to rebut this critique by pointing to scenarios involving illiquid assets or high transaction costs. *See* 87 F.R. at 73836. But these scenarios do not support allowing a nonpecuniary tiebreaker for *all* situations—let alone show that the benefits of allowing the tiebreaker outweigh the harm to participants. Instead, DOL could have expressly limited its tiebreaker to when investments have identical risk-return *and* diversification is not possible or is prohibitively expensive. Retaining the tiebreaker rule for more than this rare scenario is based on a nonfinancial consideration.[9]

### a. Authorizing Consideration of Participants' Preferences

The 2022 Rule authorizes ERISA fiduciaries managing a participant-directed

---

[9] Proposed § 2550.404a-1(c)(2), which states, "[a] fiduciary may not, however, accept expected reduced returns or greater risk to secure such additional benefits," flips the burden to the participants and beneficiaries to prove there were actually "expected reduced returns or greater risk." Flipping the burden in this manner is arbitrary because DOL lacks a permissible basis for doing so.

individual account plan to select investment alternatives by considering "participants' preferences." 87 F.R. at 73841–42. This is a euphemism for considering nonpecuniary factors such as climate change and other ESG factors. *See id.* at 73860 (discussing studies suggesting some workers "would increase their overall contribution rate if an ESG option was offered"); *id.* at 73885 (new 29 C.F.R. § 2550.404a-1(c)(3)). Indeed, the 2022 Rule does not even provide a uniform approach for how fiduciaries are supposed to determine plan participants' preferences. There is no permissible justification for this change. *Cf. Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) ("[E]ven in a defined-contribution plan . . . plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options.").

> **b.** **Authorizing Nonpecuniary Factors in Proxy Voting and Other Exercises of Shareholder Rights**

The 2022 Rule's implicit authorization to pursue nonpecuniary factors in proxy voting and other exercises of shareholder rights is similarly unlawful because it is not based on financial factors. The rule deletes the prohibition, which tracked the language in *Dudenhoffer*, on exercising proxy rights to "promote non-pecuniary benefits or goals unrelated to those financial interests of the plan participants and beneficiaries." *Compare* 29 C.F.R. § 2550.404a-1(c)(2)(ii)(C) (2021), *with* 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(d)(2)(ii)(C)).

The deletion eliminates a clear regulatory command designed to promote ERISA's focus on financial benefits for participants and beneficiaries. DOL claimed that it was based on its conclusion that the clause serves "no independent function." 87 F.R. at 73847–48. Yet the commenters were concerned that it did serve a function—it forced fiduciaries to ensure that their actions were based on financial factors. *Id.* DOL never explained how it reached its contrary conclusion, and later it contradicted itself by suggesting this straightforward requirement "impose[s] additional duties and costs and potential for litigation." *Id.* Ultimately, as it did for the tiebreaker, DOL then reverts back to the circular argument that prior guidance was more relaxed than the 2020 rules. The 2022 Rule thus did not rely on any permissible

factors in eliminating the clear command from 29 C.F.R. § 2550.404a-1(e)(2)(ii)(C), especially when weighed against the increased risk of harm to plan participants and beneficiaries. Failure to provide adequate justification, and the accompanying internal inconsistency, renders the change arbitrary and capricious. *See, e.g.*, *Encino Motorcars,* 579 U.S. at 212; *State Farm,* 463 U.S. at 43.

### c. Removing Documentation Requirements for Fiduciaries Acting for Collateral Purposes

The 2022 Rule is arbitrary and capricious for jettisoning the 2020 rules' documentation requirements and failing to replace them with new ones. The 2022 Rule eliminated the specific documentation requirement for the tiebreaker rule on the ground that it might unduly burden use of collateral benefits to break ties. *See* 87 F.R. at 73838. But as noted above, there is no cognizable interest in using the tiebreaker rule, because it definitionally does not promote the financial interests of participants. So, any burden on using that rule is also not a cognizable factor, and rescinding the documentation requirement—meant to protect the financial interests of participants and beneficiaries, which ERISA actually recognizes—is arbitrary and capricious. *Luminant*, 675 F.3d at 925.

