UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF UTAH;
STATE OF TEXAS;
COMMONWEALTH OF VIRGINIA;
STATE OF LOUISIANA;
STATE OF ALABAMA;
STATE OF ALASKA;
STATE OF ARKANSAS;
STATE OF FLORIDA;
STATE OF GEORGIA;
STATE OF IDAHO;
STATE OF INDIANA;
STATE OF IOWA;
STATE OF KANSAS;
COMMONWEALTH OF KENTUCKY;
STATE OF MISSISSIPPI;
STATE OF MISSOURI;
STATE OF MONTANA;
STATE OF NEBRASKA;                                              No. 2:23-cv-16-00016-Z
STATE OF NEW HAMPSHIRE;
STATE OF NORTH DAKOTA;
STATE OF OHIO;
STATE OF OKLAHOMA;
STATE OF SOUTH CAROLINA;
STATE OF TENNESSEE;
STATE OF WEST VIRGINIA;
STATE OF WYOMING;
LIBERTY ENERGY INC.;
LIBERTY OILFIELD SERVICES LLC;
WESTERN ENERGY ALLIANCE;
JAMES R. COPLAND; AND
ALEX L. FAIRLY

      *Plaintiffs,*

v.

MARTIN J. WALSH and UNITED STATES
DEPARTMENT OF LABOR,

      *Defendants.*

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     This lawsuit asserts claims under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, against the Department of Labor regarding "Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights," 87 F.R. 73,822 (Dec. 1, 2022) ("2022 Investment Duties Rule" or "2022 Rule"). The 2022 Rule replaces two prior rulemakings by the Department, titled "Financial Factors in Selecting Plan Investments," 85 F.R. 72,847 (Nov. 13, 2020) ("2020 Investment Rule"), and "Fiduciary Duties Regarding Proxy Voting and Shareholder Rights," 85 F.R. 81,658 (Dec. 16, 2020) ("2020 Proxy Voting Rule").

2.     The 2022 Rule undermines key protections for retirement savings of 152 million workers—approximately two-thirds of the U.S. adult population and totaling $12 trillion in assets[1]—in the name of promoting environmental, social, and governance ("ESG") factors in investing, including the Biden Administration's stated desire to address climate change.

3.     Most of the 2022 Investment Duties Rule takes effect on January 30, 2023. 87 F.R. at 73,886.

4.     The 2022 Rule oversteps the Department's statutory authority under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and is contrary to law.

5.     The 2022 Rule is also arbitrary and capricious.

6.     This action seeks a preliminary injunction.

7.     This action also seeks permanent relief in the form of a declaration that the ESG Rule violates the APA and ERISA and is arbitrary and capricious. The Court should hold

---

[1]   Emp. Benefits Sec. Admin., Dep't of Labor, *Fact Sheet: EBSA Restores Over $1.4 Billion to Employee Benefit Plans, Participants, and Beneficiaries* (2022), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/ebsa-monetary-results-2022.pdf

unlawful and set aside the 2022 Investment Duties Rule, and DOL should be enjoined from implementing or enforcing the 2022 Rule in any manner.

## PARTIES

8.   Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its proprietary and *parens patriae* interests.

9.   Plaintiff State of Texas is a sovereign State of the United States of America. Texas sues to vindicate its proprietary and *parens patriae* interests.

10.   Plaintiff Commonwealth of Virginia is a sovereign State of the United States of America. Virginia sues to vindicate its proprietary and *parens patriae* interests.

11.   Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its proprietary and *parens patriae* interests.

12.   Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama sues to vindicate its proprietary and *parens patriae* interests.

13.   Plaintiff State of Alaska is a sovereign State of the United States of America. Alaska sues to vindicate its proprietary and *parens patriae* interests.

14.   Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas sues to vindicate its proprietary and *parens patriae* interests.

15.   Plaintiff State of Florida is a sovereign State of the United States of America. Florida sues to vindicate its proprietary and *parens patriae* interests.

16.   Plaintiff State of Georgia is a sovereign State of the United States of America. Georgia sues to vindicate its proprietary and *parens patriae* interests.

17.   Plaintiff State of Idaho is a sovereign State of the United States of America. Idaho sues to vindicate its proprietary and *parens patriae* interests.

18.   Plaintiff State of Indiana is a sovereign State of the United States of America. Indiana sues to vindicate its proprietary and *parens patriae* interests.

19.   Plaintiff State of Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its proprietary and *parens patriae* interests.

20.   Plaintiff State of Kansas is a sovereign State of the United States of America. Kentucky sues to vindicate its proprietary and *parens patriae* interests.

21.   Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky sues to vindicate its proprietary and *parens patriae* interests.

22.   Plaintiff State of Mississippi is a sovereign State of the United States of America. Mississippi sues to vindicate its proprietary and *parens patriae* interests.

23.   Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its proprietary and *parens patriae* interests.

24.   Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its proprietary and *parens patriae* interests.

25.   Plaintiff State of Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its proprietary and *parens patriae* interests.

26.   Plaintiff State of New Hampshire is a sovereign State of the United States of America. New Hampshire sues to vindicate its proprietary and *parens patriae* interests.

27.   Plaintiff State of North Dakota is a sovereign State of the United States of America. North Dakota sues to vindicate its proprietary and *parens patriae* interests.

28.   Plaintiff State of Ohio is a sovereign State of the United States of America. Ohio sues to vindicate its proprietary and *parens patriae* interests.

29.   Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its proprietary and *parens patriae* interests.

30.   Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its proprietary and *parens patriae* interests.

31.   Plaintiff State of Tennessee is a sovereign State of the United States of America. Tennessee sues to vindicate its proprietary and *parens patriae* interests.

32.   Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia sues to vindicate its proprietary and *parens patriae* interests.

33.   Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to vindicate its proprietary and *parens patriae* interests.

34.   Plaintiff Liberty Energy Inc. ("Liberty") is a Delaware corporation and is a publicly traded energy company. Plaintiff Liberty Oilfield Services LLC ("Liberty Services") is a Texas limited liability company and is a subsidiary of Liberty. Liberty Services sponsors a defined contribution 401(k) plan for its employees that is covered by ERISA. It also hires an investment advisor to assist with management of its 401(k) plan.

35.   Plaintiff Western Energy Alliance is a 501(c)(6) nonprofit trade association that represents 200 companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas across the West. The Alliance represents independents, the majority of which are small businesses with an average of fourteen employees.

36.   Plaintiff James R. Copland is a participant in a retirement plan subject to ERISA.

37.   Plaintiff Alex L. Fairly lives in Amarillo, Texas and has done so for the past 35 years. Fairly is the owner of Occunet LLC, a business also located in Amarillo. Occunet sponsors a 401(k) defined contribution plan subject to ERISA and is thus a fiduciary under ERISA. Occunet hires a trustee and investment manager to assist with the management of the 401(k) plan. Fairly is a participant of Occunet's 401(k) plan.

38.   Defendant Martin J. Walsh is the Secretary of Labor. 5 U.S.C. § 551(1). He is sued in his official capacity.

39.   Defendant United States Department of Labor is an executive agency of the federal government.

## JURISDICTION AND VENUE

40.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action raises federal questions under the APA, 5 U.S.C. §§ 553, 701–06, and ERISA, 29 U.S.C. § 1001 *et seq.*

41.   This Court also has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

42.   Additionally, the Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

43.   This Court has jurisdiction under the APA to review Defendants' unlawful actions and enter appropriate relief, 5 U.S.C. §§ 553, 701–06.

44.   The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 705-706, 28 U.S.C. §§ 1361 and 2201–2202, Federal Rule of Civil Procedure 57, and its inherent equitable powers.

45.   This Court may award costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

46.   Venue is proper in this district because Defendants are United States agencies or officers sued in their official capacities. Plaintiffs State of Texas and Alex L. Fairly are residents of this judicial district, and a substantial part of the events or omissions giving rise to the Complaint occur within this district. 28 U.S.C. §§ 1391(b)(2), 1391(e).

## I.   Standing.

### A.   Liberty and Liberty Services

47.   Liberty Services, a subsidiary of Liberty, sponsors an ERISA-covered plan and thus has standing as an object of the 2022 Rule. *See Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019).

48.   Liberty Services also has standing because under the 2022 Rule, as discussed in more detail below, Liberty Services (and its employees) will lose the protections put in

place by the 2020 rules. It will be forced to expend additional time and resources monitoring and reviewing recommendations from its investment advisors, without the benefit of recordkeeping requirements or clearer fiduciary duty regulations, to ensure they are focusing explicitly on pecuniary considerations and not collateral ESG factors.

49.   Although ESG is specifically countenanced in the 2022 Rule, it remains undefined, as does the time period over which associated investments should be considered. This makes its value proposition difficult, if not impossible, to quantify. Considering ESG factors will greatly complicate and require Liberty Services to invest additional resources in the evaluation and selection of investments.

50.   ERISA also incorporates common law trust principles, *see Varity Corp. v. Howe*, 516 U.S. 489, 496-97 (1996), and trustees have historically been authorized to sue to vindicate the interests of a trust and its beneficiaries, *see, e.g.*, Restatement (Third) of Trusts § 107(1); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) (holding that an injury is concrete for purposes of standing if it is closely related to "harm traditionally recognized as providing basis for lawsuit in American courts); *Perez v. McCreary, Veselka, Bragg & Allen P.C.,* 45 F.4th 816, 822 (5th Cir. 2022) (holding "type of harm that the common law has recognized as actionable" sufficient for standing). The 2022 Rule loosens the restrictions and reporting requirements placed on fiduciaries, increasing fiduciary flexibility and the likelihood of imprudent investment recommendations and increased monitoring costs, to the detriment of Liberty Services' 401(k) plan and its participants and beneficiaries. *See Johnson v. Allsteel, Inc.*, 259 F.3d 885, 888 (7th Cir. 2000) (citing 13 Charles Alan Wright, *Federal Practice & Procedure* § 3531.4, at 292 (2001 Supp.)).