The 2022 Rule opines that the documentation requirement "can lead to conduct contrary to the plan's interests," including the risk that creating documentation "would result in increased transaction costs for no particular benefit to plan participants," estimated at half a million dollars in paperwork costs per year. 87 F.R. at 73838, 73871. But in a scenario where documentation would create net costs to participants, fiduciaries would simply be required by their duties of prudence and loyalty not to use the tiebreaker rule (*i.e.*, to forego the consideration of collateral benefits). The specter invoked by DOL could not arise and therefore cannot save the elimination of the documentation requirement from arbitrariness.

The 2022 Rule also abandons the 2020 rules' requirement to retain records of proxy votes. The rule does not take issue with the policy underlying that requirement, but rather worries it may somehow chill the exercise of proxy voting rights. *See* 87 F.R. at 73846. But the

APA requires more than the identification of myriad benefits for an action to be rational. Elimination of the documentation requirement imposes real costs on participants because it impedes their ability to monitor when their fiduciaries make investment and shareholder decisions that are concededly not designed to further the participants' financial interests— precisely the moment of greatest risk. APP097–98, Berry Letter at 22–23. DOL has not shown, or attempted to show, that these costs are worth the benefits it claims eliminating the requirement would achieve.

While the rule does explain that ERISA already requires certain documentation of proxy voting, *see* 87 F.R. at 73846, it never concludes that this pre-existing requirement renders the record retention requirements of the 2020 rules irrelevant. As far as DOL is concerned, the 2020 rules achieved an important objective, but it has nevertheless decided to abandon that objective in favor of another without weighing the two objectives against each other. Failure to do so here was arbitrary and capricious. *See, e.g.*, *Luminant*, 675 F.3d at 925. If DOL were truly worried about cost efficiency, it would not allow any consideration of collateral factors.

### d.   Eliminating Specific Restrictions on QDIAs

The rule is arbitrary and capricious for eliminating the specific restrictions on QDIAs and allowing plan fiduciaries to select funds that expressly prioritize nonpecuniary benefits, like ESG considerations, as the default investment for plan participants. *See* 29 C.F.R. § 2550.404a-1(d)(2)(ii). The rule admits that "QDIAs warrant special treatment because plan participants have not affirmatively directed the investments of their assets into the QDIA but are nevertheless dependent on the investments for long-run financial security." 87 F.R. at 73843. But the rule declines to afford special protection here, instead rescinding their special treatment under the 2020 rules. DOL also worries that the "chill" from the 2020 rules would infect the selection of QDIAs. *See* 87 F.R. at 73843. But this is no reason to abandon entirely the special treatment that DOL concedes QDIAs merit. Removing the restrictions was thus

internally inconsistent and unreasonable. *See, e.g.*, *Encino Motorcars,* 579 U.S. at 212; *State Farm*, 463 U.S. at 43.

### 3. The 2022 Rule Unreasonably Removed the Collateral Benefit Disclosure Requirement Included in the NPRM

The 2022 Rule declined to adopt a disclosure requirement proposed in the NPRM that would apply whenever a fiduciary considered a collateral benefit in selecting an investment for a participant-driven individual account plan. DOL initially proposed that the fiduciary "must ensure that the collateral-benefit characteristic of the fund, product, or model portfolio is prominently displayed in disclosure materials provided to participants and beneficiaries." 86 F.R. at 57303. The 2022 Rule eliminated this provision but remarkably does not clearly state why. Instead, it spells out the concerns of commenters, both in favor and opposed, and then states: "Based on the foregoing concerns, and reasons similar to those underlying the decision to remove the documentation requirements from the current regulation, the final rule does not adopt the proposed" requirement. *Id.* at 73841.

This decision was arbitrary and capricious because DOL fails to clearly explain it. *Sw. Airlines Co. v. Fed. Energy Regul. Comm'n*, 926 F.3d 851, 856 (D.C. Cir. 2019) ("A full and rational explanation becomes especially important when, as here, an agency elects to shift its policy or depart from its typical manner of administering a program." (quotation omitted)). DOL does not assert that the provision would fail to achieve the benefits some commenters (and DOL itself in the proposal) claimed it would achieve. Nor does DOL assert that the provision would have caused any harm. While it describes concerns of some commenters, it makes no findings as to whether any of those concerns are justified (and if so, which). Nor does it assert that any harms the provision would create would exceed its benefits. Failure to explain its decision and weigh the relationship of benefits to costs was arbitrary and capricious. *Michigan v. EPA*, 576

35

U.S. 743, 750–51 (2015); *State Farm*, 463 U.S. at 48.[10]

DOL itself characterizes the benefits of this disclosure requirement as "appreciable," 87 F.R. at 73839, and has not shown that any harm the provision potentially imposes would exceed those benefits. Therefore, on DOL's own reasoning, the documentation provision it eliminates would achieve benefits, and nothing in the rule calls those benefits into question. Yet the rule does not explain why those benefits are outweighed by any costs.