51.   Liberty, as a publicly traded company, will also likely be harmed by decreased interest from investors and access to investment capital. Liberty's funding costs are determined, in large part, by its performance in public equity markets, and increased ability to consider ESG factors under ERISA will likely move investment away from oil and gas companies like Liberty to ESG-aligned funds. The Supreme Court has already recognized

that potential loss of funding even indirectly as the result of government action is sufficient to establish standing. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019).

52.   Moreover, before the 2022 Rule, Liberty's large institutional shareholders were prohibited from leveraging ERISA plan assets for nonpecuniary ESG purposes. As discussed below, the 2022 Rule would give those institutional shareholders increased latitude to invest using ESG considerations and vote plan assets in support of such proposals, inviting explicitly nonpecuniary activists to wage costly campaigns against Liberty and divert its focus from maximizing shareholder value to collateral considerations. Given the dominance of ESG investment among institutional shareholders and proxy advisors, *see, e.g.*, *ESG-Focused Institutional Investment Seen Soaring 84% to US$33.9 Trillion in 2026, Making up 21.5% of Assets Under Management: PwC Report*, PwC, https://www.pwc.com/gx/en/news-room/press-releases/2022/awm-revolution-2022-report.html (Oct. 10, 2022), it is likely they would exercise their new discretion over ERISA plan assets in favor of ESG.

53.   Liberty and Liberty Services' injuries are fairly traceable to the 2022 Rule because they will incur costs or suffer less access to capital because of changes implemented by the 2022 Rule. Traceability "requires no more than de facto causality," including "the predictable effect of Government action on the decisions of third parties," even if unfounded or "unlawful." *Dep't of Com.*, 139 S. Ct. at 2565–66. DOL promulgated its 2020 rules to address shortcoming in the rigor of fiduciary duties related to ESG investing, so it logically follows that undoing those changes will reintroduce that risk. *See infra*, paragraphs 98-104, discussing the 2020 rules that the 2022 Rule replaces.

54.   Liberty and Liberty Services' injuries are also redressable by a favorable decision from this Court. The 2022 Rule loosens protections against unlawful fiduciary activity, removes reporting requirements to ensure compliance, opens the door for plan fiduciaries to engage in unlawful plan administration, and changes requirements for proxy voting, so enjoining it will logically halt the harms it threatens, keeping the 2020 rules in place.

**B.   Western Energy Alliance**

55.   Western Energy Alliance has standing for reasons similar to Liberty and Liberty Services. It sponsors a defined contribution 401(k) plan for its employees and hires an investment advisor to assist with management of that plan. Alliance members also maintain 401(k) and other retirement plans covered by ERISA for their employees and will be further harmed by the 2022 Rule when asset managers, large institutional investors, and other ERISA plan managers make investment decisions or pursue an agenda that discriminates against the oil and natural gas sector based on nonpecuniary factors and politicized ESG criteria.

**C.   Jim Copland**

56.   Plaintiff Copland is a plan participant of ERISA retirement plans who will be impacted by the 2022 Rule because the ERISA statute and regulations are instrumental in establishing the basic requirements for a retirement plan trust and the standards of conduct for plan fiduciaries. *See, e.g., Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015) (holding that participants in horse show events had standing to challenge USDA regulation that required organizations to amend rulebook to which participants must adhere). Plaintiff Copland is thus just as much an object of the regulatory action as the fiduciaries for purposes of the 2022 Rule.

57.   Moreover, common law trust principles are incorporated into the ERISA statute. *See Varity Corp.*, 516 U.S. at 496–97. Traditionally, beneficiaries have been able to bring suit to enforce the terms of a trust. "A suit against a trustee of a private trust to enjoin or redress a breach of trust or otherwise to enforce the trust may be maintained only by a beneficiary or by a co-trustee, successor trustee, or other person acting on behalf of one or more beneficiaries." Restatement (Third) of Trusts § 94(1); *see id.*, cmt. (b) ("A suit to enforce a private trust ordinarily . . . may be maintained by *any beneficiary whose rights are or may be adversely affected* by the matter(s) at issue." (emphasis added)); *see also TransUnion LLC*, 141 S. Ct. at 2200; *Perez*, 45 F.4th at 822. ERISA incorporates this right

of action. ERISA Section 502 permits civil actions "by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms to enforce his rights under the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this title or the terms of the plan." 29 U.S.C. § 1132(a)(3).

58.   The 2022 Rule loosens the restraints placed on fiduciaries by Sections 403 and 404, thereby allowing ERISA fiduciaries more discretion than ordinarily permitted, and surely more discretion than would have been the case under the 2020 rules. "An increased amount of discretion opens up to the [fiduciary] a greater range of permissible choices. This expanded range renders 'less solid' the participant's benefits by shifting risk to the participant. The increased risk the participant faces as a result is an injury-in-fact." *Johnson*, 259 F.3d at 888 (citing 13 Wright, *supra*, § 3531.4, at 292).

59.   As described below, the 2022 Rule introduces greater discretion beyond what Sections 403 and 404 permit in multiple ways. The 2022 Rule also removes certain documentation, disclosure, and enhanced monitoring responsibilities for fiduciaries imposed by the 2020 rules. Those transparency requirements were designed to aid plan participants in monitoring and potentially holding accountable fiduciaries who deviated from their statutory obligations. Hence, the 2022 Rule increases the burden on Copland to monitor and hold accountable plan fiduciaries for breaches of conduct under ERISA Sections 403 and 404.

60.   Copland's injuries are traceable to the regulation and redressable by favorable action from the Court because ERISA plan participants like him are objects of the action.

### D.   Alex L. Fairly

61.   Plaintiff Fairly is the owner of Amarillo-based businesses Occunet LLC and FairosRx LLC. Occunet LLC sponsors a defined contribution 401(k) plan and FairosRx LLC is a related employer to the retirement plan.   The plan is offered to Occunet and

FairosRx's employees. Occunet incurs costs to hire a plan trustee, investment managers, and other service providers for the plan. As owner of Occunet and FairosRx, Plaintiff Fairly has standing for the reasons as alleged for Plaintiffs Liberty and Liberty Services above as the sponsor of an ERISA defined contribution plan.

62.   As a participant in Occunet's 401(k) plan, Plaintiff Fairly is a participant in an ERISA plan and has allocated retirement money into two different funds that are part of the menu of investment options in the 401(k) plan, both of which are actively managed funds. Therefore, he has standing for the same reasons as alleged for Plaintiff Copland above.

### E.   States

63.    Plaintiff States have standing to challenge the 2022 Investment Duties Rule because it harms their proprietary and *parens patriae* interests. And although the Plaintiff States have standing under the traditional analysis, their claim for standing is also entitled to "special solicitude."

64.   First, Plaintiff States suffer a proprietary injury in the form of diminished tax revenue that will be caused by the 2022 Rule. Diminished tax revenue is a cognizable proprietary injury conferring Article III standing, as long as a State can identify "a loss of specific tax revenues" as opposed to "a decline in general tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992). Here, the 2022 Rule will cause the Plaintiff States to lose specific tax revenue: tax revenue from retirement distributions to the extent they tax such revenue.

65.   Second, Plaintiff States have standing to challenge the 2022 Rule as *parens patriae* because the Rule will harm the economic well-being of their residents.

66.   Third, several of Plaintiff States have significant oil and gas deposits, and fossil fuel companies have a substantial presence in those states for the purpose of oil and gas exploration and extraction. Several Plaintiff States—including at least Louisiana, Texas,

Utah, and Wyoming—also share in proceeds from oil and gas leasing on federal lands or adjoining federal waters under the Outer Continental Shelf Lands Act, the Gulf of Mexico Energy Security Act, and/or the Mineral Leasing Act. The 2022 Rule will result in reduced investment in the fossil fuel industry, *see* paragraph 51, which will reduce the revenue that accrues to the Plaintiff States through oil and gas extraction on State lands, federal property in those States, or federal waters adjoining those States. Reduced investment in the fossil fuel industry will also decrease employment, adversely impact industries that support fossil fuel development, and decrease overall economic activity and tax revenue. Some impacts from reduced investment in the fossil fuel industry will be difficult or impossible to reverse, such that the harm is irreparable. Even if those impacts could be reduced to monetary harm, damages resulting from the 2022 Rule are presumably not recoverable as a result of the federal government's sovereign immunity, such that those damages would be an irreparable harm.

67. Finally, Plaintiff States warrant special solicitude in the standing analysis. Special solicitude has "two requirements": "(1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) (citation omitted); *see also Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007)). The Plaintiff States satisfy the first requirement because they are asserting "a procedural right under the APA to challenge agency action." *Texas*, 50 F.4th at 498. They also satisfy the second requirement because, as discussed, the 2022 Rule affects the Plaintiff States' quasi-sovereign interest in the economic well-being of their residents. The Plaintiff States, therefore, warrant special solicitude in the standing analysis.