Further, the rule itself admits that "giving consideration to whether an investment option aligns with participants' preferences can be relevant to furthering the purposes of the plan," because it may "lead to greater participation and higher deferral rates." 87 F.R. at 73828. The final rule cites this consideration as justification for another provision "clarifying that fiduciaries do not violate their duty of loyalty solely because they take participants' preferences into account when constructing a menu of prudent investment options for participant-directed individual account plans." *Id.* But the same rationale would apply equally to disclosing the consideration of collateral benefits, unless, of course, the point of the rule is to allow fiduciaries to quietly pursue collateral benefits unbeknownst to everyone else, including plan participants and beneficiaries. An agency cannot adopt reasoning that is "internally inconsistent," *Gen. Chem. Corp.*, 817 F.2d at 846, or "illogical on its own terms," *AFGE, Loc. 2924*, 470 F.3d at 380 (cleaned up); *see also Encino Motorcars*, 579 U.S. at 212; *Engine Mfrs. Ass'n*, 20 F.3d at 1182 ("unexplained inconsistency" in final rule is "not reasonable").

### 4. The 2022 Rule Fails to Consider Issuing Sub-Regulatory Guidance Instead of Amending the Regulation Itself

Rather than amend the Code of Federal Regulations to replace the 2020 rules, DOL could

---

[10] Assuming DOL meant to adopt all commenters' relevant concerns, the provision is still arbitrary and capricious. The only comments that DOL cites regarding a lack of benefits for participants argue that participants do not need to know about collateral benefits because they (definitionally) do not affect risks and returns. But this rationale, to the extent DOL has adopted it, highlights a fatal flaw in DOL's reasoning. For if *participants* have no reason to care about policy or social preferences that do not affect risks and returns, what valid reason could fiduciaries have for caring about them without violating their duty of loyalty? Yet one of the rule's main objectives is to allow fiduciaries to act on the basis of these preferences. If it is valuable for fiduciaries, it is (even more) valuable for participants.

have issued sub-regulatory guidance. The 2022 Rule failed to consider this obvious alternative of leaving 29 C.F.R. § 2550.404a-1 unchanged from its 2020 amendments, and simply issuing sub-regulatory guidance to cure any alleged chill or confusion. APP117, CR Letter 18.

"When an agency rescinds or alters a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quotation omitted). DOL claims to have considered returning to the pre-2020 regulatory regime, in which the application of its 1979 Investment Duties regulation to ESG investing was clarified by guidance. 87 F.R. at 73879. There was nothing in § 2550.404a-1, even after 2020, that mentioned "climate change and other environmental, social, or governance factors." DOL therefore could have supplemented § 2550.404a-1 with guidance. But the 2022 Rule instead rescinded the 2020 rules and expressly added ESG into the regulation itself. *See* 87 F.R. at 73885 (new 29 C.F.R. § 2550.404a-1(b)(4)).

The alternative of simply adding guidance would have had many advantages, among them lower transaction costs as entities would stay with a framework with which they are familiar. The *only* reason the rule gives for embedding ESG into the regulation itself is that DOL's "prior non-regulatory guidance on ESG investing and proxy voting was removed from the [C.F.R.]" by the 2020 rules. 87 F.R. at 73879. The rule does not consider the obvious alternative of reinstating that guidance or issuing new guidance, or cite the comment that suggested doing so. APP117, CR Letter 18. This improperly fails to consider reasonable alternatives and respond to comments. *See, e.g.*, *Perez*, 575 U.S. at 96; *10 Ring Precision*, 722 F.3d at 724.

### 5. The 2022 Rule is the Product of Prejudgment

The 2022 Rule is also unlawful on account of prejudgment in violation of the APA and Due Process Clause. *See Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 183 (D.C. Cir. 2015); U.S. Const. amd. V.  The APA "is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the

agency is more likely to give real consideration to alternative ideas." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979). Interested parties must be presented with an opportunity to "influence the rule making process in a meaningful way." *Id.*; *see also Perez*, 575 U.S. at 96 ("An agency must *consider* and respond to significant comments received during the period for public comment." (emphasis added)).