## FACTS

### I.   Background on ERISA

68.   ERISA is intended to protect, among other things, American workers' retirement assets. The statute established a federal fiduciary standard for a broad category of private, employer-sponsored retirement plans.

69.   ERISA protects two basic types of retirement plans, defined benefit plans, and defined contribution plans.

70.   A defined benefit plan is commonly referred to as a traditional pension. It is a retirement plan in which the employer funds the plan and makes contributions on behalf of employees. *See* 29 U.S.C. § 1002(35); 26 U.S.C. § 414(j). In general, an employer sets a specific time period in which the employee becomes vested in the plan and obtains access to the plan's assets.

71.   The ultimate payouts depend on a variety of factors, such as the number of years that an employee has spent at a company and the employee's compensation. The company may use a complex formula to calculate the benefits a particular employee is entitled to obtain.

72.   A defined benefit plan's sponsor is responsible for ensuring that the plan is adequately funded to satisfy the promised retirement benefits to current and retired plan participants and beneficiaries. Because of these obligations, the plan sponsor maintains the investment risk associated with the plan assets. *See* Cong. Rch. Srv., R46366, Single-Employer Defined Benefit Pension Plans: Funding Relief and Modifications to Funding Rules 2 (May 20, 2020).

73.   The fiduciaries or trustees of a defined benefit plan frequently hire one or more investment managers to oversee the capital allocation or give investment advice for the plan's assets. *See* Cong. Rsch. Srv., R45957, *Capital Markets: Asset Management and Related Policy Issues* 1 (Oct. 11, 2019).

74.   The second type of ERISA retirement plan is a defined contribution plan. Unlike a defined benefit plan, which promises a participant a specific annual or monthly payment, a defined contribution plan is one in which the employee, the employer, or both make periodic contributions to a fund on behalf of the employee. *See* 29 U.S.C. § 1002(34); 26 U.S.C. § 414(i); Cong. Rsch. Serv., R47152, *Private-Sector Defined Contribution Pension Plans: An Introduction* (June 8, 2022).

75.   In a defined contribution plan, contributions are invested in a broad array of companies through mutual funds, which are subject to regulation under the Investment Act of 1940, the Investment Advisors Act of 1940, and accompanying regulations promulgated by the Securities and Exchange Commission.

76.   In many defined contribution plans, participants select where they would like their contributions invested. Cong. Rsch. Srv., R47152, at 2. In some instances, however, plan sponsors or managers make such decisions. *Id*.

77.   Even though plan participants may have a significant role in electing how to invest and thus bear market risk, plan fiduciaries have a duty of prudence to design and select the portfolio of mutual funds to offer as investment options and have a continuing fiduciary duty to monitor, and, if necessary, alter the investment options available to participants. *Id*. at 1; 7–8. Employees are limited to the options for investing included in the portfolio.

78.   In defined contribution plans, fiduciaries often hire investment managers to help manage plan assets. Such investment managers also have fiduciary duties to plan participants and beneficiaries.

79.   Common forms of defined contribution plans are 401(k) plans, 403(b) plans, and Employee Stock Ownership Plans.

80.   Title 1 of ERISA establishes the minimum standards that govern the operation of private-sector employee benefit plans, including fiduciary responsibility rules.

81.   Section 403(c) of ERISA requires that "the assets of a plan . . . shall be held [in trust] for the *exclusive purposes* of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1) (emphasis added). Section 404(a) of ERISA likewise requires that fiduciaries act as a prudent investor would in managing plan assets "*solely* in the interest of the participants and beneficiaries and . . . for the *exclusive purpose* of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1) (emphasis added).

82.   Sections 403(c) and 404(a) require fiduciaries to act solely in the interests of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits to them and defraying reasonable expenses of administering the plan. 29 U.S.C. §§ 1103(c)(1), 1104(a)(1).

83.   Section 404(a) also requires that plan fiduciaries act prudently and diversify plan investments to minimize the risk of large losses unless, under the circumstances, it is clearly prudent not to do so. 29 U.S.C. § 1104(a)(1)(C).

84.   These duties can be enforced through private suits or by DOL. *Id.* §§ 1109, 1132.

85.   ERISA plan participants and beneficiaries are not required to show an actual loss of money to prove a breach of fiduciary duty. *See Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 31 (1st Cir. 2018); Restatement (Third) of Trusts § 100 (appropriate comparator for loss calculation is rate of return of one or more suitable index funds or market indices versus the allegedly imprudent investment).

## II.   Prior Administrative Guidance

### A.   Sub-regulatory Guidance

86.   ERISA confers regulatory authority on DOL. 29 U.S.C. § 1135. DOL initially addressed the application of the duties of loyalty and prudence to investments made based on various nonpecuniary factors in sub-regulatory guidance.

15

87.   In Interpretive Bulletin 94-1, DOL labeled such issues "economically targeted investments." 59 F.R. 32,606 (June 30, 1994). The Department interpreted "the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives." *Id*. at 32,607. Some commentators labeled this standard the "all things being equal" or "tiebreaker standard."

88.   In Interpretive Bulletin 94-2, DOL stated that voting proxies fell under ERISA's fiduciary duty standard and required that "the responsible fiduciary consider those factors that may affect the value of the plan's investment and not subordinate the interests of the participants and beneficiaries in their retirement income to unrelated objectives." 59 F.R. 38,863 (July 29, 1994).

89.   IB 94-2 also approved of fiduciaries engaging in "activities intended to monitor or influence the management of corporations" when there was a "reasonable expectation" such activities would "enhance the value of the plan's investment in the corporation." *Id*. Permissible targets included workplace practices, corporate governance, and "financial and non-financial measures of corporate performance." *Id*.

90.   In 2008, DOL replaced IB 94-1 and 94-2 with Interpretive Bulletin 2008-01, 73 F.R. 61,734 (Oct. 18, 2008), and Interpretive Bulletin 2008-02, 73 F.R. 61,731 (Oct. 17, 2008), respectively. IB 2008-01 interpreted the sole interest and exclusive purpose language in ERISA to mean that "fiduciaries may *never* subordinate the economic interests of the plan to unrelated objectives, and may not select investments on the basis of any factor outside the economic interest of the plan except in very limited circumstances." 73 F.R. at 61,735 (emphasis added).

91.   IB 2008-01 also explained that "ERISA's text does not permit fiduciaries to make investment decisions on the basis of any factor other than the economic interest of the plan," holding to ERISA's longstanding directive that fiduciaries should act for the

financial interests of a plan's participants and beneficiaries. *Id*. at 61,735. It reaffirmed the strict limitations of the tiebreaker test, explaining that fiduciaries may only use the test when they "have first concluded that the alternative options are truly equal." *Id*.

92.  IB 2008-01 contained examples of how such an analysis might work, emphasizing the importance of a fiduciary's mandate to select the investments with the greatest possible returns. It rejected several scenarios, including noting that one "plan's fiduciaries may not simply consider investments in only green companies." *Id*. at 61,736. IB 2008-01 emphasized ERISA's longstanding focus on financial factors over other considerations. *See id*.

93.  The Department further reiterated ERISA's "not subordinate" language in IB 2008-2 as related to proxy voting. 73 F.R. at 617,32. This bulletin also explained that fiduciaries could only consider factors relevant to the plan's economic interest when deciding to cast a proxy vote. *Id*. Fiduciaries must ignore "objectives, considerations, and economic effects unrelated to the plan's economic interests." *Id*.

94.  IB 2008-2 continued that "[p]lan fiduciaries risk violating the exclusive purpose rule when they exercise their fiduciary authority in an attempt to further legislative, regulatory, or public policy issues through the proxy process." *Id*. at 61,734. Attempting to further policy had "no connection to enhancing the economic value of the plan's investments" and was prohibited. *Id*.

95.  In 2014, the Supreme Court ruled in *Fifth Third Bancorp v. Dudenhoeffer* that in the context of ERISA retirement plans, the statute's "benefits" language "must be understood to refer to . . . *financial* benefits (such as retirement income) . . . [and] does not cover nonpecuniary benefits like those supposed to arise from employee ownership of employer stock." 573 U.S. 409, 421 (2014) (emphasis in original).

96.  DOL soon replaced IB 2008-01 with Interpretive Bulletin 2015-01, which gave increased flexibility to consider collateral factors, including ESG factors, in a fiduciary's investment calculus. 80 F.R. 65,135 (Oct. 26, 2015). It stated, "[f]iduciaries need not treat

commercially reasonable investments as inherently suspect or in need of special scrutiny merely because they take into consideration environmental, social or other such factors." *Id*. Although the guidance purported to limit ESG investing to these narrow exceptions, its removal of all warnings against pursing nonpecuniary factors and conspicuous failure to cite *Dudenhoeffer* created uncertainty as to its intent and scope.

97.   In 2016, DOL issued Interpretive Bulletin 2016-01, which prioritized ESG concerns in proxy voting. The Bulletin stated that "thoughtful [shareholder] engagement" when voting proxies, establishing voting policies, or otherwise exercising shareholder rights could lead to long-term financial benefits. 81 F.R. 92,882 (Dec. 29, 2016). By "thoughtful engagement," the Department meant "engage[ment] on ESG issues," citing asset management organizations that "incorporate ESG issues into ownership policies and practices." *Id*. at 95,881.

### B.   2020 DOL Rules

98.   In 2020, DOL replaced its sub-regulatory guidance on the issue of nonpecuniary factors for the first time with amendments to the text of the 1979 rule, codified at 29 C.F.R. § 2550.404a-1. These new rules, the 2020 Investment Rule and 2020 Proxy Voting Rule incorporated *Dudenhoeffer*'s command to focus on financial over nonpecuniary benefits.