The 2022 Rule does not meaningfully rebut the strong evidence that DOL had already decided what to do in this rulemaking before it reviewed the public comments. APP135–37, CR Letter 36–38. Indeed, the rule echoes DOL's earlier description of its stakeholder outreach, announced before its review of comments, as designed "to determine how to craft rules that better recognize the role that ESG integration can play in the evaluation and management of plan investments in ways that further fundamental fiduciary obligations." 87 F.R. at 73823. To determine *how*, not *whether*. It also cites the Executive Orders that directed DOL to reconsider the 2020 rules. *Id.*

DOL's sole effort to rebut the charge of prejudgment is to point to changes in the final versus proposed rule. But none of the cited changes go to the fundamental question of whether to rescind the 2020 rules and replace them with rules more favorable to ESG investing. *See* 87 F.R. at 73854.

### C.  Plaintiffs Will Suffer Irreparable Harm Without an Injunction

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, Plaintiffs must show that that they are "'likely to suffer irreparable harm in the absence of preliminary relief'" and "need only show [its injury] 'cannot be undone through monetary remedies.'" *Texas v. United States*, 524 F. Supp. 3d 598, 662–63 (S.D. Tex. 2021) (citations omitted). In *BST Holdings*, the Fifth Circuit found that "compliance and monitoring costs" for businesses covered by a regulation constituted irreparable injury. 17 F.4th at 618. "[C]omplying with a regulation later held invalid almost

always produces the irreparable harm of nonrecoverable compliance costs." *Id.* (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)).

For Liberty Services and Western Energy Alliance, additional monitoring costs they or their employees incur to protect against improper collateral considerations is irreparable injury because those costs are irrecoverable. *See* APP005-7, Stock Decl. ¶¶ 10–15, 17; APP016–17, Sgamma Decl. ¶ 13–20; *see also* APP010–11, Poppel Decl. ¶¶ 3–8. For Liberty, any reduction in interest from investors and access to capital, and the associated competitive disadvantage, also qualifies as irreparable injury because it too is irrecoverable. Given the difficulties in recovering monetary damages, especially from the federal government, the loss of funds here constitutes irreparable harm. *See BST Holdings*, 17 F.4th at 618; *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015); *Texas*, 524 F. Supp. 3d at 663.

Copland is harmed because the 2022 Rule is contrary to the clear intent of the exclusive benefit rule. Copland seeks faithful adherence to ERISA and the statutory duties of loyalty and prudence incorporated therein. Hence, monetary damages would not remedy this harm. *See Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (injury is irreparable if monetary damages are unavailable or inadequate).

Moreover, "one of the expressed purposes of ERISA is to ensure the protection of millions of employees covered by pension plans: 'Congress finds . . . that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest.'" *Gould v. Lambert Excavating Inc.*, 870 F.2d 1214, 1221 (7th Cir. 1989) (quoting 29 U.S.C. § 1001(a)). Consequently, "the probability of irreparable harm is strong" when a private litigant seeks to enforce rights under the ERISA statute. *Id.*; *see also Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1423 (11th Cir. 1998) ("It remains the intent of Congress that the courts use their power to fashion legal and equitable remedies that not only protect participants and beneficiaries but deter violations of the law as well." (quoting H.R. Rep. No. 101-386, at 433 (1989) (conf. rep.))). The 2022 Rule loosens the statutory restraints of sections 403 and 404 and removes the monitoring and

39

accountability provisions that were in the 2020 rules. The result is irreparable harm because the 2022 Rule "excessively insulates [fiduciaries] from effective oversight by [plan] beneficiaries and participants." *Partenza v. Brown*, 14 F. Supp.2d 493, 495 (S.D.N.Y. 1998).

In addition, Plaintiff States have submitted substantial evidence of loss of tax revenues and harms to their economies and citizens' jobs. *See supra* pp. 16–18. These economic harms are also irreparable as they are not recoverable from the federal government. *See, e.g.*, *Texas*, 829 F.3d at 433.

### D. An Injunction Will Not Harm Defendants or Disserve the Public Interest

"Any interest [the government] may claim in enforcing an unlawful" regulation "is illegitimate." *BST Holdings*, 17 F.4th at 618. Because the 2022 Rule is an unlawful attempt to rewrite ERISA's plain text and is arbitrary and capricious, Defendants lack a legitimate interest in its implementation and would not suffer if it is enjoined.