99.   The 2020 Investment Rule adopted several amendments that made clear that ERISA's plan fiduciaries must evaluate investments "based only on pecuniary factors" weighed according to "impact on risk-return." 85 F.R. at 72,846. The rule explained that "[p]roviding a secure retirement for American workers is the paramount, and eminently worthy, 'social' goal of ERISA plans." *Id*. at 72,848.

100. The rule also stated, "the duty of loyalty—a bedrock principle of ERISA, with deep roots in the common law of trusts—requires those serving as fiduciaries to act with a single-minded focus on the interests of beneficiaries." *Id*. The rule clarified that such a duty was foremost, and that "plan fiduciaries . . . must focus solely on the plan's financial risks

and returns and keep the interests of plan participants and beneficiaries in their plan benefits paramount." *Id*.

101. The 2020 Investment Rule did not refer to ESG factors in the regulatory text. It explained that a "fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives," and prohibiting "sacrific[ing] investment return . . . on additional investment risk to promote non-pecuniary benefits or goals." *Id*.

102. While the 2020 Investment Rule included a tiebreaker, it was extremely narrow. It could be used only when a fiduciary was choosing among indistinguishable investment alternatives. To protect beneficiaries in the rare instance where a fiduciary invoked this tiebreaker, it required documentation to "prevent fiduciaries from improperly finding economic equivalence." *Id*.

103. The 2020 Proxy Voting Rule aimed to clarify voting requirements, allaying concerns that fiduciaries must vote every proxy. This rule was also clear that plan fiduciaries must "not subordinate" participant or beneficiary financial interests or "promote non-pecuniary benefits or goals unrelated to th[e] financial interests of the plan's participants and beneficiaries." 85 F.R. at 81,694; 29 C.F.R. § 2550.404a-1(e)(2)(ii)(C). The rule expressly rejected a comment arguing this limitation "was inconsistent with some client expectations" and "stewardships codes outside the United States." *Id*. at 81,667.

104. In addition, the rule required fiduciaries to maintain records on proxy voting activities and other exercises of shareholder rights. 85 F.R. at 81,694; 29 C.F.R. § 2550.404a-1(e)(2)(ii)(E).

### C.   The Biden Administration's 2021 Executive Orders and Proposed Rule

105. On January 20, 2021, President Biden issued Executive Order (E.O.) 13990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." 86 F.R. 7937 (Jan. 25, 2021). It directed agencies to review all existing

regulations issued during the prior administration that were inconsistent with its policies, including environmental policies. *Id*. The order also directed agencies to consider suspending, revising, or rescinding any such agency actions they identified. *Id*.

106. On March 10, 2021, DOL began reexamining the 2020 regulations. *See* U.S. Dep't of Labor Statement Regarding Enforcement of its Final Rules on ESG Investments and Proxy Voting by Employee Benefit Plans (Mar. 10, 2021), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/erisa/statement-on-enforcement-of-final-rules-on-esg-investments-and-proxy-voting.pdf. In addition, it announced that, pending review, DOL would not enforce the 2020 Rules or otherwise pursue enforcement actions against any fiduciary based on a failure to comply with the regulations. *Id*.

107. On May 20, 2021, President Biden issued E.O. 14030, "Executive Order on Climate-Related Financial Risk." 86 F.R. 27,967 (May 25, 2021). It included policies related to the alleged "intensifying impacts of climate change" and "the failure of financial institutions to appropriately and adequately account for and measure these physical and transition risks." *Id.* sec. 1, 86 F.R. at 27,967. It also explained an intent to help "account[] for and address[] disparate impacts on disadvantaged communities and communities of color[;] . . . spur[] the creation of well-paying jobs; and achieve our target of a net-zero emissions economy by no later than 2050." *Id.* It then directed DOL to consider publishing a proposed rule to supersede the 2020 rules. *Id.* sec. 4(b), 86 F.R. at 27,968–69.

108. DOL published a notice of proposed rulemaking on October 14, 2021 ("NPRM"), proposing amendments to 29 C.F.R. § 2550.404a-1. *See* 86 F.R. 57,272 (Oct. 14, 2021).

109. Notwithstanding ERISA's focus on financial returns, the NPRM indicated that DOL intended to "address uncertainties . . . relating to the consideration of ESG issues, including climate-related financial risk, by fiduciaries in making investment and voting decisions." *Id.* at 57,276.

110. The NPRM proposed several changes to the current regulation. While previous bulletins maintained ERISA's focus on the exclusive purpose of financial benefits, the revised rule deleted the "pecuniary/non-pecuniary" distinction that required fiduciaries to prioritize financial considerations over social goals—the same distinction relevant to the Court's interpretation of ERISA in *Dudenhoeffer*, which mandated that fiduciaries examine only financial benefits.

111. In addition, despite ERISA's plain text forbidding consideration of nonpecuniary factors, the NPRM proposed language that "made it clear" that a fiduciary's duty of prudence "may often require an evaluation of the economic effects of climate change and other ESG factors." *Id*. at 57,288, 57,302. The NPRM also twisted the tiebreaker to suggest that a fiduciary may select one of several non-correlated assets, contravening both economic theory and the statute's text.

112. The NPRM further proposed changes to proxy-voting rules, eliminating paragraph (e)(2)(ii), which clarified that the fiduciary duty does not require voting each proxy. *Id*. It also removed specific monitoring and safe-harbor language and eliminated the recordkeeping requirement for proxy voting. These changes served to prioritize a fiduciary's consideration of nonpecuniary factors.

### D.   The 2022 Investment Duties Rule

113. The final 2022 Rule reflects many of the core changes of the NPRM, broadening the role that nonpecuniary factors may play in a fiduciary's analysis. Because all guidance pre-2020 was sub-regulatory, this rule is the first binding regulation from DOL that affirmatively embraces a broad view of the use of ESG and other non-economic factors by ERISA fiduciaries regarding plan assets and proxy voting.

114. The 2022 Rule's language argues that "[a] fiduciary may *not subordinate* the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may *not sacrifice investment return or take*

21

*on additional investment risk* to promote benefits or goals unrelated to interests of the participants and beneficiaries in their retirement income or financial benefits under the plan." 87 F.R. 73,826 (Dec. 1, 2022) (emphasis added). While this language appears similar to that of the 2020 Investment Rule, the 2022 Rule nonetheless contains several key differences.

115. First, the 2022 Rule eliminates the objective pecuniary/nonpecuniary standard in the 2020 rule and instead formally incorporates ill-defined, subjective ESG concepts into the ERISA regulations. *Id.* at 73,826. But unlike the NPRM, the 2022 Rule abandons any attempt to define or advise what constitutes an ESG factor. *See id.* at 73,831–32 (explaining why DOL did not include examples of ESG factors in the 2022 Rule).

116. The 2022 Rule also undermines a fiduciary's prudence obligations. While fiduciaries had previously focused on risk and return estimates of financial benefits, under the revised 2022 Rule, a fiduciary's analysis of an investment's risk and return "may include the economic effects of climate change and other environmental, social, or governance factors on the particular investment or investment course of action." *Id.* at 73,827.

117. The preamble to the 2022 Rule gives several examples that are potentially relevant to a fiduciary's risk-return analysis, including "exposure to the physical and transitional risks of climate change," board composition, and a corporation's "progress on workforce diversity, inclusion, and other drivers of employee hiring, promotion, and retention." *Id.* at 73,832. Such changes demonstrate the degree to which collateral factors can enter the investment decision-making context under the rule, departing from ERISA's mandate that plan assets be held in trust for "the exclusive purpose of providing benefits to participants." 29 U.S.C. § 1103(c)(1).

118. DOL expressly stated that the intended effect of the 2022 Rule was to loosen restrictions on fiduciaries to consider ESG factors in their decision making. *See, e.g.*, 87 F.R. at 73,835 (describing as "rare and unreasonably difficult to identify" the 2020

Investment Rules' requirement that "a fiduciary [must be] unable to distinguish two or more investments based on pecuniary factors alone" for the tiebreaker to come into play).

119. As a practical matter, the 2022 Rule will not only loosen the statutory and regulatory restraints on fiduciaries to consider ESG factors, it will allow fiduciaries and investment managers to potentially substitute their own ESG policy preferences under the guise making a risk-return determination about an investment or investment course of action.

120. Second, the 2022 Rule abandons the tiebreaker standard contained in the 2020 Investment Rule. While the 2020 Rule emphasized the importance of pecuniary factors, *see* 85 F.R. at 72,846, the revised 2022 Rule would declare a tie "if . . . competing investments, or competing investment courses of action, equally serve the financial interests of the plan." 87 F.R. at 73,885. Thus, the 2022 Rule removes the "economically indistinguishable" standard in the 2020 Rule, replacing it with a lower threshold that allows a fiduciary increased flexibility to choose an investment based on a collateral benefit so long the investments meet the vague standard of "equally serv[ing] the financial interest of a plan over an appropriate time horizon." *Id*. at 73,835.

121. Third, the 2022 Rule also removes from 29 C.F.R. § 2550.404a-1 important transparency protections that were added by the 2020 Investment Rule. While the 2020 rule required fiduciaries or investment managers to document that there had been a tie and how a particular collateral benefit or factor was consistent with the interest of the plan, its participants, and its beneficiaries, the 2022 Rule has no such requirement. Removing these recordkeeping and disclosure requirements also exacerbates the risk of plan fiduciaries unlawfully pursuing their own preferences and collateral ESG considerations.