By contrast, the public is "served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The Supreme Court also recognizes a strong public interest in the proper functioning of retirement plans, including maximizing financial returns and members of the public saving for their future security. *Boggs v. Boggs*, 520 U.S. 833, 840–41 (1997); *see also Gould*, 870 F.2d at 1221.

The balance of harms in this case is thus straightforward. Plaintiffs seek an injunction to preserve the careful management of employee benefits and retirement plans in compliance with ERISA, while Defendants seek to perpetuate an abdication of congressionally imposed statutory duties. Enjoining the Defendants would stop an illegal agency action and compel the Defendants to follow the law. Such relief harms neither the government nor the public.

### CONCLUSION

For the foregoing reasons, this Court should grant a preliminary injunction.

Dated February 21, 2023.

Respectfully submitted,

_/s/ Leif A. Olson_____
KEN PAXTON
Attorney General
AARON REITZ
Texas Bar No. 24105704
Deputy Attorney General for Legal Strategy
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801

Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
aaron.reitz@oag.texas.gov
leif.olson@oag.texas.gov

_Counsel for Plaintiff State of Texas_

_/s/ Jonathan Berry_
C. BOYDEN GRAY
JONATHAN BERRY
R. TRENT MCCOTTER
MICHAEL BUSCHBACHER
JARED M. KELSON

Boyden Gray & Associates
801 17th Street NW, Ste. 350
Washington, DC 20006
(202) 955-0620
berry@boydengrayassociates.com
kelson@boydengrayassociates.com

_Counsel for Plaintiffs Liberty Energy Inc., Liberty
Oilfield Services LLC,_ and _Western Energy
Alliance_

_/s/ Melissa Holyoak_____
SEAN REYES
Attorney General
MELISSA HOLYOAK*
Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

BRUNN (BEAU) ROYSDEN*
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

JOHN SULLIVAN, Of Counsel
Texas Bar Number: 24083920
610 Uptown Boulevard, Suite 2000
Cedar Hill, Texas 75104
(469) 523–1351
john.sullivan@the-sl-lawfirm.com

_Counsel for Plaintiff State of Utah_

_/s/ Andrew Ferguson_
JASON MIYARES
Attorney General
ANDREW N. FERGUSON*
Solicitor General
KEVIN M. GALLAGHER*
Deputy Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

_Counsel for Plaintiff Commonwealth of Virginia_

*/s/ Neville Hedley*
NEVILLE HEDLEY*
Hamilton Lincoln Law Institute
1440 W. Taylor Street, #1487
Chicago, IL 60607
(312) 342-6008
ned.hedley@hlli.org

ANNA ST. JOHN
Hamilton Lincoln Law Institute
1629 K Street NW, Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

*Counsel for Plaintiff James R. Copland*



STEVE MARSHALL
Attorney General
EDMUND LACOUR
Solicitor General

Alabama Attorney General's Office
501 Washington Ave.
Montgomery, AL 36014
(334) 353-2196
edmund.lacour@alabamaag.gov

*Counsel for Plaintiff State of Alabama*

*/s/ Joseph S. St. John*
JEFF LANDRY
Attorney General
ELIZABETH B. MURRILL*
Solicitor General
JOSEPH S. ST. JOHN
Deputy Solicitor General
TRACY SHORT
Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*



TREG TAYLOR
Attorney General
JEFFREY G. PICKETT
Senior Assistant Attorney General
BENJAMIN HOFMEISTER*
Assistant Attorney General

Alaska Department of Law
123 4th Street
Juneau, AK 99801
(907) 269-5275
jeff.pickett@alaska.gov
ben.hofmeister@alaska.gov

*Counsel for Plaintiff State of Alaska*

TIM GRIFFIN
Attorney General
NICHOLAS J. BRONNI*
Solicitor General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
Attorney General
STEPHEN J. PETRANY*
Solicitor General

Georgia Department of Law
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
Attorney General
THOMAS FISHER*
Solicitor General

Indiana Attorney General's Office
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-6255
tom.fisher@atg.in.gov

*Counsel for Plaintiff State of Indiana*

ASHLEY MOODY
Attorney General
JOSEPH E. HART*
Assistant Attorney General of Legal Policy

Florida Attorney General's Office
The Capitol, Pl-01
Tallahassee, FL 32399-1050
Phone: (850) 414-3300
joseph.hart@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

RAÚL R. LABRADOR
Attorney General
DAVID M.S. DEWHIRST*
Chief Deputy Attorney General

Idaho Attorney General's Office
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
david.dewhirst@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

BRENNA BIRD
Attorney General
ERIC H. WESSAN*
Solicitor General

Iowa Attorney General's Office
1305 E. Walnut Street
Des Moines, IA 50319
(515) 281-5164
eric.wessan@ag.iowa.gov.