122. The 2022 Rule states that such "collateral" factors have "no economic relevance." *Id*. at 73,840.

123. This change assumes that collateral factors will have a *de minimis* impact on financial returns. In adopting it, DOL explains that such factors are of so little relevance to

financial performance that a fiduciary need not explain their reasoning for relying on such information. *See id*.

124. Fourth, while the 2020 Proxy Voting Rule allows fiduciaries and investment managers to abstain from voting proxies, the 2022 Rule compels fiduciaries to vote proxies except in limited circumstances. *See id.* at 73,844–45. Even if the proposed measure has no economic bearing on the plan's investment in a particular company, the 2022 Rule creates a strong incentive for fiduciaries to vote proxies. *See id*.

125. The 2022 Rule also encourages fiduciaries and investment managers to rely upon proxy advisory firms, but at the same time it eliminates a specific requirement from the 2020 Rule that plan fiduciaries have a heighted duty to monitor proxy advisory firms to which the plan had delegated proxy voting activity. *Id*. at 73,846–47.

126. Fifth, the 2022 Rule eliminates the prior requirement for plan fiduciaries to maintain records of proxy voting, thereby removing a tool for plan participants to monitor whether fiduciaries exercised appropriate due diligence and prudence when conducting their proxy voting activities or delegated their proxy voting powers to advisory firms. *Id*.

127. Most of the 2022 Rule is effective on January 30, 2023. *Id*. at 73,886.

## III.   Failings of the 2022 Investment Duties Rule

### A.   The Rule Conflicts With ERISA

128. ERISA requires that "the assets of a plan . . . shall be held [in trust by one or more trustees] for the *exclusive purposes* of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan" 29 U.S.C. § 1103(c)(1) (emphasis added). It also requires that all fiduciaries act as a prudent investor would in managing plan assets "*solely* in the interest of the participants and beneficiaries and . . . for the *exclusive purpose* of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1) (emphasis added).

129. The Supreme Court unanimously concluded that ERISA requires fiduciaries to consider "*financial* benefits" and not any "nonpecuniary benefits." *Dudenhoeffer,* 573 U.S. at 420. The Court then referred to ERISA's definitions of "employee pension benefit plan" and "pension plan," which focus on "retirement income" or other "deferral of income." *Id.* (citing 29 U.S.C. § 1002(2)(A)). In other words, the Court directly tied the statutory term "benefits" to "income." And it flatly concluded, "[t]he term [benefits] does not cover nonpecuniary benefits like those supposed to arise from employee ownership of employer stock." *Id.*

130. The *Dudenhoeffer* Court also explained that ERISA requires the "benefits" discussed above to be the "exclusive purpose" that all ERISA fiduciaries must pursue. *Id.* at 421 (quoting 29 U.S.C. § 1104(a)(1)(a)(i), (ii)). Section 403 and 404's use of "exclusive purpose" and "solely" show that Congress has directly spoken on the precise issue of the purposes for which ERISA fiduciaries may act. Thus, Congress did not leave room for DOL to invent other purposes to permit mixed-motives.

131. Courts have described ERISA's fiduciary duties as "the highest known to the law." *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc). ERISA requires fiduciaries to act with "complete and undivided loyalty to the beneficiaries," *Donovan v. Mazzola*, 716 F.2d 1226, 1238 (9th Cir. 1983) (quoting *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 639 (W.D. Wis. 1979)). Fiduciaries' must have "single-minded devotion," and their decisions must ''be made with an eye single to the interests of the participants and beneficiaries.'' *State Street Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003). "A fiduciary cannot contend 'that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 330 (1981) (quoting *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 269 (1941)).

132. One reason for this intense focus is that ERISA's fiduciary duty standard is derived from the law of trusts. *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent.*

*Transp., Inc.*, 472 U.S. 559, 570 (1985) (Section 404(a)(1) imposes "strict standards of trustee conduct . . . derived from the common law of trusts"); *see also Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015).

133. The common law requires fiduciaries to "maximize the trust income by prudent investment." *Blankenship v. Boyle*, 329 F. Supp. 1089, 1096 (D.D.C. 1971); *id*. at 1094 (noting common law fiduciary duty related to retirement assets is "strict"). The Restatement (Third) of Trust states that "fiduciaries[] ordinarily have a duty to seek . . . the highest return for a given level of risk and cost." *Id.* § 90, cmt. f.[2] This duty includes a prohibition on "advancing or expressing the trustee's personal views concerning social or political issues or causes." *Id.* at § 90, cmt. c; *see also id.* at § 78, cmt. f (trustee may not be influenced by its own interests, interests of a third party, or motives other than accomplishing the purposes of the trust).

134. Congress used the terms "exclusive purpose" and "solely" consistent with the law of trusts. This usage denotes that ERISA requires undivided loyalty in the form of the "sole interest" rule, which is also known as the "sole benefit" or "exclusive benefit" rule. *See* Restatement (Third) of Trusts § 78(1) cmt. a (explaining that the sole interest standard "states the trust law's fundamental principle of undivided loyalty"); *see also* Restatement (Second) of Trusts § 170(1) (same).

135. This "exclusive benefit" rule means that "the trustee has a duty to the beneficiaries not to be influenced by the interest of any third party or by motives other than the accomplishment of the purposes of the trust." Restatement (Third) of Trusts § 78(1) cmt. f. Acting with mixed motives triggers "an irrebuttable presumption of wrongdoing." *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021) (quoting Langbein & Daniel R. Fischel, *ERISA's Fundamental Contradiction, The Exclusive Benefit Rule*, 55 U. Chi. L.

---

[2]   Courts treat the Restatements of Trusts as authoritative in the ERISA context. *See Tibble*, 575 U.S. at 528 (citing Restatement (Third) of Trusts § 90 cmt. b); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–12, 115 (1989) (citing Restatement (Second) of Trust § 187).

Rev. 1105, 1114–15 (1988)); *see Amax Coal Co.*, 453 U.S. at 330. "[T]he policy of the trust law is to prefer (as a matter of default law) to remove altogether the occasions of temptation rather than to monitor fiduciary behavior and attempt to uncover and punish abuses when a trustee has actually succumbed to temptation." Restatement (Third) of Trusts § 78(1)–(2) cmt. b.

136. ERISA's structure also supports that Congress's intent was to enact an exclusive-benefit rule with only express statutory exceptions. Congress's expression of certain exceptions implies the exclusion of other exceptions. *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018). ERISA creates exceptions to the exclusive-benefit rule for the removal of assets from the trust. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000) ("That ERISA contemplates that a plan fiduciary may have multiple roles is reflected in the language of § 1104(a). That section begins with the phrase '[s]ubject to sections 1103(c) and (d), 1342, and 1344 of this title,' which explicitly refers to ERISA provisions that allow plan assets to be returned to the employer under some circumstances."). Section 403(c) similarly lists exceptions. *See* 29 U.S.C. § 1103(c). In addition, Section 406 forbids "prohibited transactions" and proscribes various types of self-dealing and other conflicts of interest. 29 U.S.C § 1106.

137. ERISA's legislative history also supports that the "exclusive purpose" and "solely" language's purpose was to enact an "exclusive benefit rule" into the statute. *See* Langbein & Fischel, *supra*, at 1108 n.20 ("The Conference Committee Report captions its discussion of the rule 'Exclusive benefit for employees.' Conference Report at 303, reprinted in 3 Legislative History at 4570 (cited in note 15)."); James D. Hutchinson & Charles G. Cole, *Legal Standards Governing Investment of Pension Assets for Social and Political Goals*, 124 U. Pa. L. Rev. 1340, 1365–67 (1980) (cataloging rejected legislative proposals to show Congress's intent to narrow the scope of a fiduciary's discretion).

138. The 2022 Investment Duties Rule contravenes ERISA's clear command that fiduciaries act with the sole motive of promoting the financial interests of plan participants and their beneficiaries.

139. **First**, the 2022 Rule purports to authorize fiduciaries to select an investment or investment course of action "based on collateral benefits other than investment returns" whenever he "prudently concludes that competing investments . . . equally serve the financial interests of the plan over the appropriate time horizon." 87 F.R. at 73,885 (forthcoming 29 C.F.R. § 2550.404a-1(c)(2)).

140. Requiring that competing investments only need to equally serve the financial interests of the plan allows fiduciaries substantial wiggle room, especially when combined with the elimination of specific recordkeeping requirements discussed below. This "renders 'less solid' the participant's benefits by shifting risk to the participant" and "[t]he increased risk the participant faces as a result is an injury-in-fact." *Johnson*, 259 F.3d at 888 (citing 13 Wright et al., *supra*, § 3531.4, at 292).

141. Such a dilution will transform the 2020 Investment Rule's strict tiebreaker into something that occurs regularly, and thus authorize consideration of "collateral benefits"— in direct contradiction to ERISA's statutory commands—in a much broader class of cases. This result is the whole purpose of the 2022 Rule. *See* 87 F.R. at 73,835 (describing as "rare and unreasonably difficult to identify" the 2020 Investment Rules' requirement that "a fiduciary [must be] unable to distinguish two or more investments based on pecuniary factors alone" for the tiebreaker to come into play). This broadening is contrary to ERISA's plain language and the Court's unanimous ruling in *Dudenhoeffer*.