*Counsel for Plaintiff State of Iowa*

KRIS KOBACH
Attorney General
JESSE A. BURRIS*
Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Ave, 2nd Floor
Topeka, KS 66612
(785) 368-8197
jesse.burris@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


LYNN FITCH
Attorney General
JUSTIN L. MATHENY
Deputy Solicitor General

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


AUSTIN KNUDSEN
Attorney General
CHRISTIAN B. CORRIGAN*
Solicitor General

Montana Department of Justice
215 N Sanders St.
Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov

*Counsel for Plaintiff State of Montana*


DANIEL CAMERON
Attorney General
LINDSEY KEISER*
Assistant Attorney General

Kentucky Attorney General's Office
700 Capital Avenue, Suite 118
Frankfort, KY
Tel: (502) 696-5478
lindsey.keiser@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*


ANDREW BAILEY
Attorney General
JOSHUA M. DIVINE*
Solicitor General
MARIA A. LANAHAN*
Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-3321
josh.divine@ago.mo.gov
maria.lanahan@ago.mo.gov

*Counsel for Plaintiff State of Missouri*


MICHAEL T. HILGERS
Attorney General
ERIC J. HAMILTON*
Deputy Solicitor General

Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN FORMELLA
Attorney General
MARK W. DELL'ORFANO*
Attorney

New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301
anthony.j.galdieri@doj.nh.gov
(603) 271-1214

*Counsel for Plaintiff State of New Hampshire*

DAVE YOST
Attorney General
BENJAMIN FLOWERS*
Solicitor General

Ohio Attorney General's office
30 E. Broad St., 17th Fl.
Columbus, OH 43215
(614) 728-7511
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

JONATHAN SKRMETTI
Attorney General and Reporter
BRANDON SMITH*
Chief of Staff

Office of the Attorney General and Reporter
of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-3491
brandon.smith@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DREW H. WRIGLEY
Attorney General
COURTNEY TITUS*
Deputy Solicitor General

North Dakota Attorney General's Office
600 E Boulevard Avenue, Dept. 125
Bismarck, ND 58505
(701) 328-3644
ctitus@nd.gov

*Counsel for Plaintiff State of North Dakota*

ALAN WILSON
Attorney General
THOMAS T. HYDRICK*
Assistant Deputy Solicitor General

South Carolina Attorney General's Office
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for Plaintiff State of South Carolina*

PATRICK MORRISEY
Attorney General
LINDSAY S. SEE*
Solicitor General
MICHAEL R. WILLIAMS*
Senior Deputy Solicitor General

West Virginia Attorney General's Office
State Capitol Complex, Bldg. 1, Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
(681) 313-4550
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for Plaintiff State of West Virginia*

BRIDGET HILL                                    *motion for admission pending or forthcoming
Attorney General
RYAN SCHELHAAS*
Chief Deputy Attorney General

Office of the Wyoming Attorney General
200 W. 24th Street
Cheyenne, WY 82002
(307) 777-7841
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*


In association with local counsel:

F. Scott Flow
FLOW LAW FIRM, PLLC
800 SW 9th Avenue
Amarillo, Texas 79101-3206
(806) 372-2010
fsflow@flowlaw.com

*Co-Counsel for Plaintiffs other than State of Texas*


## CERTIFICATE OF CONFERENCE

I certify that on February 9, 2023, counsel for the State Plaintiffs conferred with Defendants' counsel, Leslie Cooper Viegen and Cassandra M. Snyder, who stated that the Defendants oppose this motion.

/s/ Leif A. Olson


## CERTIFICATE OF SERVICE

On February 21, 2023, I filed this brief through the Court's CM/ECF service, which served it upon all counsel of record.

/s/ Leif A. Olson