142. **Second**, the 2022 Rule deletes the prohibition on exercising proxy rights to "promote non-pecuniary benefits or goals unrelated to those financial interests of the plan participants and beneficiaries." *Compare* 29 C.F.R. § 2550.404a-1(e)(2)(ii)(C) (current regulation prohibiting the promotion of nonpecuniary factors or goals in exercising

28

proxies), *with* 87 F.R. at 73,885 (forthcoming 29 C.F.R. § 2550.404a-1(d)(2)(ii)(C) deleting express prohibition).

143. This alteration is contrary to ERISA's plain text and the cases interpreting it.

144. In sum, the 2022 Investment Duties Rule makes changes that authorize fiduciaries to consider and promote "nonpecuniary benefits" when making investment decisions. Such decisions include choosing investments, exercising proxies, and selecting options for participant-direct plans. The 2022 Rule makes such changes even though courts have explained—in *Dudenhoeffer* and elsewhere—that ERISA fiduciaries may only act with the motive of furthering the financial benefits of plan assets. Contrary to Congress's clear intent, these changes make it easier for fiduciaries to act with mixed motives. They also make it harder for beneficiaries to police such conduct.

## B.    The Rule Fails Under the Major Questions Doctrine

145. The major questions doctrine also precludes DOL from exercising authority to authorize—or mandate—ERISA fiduciaries to consider *nonpecuniary* factors in administering plan assets.

146. DOL asserts broad authority in an area of substantial economic and political significance. DOL bases its authority on 29 U.S.C. § 1135, which authorizes the Secretary to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter. Among other things, such regulations may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records." *See* 87 F.R. at 73,855.

147. ERISA covers approximately 747,000 retirement plans, 2.5 million health plans, and 673,000 other welfare benefit plans. Emp. Benefits Sec. Admin., Dep't of Labor, *Fact Sheet: EBSA Restores Over $2.4 Billion to Employee Benefit Plans, Participants and Beneficiaries* (2022), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-

ebsa/our-activities/resource-center/fact-sheets/ebsa-monetary-results-2022.pdf. Employee benefit plans cover about 152 million workers, approximately two-thirds of the United States adult population, and more than $12 trillion in plan assets, equivalent to more than half of the nation's gross domestic product. *Id*.

148. The sheer magnitude of the assets that the 2022 Investment Duties Rule would affect—over half of the GDP of the entire United States—suggests that courts should hesitate before finding that DOL has authority to regulate in this area for *nonfinancial* purposes. Moreover, 29 U.S.C. § 1135's list of specific exercises of authority (*e.g.*, "defin[ing] accounting, technical, and trade terms") shows that Congress did not intend to hide an elephant in this mousehole. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (discussing *noscitur a sociis* canon).

149. In addition, the Supreme Court recently rejected attempts to use vague grants of regulatory authority to address climate change. *See W. Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). The 2022 Investment Duties Rule does not disguise its intent to encourage ERISA fiduciaries to manage plan assets consistent not with their obligations to maximize investor returns, but with the Biden Administration's priorities to address the "climate crisis." 87 F.R. at 73,823, 25–26 (admitting that the 2022 Rule was drafted in response to executive orders related to the "climate crisis.").

150. Importantly, DOL's present claim of authority to *allow* fiduciaries to consider nonpecuniary factors like climate change can be used to *mandate* such consideration tomorrow. The NPRM in fact proposed language that "made it clear" that a fiduciary's duty of prudence "may often require an evaluation of the economic effects of climate change and other ESG factors." *Id.* at 73,826.

151. The mere fact that the 2022 Rule omits the mandate that the NPRM proposed does not change this analysis. It is the scope of the authority DOL claims, not how it exercises it in a particular instance that determines whether an issue is a major question. *See W. Virginia*, 142 S. Ct. at 2612 (Where EPA argued that it must "limit the magnitude

30

of generation shift it demands to a level that will not be 'exorbitantly costly' or 'threaten the reliability of the grid,'" the Court said "this argument does not so much *limit* the breadth of the Government's claimed authority as *reveal* it. On EPA's view . . . Congress implicitly tasked it, and it alone, with balancing the many vital considerations of national policy implicated in deciding how Americans will get their energy.").

152. DOL is thus claiming the authority to do what the EPA cannot, through commandeering the power of trillions of dollars in assets saved through ERISA to pursue the current administration's preferred climate objectives.

153. Regulating trillions of dollars in ERISA plans for *nonfinancial* purposes presents the exact kind of "extraordinary case" that requires an express grant of authority from Congress. *See id.* at 2609.

### C.    The Rule is Arbitrary and Capricious

154. The 2022 Investment Duties Rule is an arbitrary and capricious exercise of administrative power for multiple reasons.

#### 1.    Ignoring relevant considerations

155. **First**, the 2022 Rule ignores considerations relevant to ERISA, including past findings by DOL, and instead relies on factors that Congress did not intend for DOL to consider. ERISA is designed to protect plan participants and beneficiaries, but the rule fails to inquire about the harm it will cause them. The 2020 rules were predicated on a factual finding of "shortcomings in the rigor of the prudence and loyalty analysis by some participating in the ESG marketplace," and that stricter regulations were needed to protect investors and ensure compliance with ERISA. 85 F.R. at 72,847, 72,850. The 2022 Rule does not address this factual finding, nor does it dispute that the 2020 rules protect investors and are effective in stopping fiduciary violations. DOL was obligated to consider the 2022 Rule's effect on the danger to investors from the shortcomings that the 2020 rule identified, as the danger was well "within the ambit of the existing" regulation and indeed was its

purpose. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983). Its failure to adequately consider this core factor is arbitrary and capricious. *Id.* at 43.

156. The 2022 Rule also fails to inquire about the harms that departing from the 2020 rules' protections will cause plan participants and beneficiaries. The underlying justification for the 2020 rules was the "shortcomings in the rigor of the prudence and loyalty analysis by some participating in the ESG marketplace." 85 F.R. at 72,847, 72,850. Because DOL was departing from the 2020 rules' factual findings about the inadequacy of less stringent regulations, it needed to give "a more detailed justification" for its new policy that "rests upon factual findings that contradict those which underlay its prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

157. The 2022 Rule's deviation from Congress's intent is most apparent in the expansion of the tiebreaker rule, the implicit authorization to consider nonpecuniary factors in proxy voting and exercising shareholder rights, and the authorization to consider participant preferences in selecting participant-directed investments.

158. DOL goes not adequately justify its decision to permit fiduciaries to consider nonpecuniary factors when making investment decisions or exercising shareholder rights. By formally injecting ESG concepts into the ERISA prudent duty regulations, DOL has ventured into territory that Congress explicitly rejected when it drafted ERISA. *See, e.g,* Hutchinson & Cole, *supra*, at 1365–67 (cataloging rejected legislative proposals permitting fiduciaries to consider political or social objectives).

159. Nor when authorizing collateral considerations does DOL even attempt to grapple with longstanding precedent that "[a] fiduciary cannot contend 'that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" *Amax Coal Co.*, 453 U.S. at 330 (quoting *Woods*, 312 U.S. at 269).

### 2.    Unjustified changes

160. **Second**, DOL's justifications for the 2022 Rule do not support changes to the regulation. DOL justified the 2022 rule and revocation of the 2020 rules to cure a "chill" or "confusion" allegedly caused by the latter. DOL never identified who was confused, what the source of confusion was, or whether the alleged confusion caused a reduction in the financial returns for plan participants.

161. DOL conceded "that when selecting an investment or investment course of action fiduciaries must focus on relevant risk and return." 87 F.R. at 73,833. But DOL admits that it just doesn't like the terminology of pecuniary/nonpecuniary. *Id.* It asserts that pecuniary/nonpecuniary is not defined in ERISA, yet it is the terminology used by the Supreme Court in *Dudenhoeffer* holding that Section 404 demands that fiduciaries act solely in the financial interests of plan participants. Hence, the 2022 Rule inexplicably abandons the stringent language from *Dudenhoeffer* imposing a narrow and objective standard in the 2020 rule, and replaces it with ESG concepts that, unlike the NPRM, the 2022 Rule makes no attempt to define.

162. DOL also admits that the NPRM language "created a misimpression" that the proposed rule intended to favor ESG factors. *Id.* at 73,854. The 2022 Rule removes proposed regulatory text that ERISA "may often require" consideration of ESG factors "to make it clear that climate change and other ESG factors may be relevant in a risk-return analysis of an investment and do not need to be treated differently than other relevant investment factors, without causing a perception that [DOL] favors such factors in any or all cases." *Id.* at 73,830–31.

163. The preamble similarly explained that the 2022 Rule is not intended to "channel" investments into ESG investments or funds. *Id.* at 73,854. Rather it was simply intended "to remove barriers to fiduciary's consideration of all financially relevant factors*" Id.*

164. But financially relevant factors are pecuniary factors, and the 2020 rules already did that—allowed fiduciaries to consider all pecuniary factors when making investment

decisions. Moreover, DOL's assertion that the 2022 Rule was not intended to "channel" money into ESG investments is undermined by the preamble's emphasis on the increasing importance and anticipated growth of ESG investing. *Id*. at 73,857.

165. The 2022 Rule "cannot be adequately explained" by DOL's proffered justifications and "reveal[s] a significant mismatch between the decision the Secretary made and the rationale he provided." *Dep't of Com.,* 139 S. Ct. at 2575. This disconnect demonstrates that the 2022 rule is arbitrary and capricious.

### 3.   Inadequate explanation

166. **Third**, the 2022 Rule's elimination of the collateral-benefit disclosure requirement, proposed in the NPRM for application to participant-driven individual account plans, is arbitrary and capricious. This would have required a fiduciary to disclose collateral considerations. *See* 86 F.R. at 57,303. The 2022 Rule does not adequately explain why it removed this requirement. *See* 87 F.R. at 73,841. Rather, DOL simply recites the arguments from commenters both for and against its inclusion. This failure to explain means elimination of the disclosure requirement is arbitrary and capricious.

167. DOL itself characterizes the benefits of this disclosure requirement as "appreciable," *id.* at 73,839, and has not shown that any harm the requirement would do exceeds those benefits. On DOL's own reasoning, then, the eliminated documentation requirement would create benefits, yet DOL does not explain why those benefits are outweighed by countervailing costs. Removing the requirement was unreasonable.

168. The only comments that DOL cites in support of the proposition that the disclosure requirement would not benefit for participants is a set of comments arguing that participants do not need to know about collateral benefits because they (definitionally) do not affect risks and returns. But this logic is inconsistent. The 2022 Rule poses that participants have no reason to care about policy or social preferences that do not affect risks and returns, but then it explains that fiduciaries may act on the basis of such

preferences. If it is valuable for fiduciaries to act on such preferences, it is even more valuable for the participants whose funds are being invested to be aware of and act on the basis of such information.

### 4.   Failure to consider alternatives

169. **Fourth**, the 2022 Rule is arbitrary and capricious because DOL failed to consider that the obvious solution to the purported concerns about "confusion" and "chilling" caused by the 2020 rules was simply to issue clarifying sub-regulatory guidance.

170. DOL claims to have considered returning to the pre-2020 regulatory regime that predominantly relied upon sub-regulatory guidance to elaborate on a fiduciary's duty of prudence in relation to collateral factors. Doing so, would have avoided formally injecting ESG and climate-change concepts into the ERISA regulations.

171. The *only* reason DOL gives for declining to take the approach of not embedding ESG into the regulation itself is that DOL's "prior non-regulatory guidance on ESG investing and proxy voting was removed from the Code of Federal Regulations" by the 2020 rules, and fiduciaries therefore would lack "any guidance on the consideration of ESG issues when relevant to plan financial interests." 87 F.R. at 73,879. Yet, the 2022 Rule specifically eliminated the examples of ESG factors that had been in the NPRM, thereby removing any formal regulatory guidance regarding what constitutes an ESG factor. *See id.* at 73,831–32. And the recommendation was not to rescind the 2020 Rule, anyway, it was to issue a clarifying guidance document like DOL had previously done for decades.

### 5.   Unreasoned changes

172. **Fifth**, the 2022 Rule is arbitrary and capricious for jettisoning the 2020 rule's documentation requirement for the tiebreaker rule. While DOL justifies this omission by saying its inclusion would unduly burden fiduciaries who sought to use the tiebreaker, *see id.* at 73,838, there is no cognizable interest in using the tiebreaker rule, because it does not promote ERISA's goal of promoting the financial well-being of plan participants. Any

burden on the tiebreaker is thus not a cognizable factor. Rescinding the documentation is thus arbitrary and capricious.

173. DOL opines that the documentation requirement "can lead to conduct contrary to the plan's interests," including the risk that creating the documentation "would result in increased transaction costs for no particular benefit to plan participants." *Id.* at 73,838. But in a scenario where documentation would create costs to participants, fiduciaries would simply be required by their duties of prudence and loyalty not to use the tiebreaker rule (i.e., to forego the consideration of collateral benefits). Therefore, DOL's fear could not arise and cannot save the 2022 Rule's decision to eliminate the documentation requirement from arbitrariness.

174. Instead, removing the requirement imposes costs on participants, who will now struggle to monitor their fiduciaries' activities. The Department has not shown that these costs are worth the benefits. *See id.* at 73,871.

175. The rule is also arbitrary and capricious for eliminating the specific restrictions for Qualified Default Investment Alternatives (QDIAs) to allow plan fiduciaries to select funds that expressly prioritize nonpecuniary benefits, like ESG considerations, as the default investment for plan participants. See 29 C.F.R. § 2550.404a-1(d)(2)(ii). The rule admits that "QDIAs warrant special treatment because plan participants have not affirmatively directed the investments of their assets into the QDIA but are nevertheless dependent on the investments for long-run financial security." 87 F.R. at 73,843. But the rule declines to afford special protection here, rescinding a prohibition on such in the 2020 rules. DOL also worries that the "chill" from the 2020 rules would infect the selection of QDIAs. *Id*. But this is no reason to abandon the "special treatment" that DOL concedes QDIAs merit.

176. **Sixth,** the 2022 Rule is unlawful on account of prejudgment. The preamble to the 2022 Rule does not dispute strong evidence that DOL decided what to do before it reviewed the public comments. The 2022 Rule echoes DOL's earlier description of its

stakeholder outreach, announced before its review of comments, as designed "to determine how to craft rules that better recognize the role that ESG integration can play in the evaluation and management of plan investments in ways that further fundamental fiduciary obligations." *Id.* at 73,823. "[T]o determine *how*," rather than *whether*, is an admission that a new rule was coming no matter how thoroughly the comments refuted the need for one.

177. While the 2022 Rule attempts to rebut this charge by pointing to differences between the final and proposed rules, none of these changes go to the fundamental question of whether to rescind the 2020 rules and replace them with a rule more favorable to ESG investing. *See id.* at 73,854. That is the issue the Department appears to have prejudged, and the rule gives no reasons to think otherwise.

## CLAIMS FOR RELIEF

## I. Count One: The 2022 Investment Duties Rule Exceeds DOL's Statutory Authority in Violation of ERISA and the APA

178. Under the APA, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C)–(D); *see also Cargill v. Garland*, No. 20-51016, 2023 WL 119435, at *14 (5th Cir. Jan. 6, 2023) (*en banc*) (citing 5 U.S.C. § 706).

179. "[A] fundamental precept of administrative law [is] that an agency . . . regulation cannot overcome the plain text enacted by Congress." *Khalid v. Holder*, 655 F.3d 363, 372 (5th Cir. 2011) (quotation marks omitted), *abrogated on other grounds by Scialabba v. Cuellar de Osorio*, 573 U.S. 41 (2014).

180. "To decide whether the statute is sufficiently capacious to include [a] Rule, [courts] rely on the conventional standards of statutory interpretation and authoritative Supreme Court decisions." *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 369 (5th Cir. 2018) (citation omitted). "The text, structure, and the overall statutory

scheme are among the pertinent 'traditional tools of statutory construction.'" *Id.* (citation omitted). As the Fifth Circuit noted when evaluating a different DOL rule that departed from the underlying grant of authority, "DOL . . . attempts to rewrite the law that is the sole source of its authority. This it cannot do." *Id.* at 373.

181. Section 403(c) of ERISA requires that "the assets of a plan . . . shall be held [in trust] for the *exclusive purposes* of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1) (emphasis added).Section 404(a) of ERISA likewise requires that fiduciaries act as a prudent investor would in managing plan assets "*solely* in the interest of the participants and beneficiaries and . . . for the *exclusive purpose* of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1) (emphasis added).

182. Sections 403(c) and 404(a) require fiduciaries to act solely in the interests of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits to them and defraying reasonable expenses of administering the plan. 29 U.S.C. §§ 1103(c)(1), 1104(a)(1).

183. Congress included Section 404(a) to restrict plan fiduciaries from pursuing investment decisions that were not for the exclusive financial benefit of plan participants and beneficiaries. Indeed, when drafting ERISA, Congress rejected several legislative proposals that would have encouraged socially desirable or socially responsible investing. *See, e.g.,* Hutchinson & Cole, *supra,* at 1365–67 (cataloging rejected legislative proposals as evidence of Congress's intent to limit the scope of a plan fiduciary's discretion).

184. The Supreme Court has held that the exclusive benefit language in Section 404(a) refers to "financial benefits" of plan participants and beneficiaries. *See Dudenhoeffer*, 573 U.S. at 421.

185. The 2022 Investment Duties Rule injects collateral, nonfinancial EGS factors into the investment and shareholder proxy voting decisions of plan fiduciaries in a manner that is not supported by Section 403(c), 404(a), or legal precedent.

186. Because it attempts to override ERISA's plain text, that rule must be set aside.

187. The 2022 Investment Duties Rule also fails under the major questions doctrine. It applies to the retirement savings of over two-thirds of the U.S. adult population, totaling $12 trillion in assets, and its objective is to promote the favored climate-change policy of the current administration. A rule of such "vast economic and political significance" requires clear authorization from Congress. *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022). No such clear statement exists here.

188. The Department's promulgation of the 2022 Investment Duties Rule was thus contrary to law and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706. The 2022 Investment Duties Rule should be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner. The portions of the 2022 Investment Duties Rule challenged here are integral and non-severable from the remainder of the rule, and their vacatur necessarily requires vacatur of the 2022 Investment Duties Rule as a whole.

## II. Count Two: The 2022 Investment Duties Rule Violates the APA Because It Is Arbitrary, Capricious, and Irreconcilable With ERISA's Language

189. Under the APA, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C)–(D).

190. Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference

in view or the product of agency expertise." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012).

191. "[S]ignificant and viable alternatives" to a proposed regulatory action must be considered, *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013), and the agency must articulate a "satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (citation omitted).

192. If the agency fails to "cogently explain why it has exercised its discretion in a given manner," its action will be invalidated. *Id*. at 48. The agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy." *Fox Television Stations*, 556 U.S. at 515.

193. The 2022 Investment Duties Rule is arbitrary and capricious for multiple reasons, as highlighted in the non-exclusive discussion in the proceeding paragraphs. *See, e.g.*, paragraphs 154–177.

194. The Department's promulgation of the 2022 Investment Duties Rule was arbitrary, capricious, and otherwise not in accordance with law. Plaintiffs are therefore entitled to relief under 5 U.S.C. §§ 702, 706. The 2022 Investment Duties Rule should be declared unlawful, set aside, and enjoined from enforcement, implementation, and being given effect in any manner. The portions of the 2022 Investment Duties Rule challenged here are integral and non-severable from the remainder of the rule, and their vacatur necessarily requires vacatur of the 2022 Investment Duties Rule as a whole.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

A.  Postpone the effective date of the 2022 Rule and maintain the status quo pending the conclusion of this case under 5 U.S.C. § 705;

B.  Declare that the 2022 Investment Duties Rule is arbitrary and capricious or otherwise contrary to law within the meaning of 5 U.S.C. § 706(2)(A) and was promulgated by the Department in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C);

C.  Hold unlawful and set aside the 2022 Investment Duties Rule, including under 5 U.S.C. § 706;

D.  Preliminarily and permanently enjoin Defendants and all of their officers, employees, and agents from implementing applying, or taking any action whatsoever under the 2022 Investment Duties Rule, anywhere within DOL's jurisdiction. An injunction would protect the Plaintiffs and serve the public interest by reinforcing that the duty of prudence and loyalty in Section 403(c) and 404(a)'s exclusive benefit rule relates strictly to the financial interests of ERISA plan participants and beneficiaries;

E.  Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

F.  Grant other legal or equitable relief as this Court deems just and proper.

Dated February 28, 2023.

*/s/ Leif A. Olson*
KEN PAXTON
Attorney General
AARON REITZ
Texas Bar No. 24105704
Deputy Attorney General for Legal Strategy
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801

Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
aaron.reitz@oag.texas.gov
leif.olson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

Respectfully submitted,

*/s/ Melissa Holyoak*
SEAN REYES
Attorney General
MELISSA HOLYOAK
Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

BRUNN (BEAU) ROYSDEN*
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

JOHN SULLIVAN, Of Counsel
Texas Bar Number: 24083920
610 Uptown Boulevard, Suite 2000
Cedar Hill, Texas 75104
(469) 523–1351
john.sullivan@the-sl-lawfirm.com

*Counsel for Plaintiff State of Utah*

*/s/ Jonathan Berry*
C. BOYDEN GRAY
JONATHAN BERRY
R. TRENT MCCOTTER
MICHAEL BUSCHBACHER
JARED M. KELSON

Boyden Gray & Associates
801 17th Street NW, Ste. 350
Washington, DC 20006
(202) 955-0620
berry@boydengrayassociates.com
kelson@boydengrayassociates.com

*Counsel for Plaintiffs Liberty Energy Inc.,
Liberty Oilfield Services LLC*, and *Western
Energy Alliance*

*/s/ Andrew Ferguson*
JASON MIYARES
Attorney General
ANDREW N. FERGUSON*
Solicitor General
KEVIN M. GALLAGHER*
Deputy Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Plaintiff Commonwealth of
Virginia*

/s/ Anna St. John
ANNA ST. JOHN
Hamilton Lincoln Law Institute
1629 K Street NW, Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

NEVILLE HEDLEY*
Hamilton Lincoln Law Institute
1440 W. Taylor Street, #1487
Chicago, IL 60607
(312) 342-6008
ned.hedley@hlli.org

*Counsel for Plaintiff James R. Copland and
Alex L. Fairly*


STEVE MARSHALL
Attorney General
EDMUND LACOUR
Solicitor General

Alabama Attorney General's Office
501 Washington Ave.
Montgomery, AL 36014
(334) 353-2196
edmund.lacour@alabamaag.gov

*Counsel for Plaintiff State of Alabama*

/s/ Joseph S. St. John
JEFF LANDRY
Attorney General
ELIZABETH B. MURRILL
Solicitor General
JOSEPH S. ST. JOHN
Deputy Solicitor General
TRACY SHORT
Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


TREG TAYLOR
Attorney General
JEFFREY G. PICKETT
Senior Assistant Attorney General
BENJAMIN HOFMEISTER**
Assistant Attorney General

Alaska Department of Law
123 4th Street
Juneau, AK 99801
(907) 269-5275
jeff.pickett@alaska.gov
ben.hofmeister@alaska.gov

*Counsel for Plaintiff State of Alaska*

TIM GRIFFIN
Attorney General
NICHOLAS J. BRONNI*
Solicitor General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
Attorney General
STEPHEN J. PETRANY**
Solicitor General

Georgia Department of Law
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

THEODORE E. ROKITA
Attorney General
THOMAS M. FISHER**
Solicitor General

Indiana Attorney General's Office
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-6255
tom.fisher@atg.in.gov

*Counsel for Plaintiff State of Indiana*

ASHLEY MOODY
Attorney General
JOSEPH E. HART
Assistant Attorney General of Legal Policy

Florida Attorney General's Office
The Capitol, Pl-01
Tallahassee, FL 32399-1050
Phone: (850) 414-3300
joseph.hart@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

RAÚL R. LABRADOR
Attorney General
DAVID M.S. DEWHIRST**
Chief Deputy Attorney General

Idaho Attorney General's Office
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
david.dewhirst@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

BRENNA BIRD
Attorney General
ERIC H. WESSAN*
Solicitor General

Iowa Attorney General's Office
1305 E. Walnut Street
Des Moines, IA 50319
(515) 281-5164
eric.wessan@ag.iowa.gov.

*Counsel for Plaintiff State of Iowa*

KRIS KOBACH
Attorney General
JESSE A. BURRIS**
Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Ave, 2nd Floor
Topeka, KS 66612
(785) 368-8197
jesse.burris@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


LYNN FITCH
Attorney General
JUSTIN L. MATHENY
Deputy Solicitor General

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


AUSTIN KNUDSEN
Attorney General
CHRISTIAN B. CORRIGAN**
Solicitor General

Montana Department of Justice
215 N Sanders St.
Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov

*Counsel for Plaintiff State of Montana*


DANIEL CAMERON
Attorney General
LINDSEY KEISER*
Assistant Attorney General

Kentucky Attorney General's Office
700 Capital Avenue, Suite 118
Frankfort, KY
Tel: (502) 696-5478
lindsey.keiser@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*


ANDREW BAILEY
Attorney General
JOSHUA M. DIVINE
Solicitor General
MARIA A. LANAHAN**
Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-3321
josh.divine@ago.mo.gov
maria.lanahan@ago.mo.gov

*Counsel for Plaintiff State of Missouri*


MICHAEL T. HILGERS
Attorney General
ERIC J. HAMILTON
Deputy Solicitor General

Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN FORMELLA
Attorney General
MARK W. DELL'ORFANO
Attorney

New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301
anthony.j.galdieri@doj.nh.gov
(603) 271-1214

*Counsel for Plaintiff State of New Hampshire*

DREW H. WRIGLEY
Attorney General
COURTNEY TITUS*
Deputy Solicitor General

North Dakota Attorney General's Office
600 E Boulevard Avenue, Dept. 125
Bismarck, ND 58505
(701) 328-3644
ctitus@nd.gov

*Counsel for Plaintiff State of North Dakota*

DAVE YOST
Attorney General
BENJAMIN FLOWERS
Solicitor General

Ohio Attorney General's office
30 E. Broad St., 17th Fl.
Columbus, OH 43215
(614) 728-7511
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

GENTNER F. DRUMMOND
Attorney General
GARRY M. GASKINS, II
Solicitor General
ZACH WEST
Director of Special Litigation

Oklahoma Attorney General's Office
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
gary.gaskins@oag.ok.gov
zach.west@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

ALAN WILSON
Attorney General
THOMAS T. HYDRICK**
Assistant Deputy Solicitor General

South Carolina Attorney General's Office
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for Plaintiff State of South Carolina*


PATRICK MORRISEY
Attorney General
LINDSAY S. SEE**
Solicitor General
MICHAEL R. WILLIAMS*
Senior Deputy Solicitor General

West Virginia Attorney General's Office
State Capitol Complex, Bldg. 1, Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
(681) 313-4550
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for Plaintiff State of West Virginia*


JONATHAN SKRMETTI
Attorney General and Reporter
GABRIEL KRIMM**
Assistant Solicitor General

Office of the Attorney General and Reporter
of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-3491
gabriel.kirmm@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*


BRIDGET HILL
Attorney General
RYAN SCHELHAAS**
Chief Deputy Attorney General

Office of the Wyoming Attorney General
200 W. 24th Street
Cheyenne, WY 82002
(307) 777-7841
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*


*\*motion for admission pro hac vice
forthcoming or pending*

*\*\*admission pro hac vice granted*


In association with local counsel:

F. Scott Flow
FLOW LAW FIRM, PLLC
800 SW 9th Avenue
Amarillo, Texas 79101-3206
(806) 372-2010
fsflow@flowlaw.com

*Co-Counsel for Plaintiffs other than State of Texas, Tennessee*

## CERTIFICATE OF SERVICE

On February 28, 2023, this First Amended Complaint was filed through the

Court's CM/ECF system, which serves it upon all counsel of record.

*/s/ Anna St. John*