**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| STATE OF UTAH, *et al.*,<br><br>                    Plaintiffs,<br><br>         v.<br><br>JULIE A. SU, *et al.*,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      No. 2:23-cv-16 |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND .................................................................................................................3

I.     Statutory Framework .................................................................................................3

II.    Regulatory Background ..............................................................................................4

      A.    Pre-2020 Sub-Regulatory Guidance ......................................................4

      B.    The 2020 Rules ........................................................................................7

      C.    Executive Orders and Stakeholder Outreach ........................................8

      D.    The Investment Duties NPRM and Final Rule ....................................10

III.   Procedural History and Plaintiffs' Claims ..............................................................14

ARGUMENT .....................................................................................................................14

I.     The State Plaintiffs Lack Standing. .........................................................................14

      A.    Loss of General Tax Revenue Cannot Confer Standing. .....................15

      B.    Speculative Injuries to a Handful of Plaintiff States Cannot Confer Standing Generally. ............................................................................16

      C.    Plaintiff States Cannot Establish *Parens Patriae* or "Special Solicitude" Standing. ......17

II.    The Extraordinary Remedy of a Preliminary Injunction Is Not Warranted Here ...................18

      A.    Plaintiffs Have Not Shown Irreparable Harm. ...................................19

      B.    Plaintiffs Have Not Demonstrated a Substantial Likelihood of Success on the Merits. ...................................................................................22

            1.    The Rule Falls Within DOL's Statutory Authority. ...............................22

                 a.    The Rule is within DOL's broad regulatory authority to carry out ERISA. ...................................22

                 b.    The plain language of ERISA does not preclude the Department's interpretation. ...................24

                 c.    The Department's reasoned interpretation is entitled to deference ...25

                 d.    The major questions doctrine does not apply. ...................................26

2.     The Rule Is the Product of Reasoned Decisionmaking. ...................................28

    a.     The Rule adequately explains its departure from 2020 Rules. ............28

    b.     The Rule is consistent with its stated rationale. ....................................29

    c.     The tiebreaker provision is reasonable. ...................................................30

    d.     Authorizing fiduciaries to consider participants' preferences is reasonable. ..............................................................................................31

    e.     It was reasonable not to adopt proposed language that imposed additional costs on proxy voting without any added benefit. .............32

    f.     It was reasonable to eliminate the tiebreaker documentation requirement. ............................................................................................33

    g.     It was reasonable to eliminate the documentation requirements for proxy voting. ...........................................................................................34

    h.     It was reasonable to remove the 2020 Rules' specific restrictions on QDIAs. ....................................................................................................35

    i.     It was reasonable not to adopt the collateral benefit disclosure requirement. ............................................................................................36

    j.     Sub-regulatory guidance would not have cured defects in the 2020 Rules. .......................................................................................................37

    k.     Plaintiffs cannot impose a novel procedural requirement in excess of the APA. ..................................................................................................38

C.     A Preliminary Injunction Would Not Serve the Public Interest. ...................................39

III.     Any Relief Granted Should Be Appropriately Limited....................................................40

CONCLUSION....................................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*10 Ring Precision, Inc. v. Jones,*
  722 F.3d 711 (5th Cir. 2013) ................................................................................................ 37, 38

*AARP v. EEOC*
  226 F. Supp. 3d 7 (D.D.C. 2016) ......................................................................................... 19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ........................................................................................................... 17, 18

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017) .............................................................................................. 16

*Biden v. Texas*
  142 S. Ct. 2528 (2022) ......................................................................................................... 38

*Boire v. Pilot Freight Carriers, Inc.,*
  515 F.2d 1185 (5th Cir. 1975) ........................................................................................... 19

*Brackeen v. Haaland,*
  994 F.3d 249 (5th Cir. 2021) (en banc) ............................................................................ 17

*BST Holdings LLC v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) .............................................................................................. 20

*California v. Texas*
  141 S. Ct. 2104 (2021) ......................................................................................................... 18

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971) ............................................................................................................. 28

*City of Arlington, Tx. v. FCC,*
  569 U.S. 290 (2013) ............................................................................................................. 22

*City of Oakland v. Lynch,*
  798 F.3d 1159 (9th Cir. 2015) ........................................................................................... 16

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................................. 16, 17, 21

*Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
  602 F.3d 687 (5th Cir. 2010) ............................................................................................. 28

*Crossover Mkt. LLC v. Newell,*
  2022 WL 1797359 (W.D. Tex. Jan. 12, 2022) .................................................................. 19

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ............................................................................................................. 17

*Dep't of Com. v. New York*
  139 S. Ct. 2551 (2019) ........................................................................................... 29

*DHS v. New York*
  140 S. Ct. 599 (2020) ............................................................................................. 40

*El Paso Cty., Texas v. Trump,*
  982 F.3d 332 (5th Cir. 2020) ............................................................................ 15, 16

*Exelon Wind 1, LLC v. Nelson,*
  766 F.3d 380 (5th Cir. 2014) ................................................................................. 26

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ......................................................................................... 28, 29

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ......................................................................................... 27, 28

*Fifth Third Bancorp v. Dudenhoeffer,*
  573 U.S. 409 (2014) .................................................................................... 12, 13, 25

*Florida v. Mellon,*
  273 U.S. 12 (1927) ................................................................................................. 16

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ........................................................................................... 40

*Gould v. Lambert Excavating, Inc.,*
  870 F.2d 1214 (7th Cir. 1989) ............................................................................... 22

*Gov't of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019) .............................................................................. 17

*House the Homeless, Inc. v. Widnall,*
  94 F.3d 176 (5th Cir. 1996) .................................................................................. 18

*Humana, Inc. v. Jacobson,*
  804 F.2d 1390 (5th Cir. 1986) .............................................................................. 19

*Jordan v. Fisher,*
  823 F.3d 805 (5th Cir. 2016) ........................................................................... 18, 19

*Lake Charles Diesel, Inc., v. Gen. Motors Corp.,*
  328 F.3d 192 (5th Cir. 2003) ................................................................................ 19

*Louisiana v. Becerra,*
  2022 WL 4370448 (W.D. La. Sept. 21, 2022) ...................................................... 17

*Lujan v. Defs. of Wildlife*
  504 U.S. 555 (1992) ........................................................................................ *passim*

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ........................................................................................... 17

*Massimo Motor Sports LLC v. Shandong Odes Indus. Co.,*
  2021 WL 6135455, at *2 (N.D. Tex. Dec. 28, 2021) ...................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................... 28

*Nat'l Shooting Sports Found., Inc. v. Jones,*
  716 F.3d 200 (D.C. Cir. 2013) ......................................................................... 37

*NCTA v. Brand X Internet Serv.,*
  545 U.S. 967 (2005) ......................................................................................... 26

*NFIB v. OSHA,*
  142 S. Ct. 661 (2022) (per curiam) ................................................................. 27

*Nichols v. Alcatel USA, Inc.,*
  532 F.3d 364 (5th Cir. 2008) ........................................................................... 22

*Pennsylvania v. Kleppe,*
  533 F.2d 668 (D.C. Cir. 1976) ......................................................................... 15

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ........................................................................................... 38

*S. Ute Indian Tribe v. Dep't of the Interior,*
  2015 WL 3862534 (D. Colo. Jun. 22, 2015) .................................................. 19

*Salt Lake Trib. Pub. Co. v. AT&T Corp.,*
  320 F.3d 1081 (10th Cir. 2003) ....................................................................... 20

*Sebelius v. Auburn Reg'l Med. Ctr.,*
  568 U.S. 145 (2013) ......................................................................................... 26

*Sierra Club v. United States Dep't of Interior,*
  990 F.3d 909 (5th Cir. 2021) ........................................................................... 28

*Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*
  140 S. Ct. 2367 (2020) ..................................................................................... 38

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) ................................................................................... 17, 18

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ..................................................................................... 15

*Stringer v. Whitley,*
  942 F.3d 715 (5th Cir. 2019) ........................................................................... 16

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................ 17

*Sw. Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019) ......................................................................... 40

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ......................................................................... 18

*Texas v. Ysleta del Sur Pueblo*,
   2018 WL 1566866 (W.D. Tex. Mar. 29, 2018) ............................................ 20

*TXCO ABC/AGC, Inc. v. Perez*,
   2016 WL 6947911 (N.D. Tex. Nov. 28, 2016) ............................................ 18

*Under Chevron v. NRDC*,
   476 U.S. 837 (1984) ........................................................................................ 25

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ........................................................................................ 26

*W&T Offshore, Inc. v. Bernhardt*,
   946 F.3d 227 (5th Cir. 2019) .................................................................. 25, 26

*Watchguard Techs., Inc. v. Valentine*,
   433 F. Supp. 2d 792 (N.D. Tex. 2006) ......................................................... 19

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ............................................................................. 26, 28

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ........................................................................................ 16

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ............................................................................................ 18

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ........................................................................................ 15

**United States Code**

29 U.S.C. § 1001 ................................................................................................... 4

29 U.S.C. § 1104 ..................................................................................... 4, 23, 24

29 U.S.C. § 1106 ................................................................................................. 23

29 U.S.C. § 1135 ......................................................................................... 4, 22

**Regulations**

29 C.F.R. § 2550.404a-1 .............................................................................. *passim*

29 C.F.R. § 2550.404c–5 ...................................................................................... 7

29 C.F.R. §§ 2550.404a–1(c)(1), (2) ........................................................................ 25

44 Fed. Reg. 1065 (Jan. 3, 1979) ............................................................................... 4

59 Fed. Reg. 32606 (Jun. 23, 1994) ........................................................................... 5

59 Fed. Reg. 38860 (July 29, 1994) ........................................................................... 6

73 Fed. Reg. 61734 (Oct. 17, 2008) ....................................................................... 5, 6

80 Fed. Reg. 65135 (Oct. 26, 2015) ....................................................................... 5, 6

81 Fed. Reg. 95879 (Dec. 29, 2016) ...................................................................... 6, 7

85 Fed. Reg. 72846 (Nov. 13, 2020) .................................................................. *passim*

85 Fed. Reg. 81658 (Dec. 16, 2020) ...................................................................... 7, 8

86 Fed. Reg. 7037 (Jan. 20, 2021) ........................................................................ 8, 9

86 Fed. Reg. 27967 (May 25, 2021) ......................................................................... 10

86 Fed. Reg. 57272 (Oct. 14, 2021) ......................................................................... 10

87 Fed. Reg. 73822 (Dec. 1, 2022) ..................................................................... *passim*

**Restatement of the Law**

*Restatement (Third) of Trusts*
§ 78(2007) ........................................................................................................ 25

**Other Authorities**

DOL Stmt. re: Enforcement,
https://perma.cc/W6SR-J534 (March 10, 2021) ................................................ 9

Fact Sheet,
https://perma.cc/3WAW-PZ26 (Jan. 20, 2021)................................................... 8

Field Assistance Bulletin (FAB) 2018–01 at 2,
https://perma.cc/HCS2-JBMR (Apr. 23, 2018) ................................................. 5

Summary, H.J. Res. 30,
https://www.congress.gov/bill/118th-congress/house-joint-resolution/30 (last visited Mar. 28,
2023) ............................................................................................................... 14

Veto Message, H.J. Res. 30,
https://perma.cc/YJW5-HDVF (Mar. 20, 2023) ............................................... 14

## INTRODUCTION

Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA) to protect the financial stability and hard-earned retirement savings of working Americans. The Department of Labor (DOL or Department) has long been charged with promulgating regulations to carry out the statute in furtherance of these goals. The Rule challenged here supports Congress's aims by rescinding two rules that risked discouraging plan fiduciaries from selecting investments that might be in the best financial interests of plan participants and beneficiaries. Those prior rules created a chilling effect on fiduciaries' consideration of the economic effects of environmental, social, and governance (ESG) factors—even where such factors were material to financial performance. The current Rule removes this thumb on the scale against consideration of ESG factors and confirms fiduciaries' ability to consider any factor they reasonably conclude is relevant to a risk and return analysis. *See* Final Rule, Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 87 Fed. Reg. 73822 (Dec. 1, 2022) (Investment Duties Rule or Rule). In doing so, the Rule places ERISA plan participants and beneficiaries on equal footing with other market participants by allowing them to take advantage of economic opportunities presented by, and protect against economic risks posed by, ESG factors. Critically, however, the Rule does not *require* fiduciaries to take ESG factors into account where they prudently decide not to—and it certainly does not mandate ESG investing.

The Rule also reaffirms, consistent with ERISA's statutory text, that fiduciaries' exclusive purpose must be to secure financial benefits for plan participants and beneficiaries, and that this purpose may never be subordinated to unrelated goals. Consistent with this requirement, the Rule restates the Department's position—which has remained unswerving for nearly three decades, across five presidential administrations, and even in the rules it rescinds—that where two investment courses of action are economically equivalent, ERISA does not instruct fiduciaries as to how to choose between them, and so a fiduciary may look to collateral benefits in deciding how to break the tie. The

tiebreaker standard explicitly prohibits fiduciaries from considering collateral benefits other than investment returns in selecting investments *except* where the competing options equally serve the financial interests of the plan; it expressly forbids fiduciaries from sacrificing investment return or taking on additional risk to promote collateral goals.  The updated regulation further eliminates onerous paperwork requirements that risked discouraging fiduciaries from making certain types of economically prudent investments, including those based on a consideration of the economic effects of ESG factors, or exercising shareholder rights in certain ways, even where they serve the financial interests of participants and beneficiaries.

This lawsuit rests on a false premise that the Rule permits fiduciaries to pursue non-financial goals in violation of their statutory duties under ERISA.  Not so.  A proper reading of the Rule reveals this lawsuit to be a thinly veiled attempt to roll back the Rule's placement of the economic effects of ESG considerations on an equal footing with other risk-return factors.  In that regard, Plaintiffs cannot meet their burden to obtain the extraordinary remedy they seek here.  At the outset, Plaintiffs cannot demonstrate irreparable harm—in fact, the majority of Plaintiffs lack standing to bring this lawsuit.  The Plaintiff States' main theory of standing, which depends on speculative and general allegations of lost tax revenue, was recently and squarely rejected by the Fifth Circuit.  Moreover, any alleged harm to any Plaintiff due to reduced investment in the fossil fuel industry would be caused by fiduciaries' independent exercise of their statutory duties in selecting investments, not by the Rule.  Liberty Oilfield Services and Western Energy Alliance have additionally alleged they will undertake voluntary, unspecified additional "monitoring" of their ERISA fiduciaries; any such self-inflicted costs cannot constitute irreparable harm.  Moreover, Plaintiffs' unexplained delay in seeking emergency injunctive relief—a full three months after the Rule was signed, and nearly a month after its effective date— alone counsels against finding irreparable harm.

Plaintiffs also are unlikely to succeed on the merits.  The Department was authorized to

promulgate the Rule by a broad and deliberate delegation of rulemaking authority with respect to ERISA; the tiebreaker provision fills a gap in the statute and is in harmony with its text. The major questions doctrine is inapplicable here because the Rule addresses an area that DOL has regulated for over forty years, is consistent with the Department's decades-old positions, and implements clarifying guidelines rather than imposing any mandatory action. Finally, the Rule is neither arbitrary nor capricious. It is the product of reasoned decisionmaking reflecting the appropriate consideration of alternatives and of all important aspects of the problem at issue. Plaintiffs' criticisms of the Rule amount to policy disagreements with DOL's conclusions, but this Court may not substitute its judgment for that of the agency by ruling on that basis.

Finally, the public interest here weighs heavily in the government's favor. The Rule protects ERISA plan participants and beneficiaries' retirement savings by confirming that fiduciaries' investment selections must be for the exclusive purpose of providing financial benefits to plan participants and beneficiaries, and by clarifying that they may consider all appropriate factors relevant to a risk-return analysis in selecting investments. The Rule also makes clear that fiduciaries must act consistent with these principles when exercising shareholder rights.

The Court should deny Plaintiffs' request for a preliminary injunction.

## BACKGROUND

### I.  Statutory Framework

Congress enacted ERISA in 1974 "to protect . . . the interests of participants in employee benefit plans and their beneficiaries," finding that such plans were vital to "the continued well-being and security of millions of employees" and "an important factor affecting the stability of employment." 29 U.S.C. § 1001(a), (b). Accordingly, Congress created requirements for "disclosure and reporting to participants and beneficiaries," established "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and provided plan participants and beneficiaries

with remedies for any violation of these requirements. *Id.* § 1001(b).  ERISA "establishes minimum standards that govern the operation of private-sector employee benefit plans." 87 Fed. Reg. at 73822.

As relevant here, section 404 of the Act codified ERISA fiduciaries' duties of loyalty and prudence to plan participants and beneficiaries. *See* 29 U.S.C. § 1104.  The statute requires a fiduciary to "discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries." *Id.* § 1104(a)(1).  Fiduciaries are further obligated to act with the "skill, care, prudence, and diligence under the circumstances then prevailing" of a prudent person. *Id.* § 1104(a)(1)(B).

To further the goals of ERISA, Congress delegated to the Secretary of Labor broad authority to promulgate "such regulations as he finds necessary or appropriate" and "to carry out" certain provisions of the Act, including its fiduciary duty requirements. *Id.* § 1135.  The statute does not further constrain the Secretary's authority, but recognizes that "among other things," such regulations may define terms, prescribe forms, or provide for record keeping or inspection. *Id.*

## II. Regulatory Background

The Department first promulgated a version of the Investment Duties regulation at issue here in 1979. *See* 87 Fed. Reg. at 73839; *see also* 44 Fed. Reg. 1065 (Jan. 3, 1979).  That regulation remained unchanged for over forty years; during this time DOL issued sub-regulatory guidance to provide additional interpretation of fiduciary duties under ERISA. *See* 87 Fed. Reg. at 73823–25.

### A. Pre-2020 Sub-Regulatory Guidance

DOL has, for nearly three decades, taken the position that ERISA's obligations of prudence and loyalty do not forbid the consideration of collateral, non-financial benefits in selecting between competing investments that serve the plan's economic interests equally.  87 Fed. Reg. at 73824.  This test, first introduced in sub-regulatory guidance in Interpretive Bulletin (IB) 1994–01, has been

4

colloquially referred to as the "tiebreaker" standard.  *See* IB 94–1, 59 Fed. Reg. 32606 (Jun. 23, 1994).[1]
The tiebreaker is permitted only where the selected investment has "an expected rate of return at least
commensurate to rates of return of available alternative investments" (with similar risks) and otherwise
comports with factors like "diversification" and "the investment policy of the plan."  87 Fed. Reg.
at 73824.  IB 2008–01 maintained that the tiebreaker standard did not conflict with ERISA's plain
text.  This is because where "two or more investment alternatives are of equal economic value to a
plan," "ERISA does not itself specifically provide a basis for making the investment choice," and "the
economic interests of the plan are fully protected" by the fact that the alternatives are economically
equivalent.  IB 2008–01, 73 Fed. Reg. 61734, 61735 (Oct. 17, 2008).  IB 2015–01 likewise advised that
the use of the tiebreaker standard was consistent with the fiduciary duties of prudence and loyalty and
with ERISA's exclusive purpose provision.  *See* IB 2015–01, 80 Fed. Reg. 65135, 65136
(Oct. 26, 2015).  Thus, DOL has steadfastly maintained, for at least thirty years, that ERISA fiduciaries
may consider collateral benefits as a tiebreaker.

The Department has also specifically recognized that fiduciaries' prudent determination that
an investment is appropriate based solely on economic factors may include the consideration of
"[e]nvironmental, social, and governance issues" that "have a direct relationship to the economic value
of the plan's investment."  *See* IB 2015–01, 80 Fed. Reg. at 65136; *see also* Field Assistance Bulletin
(FAB) 2018–01 at 2, https://perma.cc/HCS2-JBMR (Apr. 23, 2018) ("otherwise collateral ESG
issues" could "present material business risk or opportunities" and in such situations "should be
considered by a prudent fiduciary along with other relevant economic factors").  IB 2015–01 explained
that where ESG issues themselves present economic considerations, they "are not merely collateral

---

[1] Even before IB 1994–01, DOL issued advisory opinions and letters stating that fiduciaries could
take into account factors unrelated to investment return only if the selected investments' financial
prospects were "equal or superior" to available alternatives.  *See* 59 Fed. Reg. at 32606–07.

considerations or tie-breakers," but rather "proper components of the fiduciary's primary analysis of the economic merits."  80 Fed. Reg. at 65136.  In recognizing that ESG factors could, where appropriate, be treated as relevant economic considerations, DOL emphasized the need to "always put first the economic interests of the plan."  FAB 2018–01 at 2.

DOL has also long held that managing proxy voting and other exercises of shareholder rights fall within ERISA fiduciaries' responsibilities, and that such acts are subject to the duties of loyalty and prudence.  *See* 87 Fed. Reg. at 73825.  In IB 1994–02, the Department explained that fiduciaries were permitted to "engage in shareholder activities intended to monitor or influence corporate management" if, "taking into account the costs involved," the fiduciary reasonably expected that these activities would "enhance the value of the plan's investment in the corporation."  *Id.*; *see also* IB 1994–02, 59 Fed. Reg. 38860 (July 29, 1994).  IB 2008–02 confirmed that fiduciaries are charged with managing voting rights associated with plan assets that are shares of corporate stock.  IB 2008–02, 73 Fed. Reg. 61732, 61732 (Oct. 17, 2008).  IB 2008–02 stated that this responsibility included both voting and decisions not to vote, explained that voting decisions must be made solely based on factors that relate to the plan's economic value, and reiterated that the interests of participants and beneficiaries in their retirement income could not be subordinated to unrelated objectives.  *See id.*  It also recognized that decisions to vote proxies required fiduciaries to balance the economic costs and benefits of voting, and to refrain if the latter did not outweigh the former.  *See id.*

IB 2016–02 again reiterated that in voting proxies, ERISA fiduciaries must consider "factors that may affect the value of the plan's investment" and must "not subordinate the interests of the participants and beneficiaries . . . to unrelated objectives."  IB 2016–02, 81 Fed. Reg. 95879, 95883 (Dec. 29, 2016).  It confirmed that fiduciaries could not "sacrifice investment returns . . . to promote collateral goals," and should not vote proxies where "the time and cost . . . may not be in the plan's best interest."  *Id.* at 95881.  But it also pointed out that voting proxies may lead to "long-term financial

benefits," and that "many proxy votes involve very little, if any, additional expense." *Id.*

### B. The 2020 Rules

In 2020, the Department issued two new rules via notice-and-comment rulemaking that removed prior sub-regulatory guidance from the Code of Federal Regulations and amended the Department's Investment Duties regulation for the first time since its adoption in 1979. *See* 87 Fed. Reg. at 73823. The first rule primarily concerned the consideration of ESG factors in selecting investments; the second concerned proxy voting and other exercises of shareholder rights. *See id.*; *see also* Final Rule, Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72846 (Nov. 13, 2020) (2020 Investment Duties Rule); Final Rule, Fiduciary Duties Regarding Proxy Voting and Shareholder Rights, 85 Fed. Reg. 81658 (Dec. 16, 2020) (2020 Proxy Voting Rule) (collectively, the 2020 Rules).

The 2020 Investment Duties Rule amended DOL's Investment Duties regulation in several ways. Among other things, it required plan fiduciaries to choose investments and investment courses of action based solely on consideration of "pecuniary factors"—a term not used in ERISA. *See* 87 Fed. Reg. at 73823; *see also* 85 Fed. Reg. at 72884. The revised regulation retained the tiebreaker test, acknowledging that fiduciaries could properly consider collateral factors in breaking a tie. *See* 85 Fed. Reg. at 72862. But it stated that the tiebreaker was available only where fiduciaries were "unable to distinguish" among investments "on the basis of pecuniary factors alone" and imposed novel documentation requirements. *See id.* at 72884. It also, for the first time, prohibited adding or retaining as a qualified designated investment alternative (QDIA)[2] any investment fund, product, or model portfolio that "includes even one non-pecuniary objective in its investment objectives or principal investment strategies." 87 Fed. Reg. at 73823; *see also* 85 Fed. Reg. at 72884. The preamble tied these changes to ESG investing, stating that "ESG investing raises heightened concerns under ERISA,"

---

[2] A QDIA is a default investment selection made "in the absence of an investment election by the participant." *See* 29 C.F.R. § 2550.404c–5(a)(1).

based on the perception that it "may prompt ERISA fiduciaries to make investment decisions for purposes distinct from providing benefits to participants and beneficiaries." 85 Fed. Reg. at 72848. It recognized, however, "that there are instances where one or more [ESG] factors will present an economic business risk or opportunity" that fiduciaries "would appropriately treat as material economic considerations." *Id.*

The 2020 Proxy Voting Rule implemented several other changes to the Investment Duties regulation. Among other things, it stated that ERISA fiduciaries are not required to "vote[] every proxy or exercise[] every shareholder right." 85 Fed. Reg. at 81694. As part of the rationale, the preamble explained that it was "likely" that "many" proxies "related to environmental, social, or public policy agendas" have "little bearing on share value or other relation to plan financial interests." *Id.* at 81681. The 2020 Proxy Voting Rule also imposed specific monitoring and recordkeeping requirements with respect to proxy voting and other exercises of shareholder rights. *Id.* at 81694.

### C. Executive Orders and Stakeholder Outreach

Shortly after the promulgation of the 2020 Rules—eight days after the effective date of the 2020 Investment Duties Rule and five days after the effective date of the 2020 Proxy Voting Rule— President Biden issued Executive Order (E.O.) 13990, which recognized the Nation's "abiding commitment to empower our workers and communities" and to "protect our public health and the environment." E.O. 13990, 86 Fed. Reg. 7037, 7073 (Jan. 20, 2021). In light of the administration's priorities, including "to bolster resistance to the impact of climate change," the E.O. directed all federal agencies to review regulations promulgated between January 20, 2017 and January 20, 2021 that might be inconsistent with these goals and, "as appropriate and consistent with applicable law," to consider whether to suspend, revise, or modify those agency actions.[3] *Id.*

---

[3] A Fact Sheet issued along with E.O. 13990 stated that DOL was to undertake a review of the 2020 Investment Duties Rule. *See* Fact Sheet, https://perma.cc/3WAW-PZ26 (Jan. 20, 2021).

The Department accordingly conducted outreach to, and heard feedback from, "a wide variety of stakeholders," including "asset managers, labor organizations, and other plan sponsors, consumer groups, service providers, and investment advisors" regarding the 2020 Rules.  87 Fed. Reg. at 73823 n.13, 73825–26.  These stakeholders questioned whether the 2020 Rules properly reflected fiduciary duties of prudence and loyalty.  *See id.*  They also questioned whether the 2020 Rules adequately addressed the "substantial evidence submitted by public commenters" about the use of ESG considerations "improving investment value and long-term investment returns for retirement investors," as well as whether the 2020 Rules were "rushed."  *See id.* at 73825.  The 2020 Rules were reportedly creating "confusion" among investors about "whether climate change and other ESG factors may be treated as 'pecuniary' factors."  *Id.*  This was, in the eyes of stakeholders, creating a "chilling effect" on "appropriate integration of climate change and other ESG factors in investment decisions."  *Id.*  Stakeholders feared that the 2020 Rules placed "a thumb on the scale against the consideration of ESG factors"—"even when those factors are financially material."  *Id.* at 73826.

After hearing some of this feedback, DOL announced that it intended to revisit the 2020 Rules and, during that reconsideration process, would not enforce the 2020 Rules.  *See* DOL Stmt. re: Enforcement, https://perma.cc/W6SR-J534 (March 10, 2021).  DOL also continued to conduct stakeholder outreach about the impact of the 2020 Rules.  *See* 87 Fed. Reg. at 73823.  The chilling effect on proper consideration of ESG factors persisted in the non-enforcement period, "including in circumstances where the current regulation may in fact allow [such] consideration."  *Id.* at 73825–26.

A few months after DOL's non-enforcement statement, the President signed E.O. 14030, which recognized the financial risks created by the "intensifying impacts of climate change" and the "global shift away from carbon-intensive energy sources and industrial processes," along with the opportunities presented by this "generational shift" to "enhance U.S. competitiveness and economic growth."  E.O. 14030, 86 Fed. Reg. 27967 (May 25, 2021).  The E.O. warned that failure to

appropriately account for these physical and transition risks "threatens . . . the life savings and pensions of U.S. workers and families." *Id.* Accordingly, the E.O. directed DOL to "consider publishing, by September 2021, . . . a proposed rule to suspend, revise, or rescind" the 2020 Rules. *Id.* at 27968–69.

## D. The Investment Duties NPRM and Final Rule

On October 14, 2021, the Department issued a notice of proposed rulemaking (NPRM) that proposed several changes and clarifications to the Investment Duties regulation as modified by the 2020 Rules. *See generally* Proposed Rule, Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 86 Fed. Reg. 57272 (Oct. 14, 2021). The NPRM noted that, although the 2020 regulation did not ultimately include explicit references to ESG investing, the preambles to the 2020 Rules "appeared to express skepticism about fiduciaries' reliance on ESG considerations." *Id.* at 57275. Stakeholder feedback demonstrated that the regulation as modified had created a chilling effect on the proper consideration of ESG factors in investment decisions and could "deter fiduciaries from taking steps that other marketplace investors would take in enhancing investment value and performance, or improving investment portfolio resilience against the potential financial risks and impacts often associated with climate change and other ESG factors."[4] *Id.* DOL was also concerned that the regulation "ha[d] created a perception that fiduciaries are at risk if they include any ESG factors in the financial evaluation of plan investments"—and that "even ordinary exercises of shareholder rights" might require "special justifications." *Id.* at 57275–76. The proposed rule was intended to address these uncertainties "relating to the consideration of ESG issues" to "help safeguard the interests of participants and beneficiaries." *Id.* at 57276.

Consistent with this purpose, the NPRM proposed several changes and clarifications to the

---

[4] The NPRM included an extended discussion of reports and studies describing the extent to which climate change and other ESG factors may present material financial risks and opportunities for companies and investors. *See* 86 Fed. Reg. at 57289–92.

10

Investment Duties regulation, including: removing the use of the "pecuniary/non-pecuniary" distinction due to its "chilling effect on financially beneficial choices"; adding language that the duty of prudence "may often require an evaluation of the economic effects of climate change and other ESG factors"; adding to the regulation examples of climate change and ESG factors that may be material; modifying the tiebreaker test and removing special document requirements "in favor of ERISA's generally applicable statutory duty to prudently document plan affairs"; implementing a disclosure requirement as to the collateral benefits used in the tiebreaker test; removing special rules that applied to the selection of QDIAs; removing language stating that fiduciaries are not required to vote every proxy, which could "suggest[] that plan fiduciaries should be indifferent to the exercise of their rights as shareholders, even if the cost is minimal"; and eliminating new monitoring and recordkeeping requirements associated with proxy voting activities and other exercises of shareholder rights. *See* 87 Fed. Reg. at 73826–27. During a sixty-day comment period, the Department received more than 895 written comments and 21,469 form petitions regarding these proposals. *Id.* at 73827.

The Investment Duties Rule, issued on November 21, 2022, responds to these comments and adopts some, but not all, of the proposals in the NPRM, with the goal of restoring longstanding ERISA standards and clarifying that fiduciaries may consider ESG factors in selecting investments or other investment courses of action where appropriate and consistent with their fiduciary duties. First, the Rule removes the "pecuniary/non-pecuniary" nomenclature and replaces it with the clear instruction that fiduciaries' investment decisions "must be based on factors that the fiduciary reasonably determines are relevant to a risk and return analysis." *See id.* at 73885. Many commenters supported this change, noting that the use of the term "pecuniary" created confusion as to fiduciaries' ability to appropriately consider factors that "have a material effect on the bottom line of an investment" but also "have the effect of supporting non-financial objectives." *Id.* at 73833–34. The Department concluded that replacing this language, and thus eliminating the chilling effect on

11

consideration of such factors, was most consistent with ERISA's requirement that fiduciaries' investment decisions focus on factors that are "relevant to a risk and return analysis." *Id.* DOL found that this change was consistent with *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014). *Id.*

Second, the Rule modifies several proposals in the NPRM to avoid creating the misperception that the Department was favoring ESG investment strategies over fiduciaries' considered judgment. It replaces the proposed language that risk and return factors "may often require" a consideration of the economic effects of climate change and other ESG factors with the observation that risk and return factors "may include the economic effects of climate change and other [ESG] factors." *Id.* at 73829–31, 73885. It also specifies that what constitutes a risk-return factor depends on individual facts and circumstances, and that fiduciaries' determinations should "appropriately reflect a reasonable assessment of [any factor's] impact on risk-return." *Id.* at 73885. In addition, the Rule does not adopt the proposal to add examples of ESG factors to the regulation, which commenters observed might be incorrectly interpreted as "creating an apparent regulatory bias in favor of particular investments or investment strategies." *Id.* at 73831–32. The preamble states clearly that fiduciaries "remain[] free under the final rule to determine that an ESG-focused investment is *not* in fact prudent." *Id.* at 73831.

Third, the Rule modifies the tiebreaker test in a manner consistent with longstanding sub-regulatory guidance. The regulation now defines the test to permit the consideration of collateral benefits where competing investments "equally serve the financial interests of the plan over the appropriate time horizon." *Id.* at 73885. This language replaced the requirement that the tiebreaker apply only where investments are indistinguishable "on the basis of pecuniary factors alone," which commenters found confusing and difficult to apply. *Id.* at 73835–37. As the Rule points out, "ERISA does not specifically address" situations where "multiple investment alternatives equally serve the financial interests of the plan." *Id.* at 73836. The test is particularly useful where, for example, choosing among equally financially beneficial investments would avoid "transactional or monitoring

12

costs" that could "offset the benefits of investing." *Id.* The Rule makes plain that "[f]iduciaries without a need to break a tie . . . need not use the provision," and that "nothing in the regulation . . . requires fiduciaries to look to . . . ESG factors to break the tie." *Id.* at 73836.

Fourth, the Rule eliminates the novel specific documentation requirement added in the 2020 Rule, *see id.* at 73885, which commenters noted would chill fiduciaries from utilizing the test at all. *Id.* at 73836–38. For similar reasons, the Rule does not adopt proposed collateral benefit disclosure requirements where fiduciaries appropriately utilize the tiebreaker test. *Id.* at 73839. But DOL emphasized that these decisions do not alter "a fiduciary's duty to prudently document . . . tiebreaking decisions in accordance with section 404 of ERISA." *Id.* at 73841.

Fifth, the Rule removes special requirements regarding the selection of QDIAs. This change was "overwhelmingly" supported by commenters, who felt that these additional requirements "effectively preclude[d] fiduciaries from considering QDIAs that include ESG strategies, even where they were otherwise prudent or economically superior to competing options." *Id.* at 73842–43.

Finally, the Rule adopts the proposals to eliminate regulatory language indicating that the exercise of fiduciary duties "does not require the voting of every proxy or the exercise of every shareholder right," and to eliminate monitoring and recordkeeping requirements related to proxy voting or other exercises of shareholder rights. *Id.* at 73843–46. As to the proxy voting language, commenters agreed with DOL's concern that it could promote indifference and discourage voting of proxies even where doing so was in the plan's financial interest. *Id.* at 73844–45. As to the monitoring and recordkeeping requirements, ERISA already "requires proper documentation of the activities of the investment manager and of the named fiduciary of the plan in monitoring the activities of the investment manager." *Id.* at 73846. Commenters raised concerns, with which the Department agreed, that a regulation "treating proxy voting and other exercises of shareholder rights differently" could make these activities seem "disfavored" and suggest that they carry "greater potential liability," which

could discourage fiduciaries from voting proxies. *Id.* The regulation continues to require that, when exercising shareholder rights, fiduciaries must "[a]ct solely in accordance with the economic interest of the plan and its participants and beneficiaries"; "[c]onsider any costs involved"; and "[n]ot subordinate the interests of the participants and beneficiaries . . . to any other objective." *Id.* at 73885.

The majority of the Rule had an effective date of January 30, 2023.[5] *See id.* at 73886.

## III. Procedural History and Plaintiffs' Claims

Nearly two months after the Rule was signed, and days before its effective date, on January 26, 2023, a group of States, an energy company, a trade association representing oil and natural gas companies, and an individual sued DOL under the Administrative Procedure Act (APA).[6] Compl., ECF No. 1. Nearly a month later, Plaintiffs moved for a preliminary injunction. Mot., ECF No. 39. Plaintiffs allege that the Rule exceeds DOL's statutory authority and is arbitrary and capricious.

## ARGUMENT

## I.   The State Plaintiffs Lack Standing.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must demonstrate (1) "an injury in fact," (2) "fairly traceable to the challenged conduct," (3) "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Lujan*, 504 U.S. at 561. None of the Plaintiff States' hodgepodge of standing theories overcomes

---

[5] On March 1, 2023, Congress passed a joint resolution disapproving of the Investment Duties Rule pursuant to the Congressional Review Act. *See* H.J. Res. 30. The President vetoed the resolution, explaining that the Rule "allows retirement plan fiduciaries to make fully formed investment decisions by considering all relevant factors that might impact a prospective investment, while ensuring that investment decisions made by retirement plan fiduciaries maximize financial returns for retirees." Veto Message, H.J. Res. 30, https://perma.cc/YJW5-HDVF (Mar. 20, 2023). Congress failed to override the veto. *See* Summary, H.J. Res. 30, https://www.congress.gov/bill/118th-congress/house-joint-resolution/30 (last visited Mar. 28, 2023).

[6] Plaintiffs filed an Amended Complaint on February 28, 2023. Am. Compl., ECF No. 47.

the fact that they have suffered no cognizable injury. Accordingly, even should the Court determine that relief is appropriate, no such relief should run to the Plaintiff States.

### A. Loss of General Tax Revenue Cannot Confer Standing.

Plaintiff States allege they will suffer "injury in the form of diminished tax revenues," Mot. 16, and "decrease[d] overall economic activity," *id.* at 17. But the Fifth Circuit has squarely held that "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020). The reality is that "'virtually all federal policies' will have 'unavoidable economic repercussions.'" *Id.* at 339 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)). Accordingly, complaints about such losses are precisely "the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." *Kleppe*, 533 F.2d at 672.

Plaintiffs attempt to frame their allegations as "'a loss of specific tax revenues'" because "many of the Plaintiff States treat retirement distributions as State taxable income."[7] Mot. 16 (quoting *Wyoming v. Oklahoma,* 502 U.S. 437, 447–48 (1992)). But "merely speculative" "assertions of future lost tax revenue" based on overall alleged loss to residents' retirement funds is not "a loss of a specific tax revenue." *Wyoming*, 502 U.S. at 443–44. The Fifth Circuit rejected essentially the same standing theory in *El Paso County*, finding insufficient a county's allegations of harm from the cancellation of a construction project due to alleged loss of "generate[d] taxes through workers staying at hotels, buying supplies, and spending money at local establishments." 982 F.3d at 338–39; *see also Florida v. Mellon*, 273 U.S. 12, 17 (1927); *City of Oakland v. Lynch*, 798 F.3d 1159, 1161–62, 1164 (9th Cir. 2015).

---

[7] Plaintiffs allege that only *some* Plaintiff States include retirement distributions in income tax calculations. Mot. 16 n.5. But Alaska, Florida, Tennessee, Texas, and Wyoming do not tax income at all. Mississippi does not tax income from retirement plans. These States cannot rely on any theory of injury based on alleged lost income tax revenue, if such a theory were cognizable (which it is not).

15

**B. Speculative Injuries to a Handful of Plaintiff States Cannot Confer Standing Generally.**

Plaintiffs also attempt to claim injury based on "reduced investment in the fossil fuel industry," which will allegedly lead to reduced revenue in three of the twenty-six Plaintiff States from "oil and gas extraction on State lands, federal property in those States, or federal waters adjoining those States." Mot. 17. But Plaintiffs' speculative, attenuated theory is not a cognizable harm—and even if it were, it could only apply to the few States that allege lost revenues based on this theory.

To support Article III standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Imminence requires that an injury be "*certainly* impending," *id.* (quoting *Lujan*, 504 U.S. at 565 n.2), or that there is "at least a 'substantial risk' that the injury will occur," *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019). The Supreme Court has "repeatedly reiterated" that "'[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

None of the Plaintiff States alleges any "concrete, particularized," or "actual" injury. *Clapper*, 568 U.S. at 409. Rather, Plaintiffs allege at most a "possible future injury," *id.*, premised on a "speculative chain of possibilities," *Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017). Plaintiffs assert that hypothetical fiduciary activity will reduce the economic activity of private companies and, consequently, certain Plaintiff States may collect lower-than-expected proceeds from those companies.[8] But, as explained, "incidental and attenuated harm is insufficient to grant a state . . . standing." *El Paso Cty.*, 982 F.3d at 341.

Moreover, where "the plaintiff is not himself the object of the government action or inaction he challenges, standing . . . is ordinarily 'substantially more difficult' to establish." *Summers v. Earth*

---

[8] Plaintiffs' allegations of injury due to "[r]educed investment in the fossil fuel industry" which will allegedly "decrease employment, adversely impact industries . . . , and decrease overall economic activity and tax revenue," Mot. 17, fail for the same reason as their allegations of reduced tax revenue.

*Island Inst.*, 555 U.S. 488, 493-94 (2009) (quoting *Lujan*, 504 U.S. at 562). The Supreme Court has expressly "rejected theories that rest on speculation about the decisions of independent actors" such as non-party fiduciaries. *Clapper*, 568 U.S. at 409, 414; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006). By Plaintiffs' own admission, the actualization of any harm would first require ERISA fiduciaries independently to decide to "[r]educe investment," Mot. 17, in unnamed fossil fuel corporations that extract oil and gas within the relevant Plaintiff States. Yet the Rule does not require ERISA fiduciaries to reduce investment in the fossil fuel industry—or even to take ESG factors into account when choosing investments. Rather, the Rule clarifies that fiduciaries *can* consider ESG factors when making investment decisions when doing so comports with their fiduciary duties, is relevant to a risk and return analysis, and is in plans' best financial interest. Any reduction in investment in the fossil fuel industry therefore is not fairly traceable to the Rule.

### C. Plaintiff States Cannot Establish *Parens Patriae* or "Special Solicitude" Standing.

"[A]s a general matter, a 'State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 176 (D.C. Cir. 2019) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)); *see also Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923). Plaintiff States claim an "exception" to this principle because they are bringing suit "to enforce rights guaranteed by a federal statute." Mot. 17 n.6 (quoting *Louisiana v. Becerra*, 2022 WL 4370448, at *5 (W.D. La. Sept. 21, 2022)). This argument cannot be squared with a longstanding concept that six Fifth Circuit judges recently endorsed: a state cannot bring constitutional claims "as the parent of its citizens . . . against the Federal Government," because the United States is "the ultimate parens patriae of every American citizen." *Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) (op. of Dennis, J.) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966)). If states cannot sue the federal government as *parens patriae* to enforce constitutional rights, it makes little sense to allow them to do so to enforce statutory rights.

Even if Plaintiff States could establish that such an exception exists, they have not asserted a "quasi-sovereign interest." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 602. Plaintiff States summarily assert standing to sue on behalf of "the health and well-being" of their residents. Mot. 17. But quasi-sovereign interests "are not . . . private interests pursued by the State as a nominal party," *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 602, and Plaintiffs make no attempt to explain how alleged injury to residents implicates a "quasi-sovereign" interest separate and apart from the residents' private injury.

Similarly unavailing is the idea that "Plaintiff States warrant special solicitude" in a way that materially alters the analysis. Mot. 17 (quoting *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022)). In *California v. Texas*, 141 S. Ct. 2104 (2021), the Supreme Court had little trouble concluding that states lacked standing—without even mentioning (let alone relying on) "special solicitude." Regardless, as discussed, Plaintiffs fail to allege any harm to a "quasi-sovereign interest" distinct from the alleged harm to private parties. For all these reasons, the State Plaintiffs lack standing.

## II. The Extraordinary Remedy of a Preliminary Injunction Is Not Warranted Here.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). "The Fifth Circuit frequently cautions that . . . 'the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.'" *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996); *see also TXCO ABC/AGC, Inc. v. Perez*, 2016 WL 6947911, at *2 (N.D. Tex. Nov. 28, 2016). The party seeking a preliminary injunction bears the burden to show: (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016). A preliminary injunction should not be "granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* at 221 (citation omitted).

18

### A. Plaintiffs Have Not Shown Irreparable Harm.

Plaintiffs bear a "heavy burden of clearly establishing to the Court irreparable harm," *Watchguard Techs., Inc. v. Valentine*, 433 F. Supp. 2d 792, 794 (N.D. Tex. 2006), which is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction," 11A Wright, Miller & Kane, *Federal Practice & Procedure* § 2948.1 (3d ed. 2013). To show irreparable harm, a party must demonstrate "a significant threat of injury from the impending action" and "that the injury is imminent." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).

"Absent a good explanation, . . . delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*, 2021 WL 6135455, at *2 (N.D. Tex. Dec. 28, 2021) (quotation omitted); *see also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (three month delay in filing weighed against granting temporary relief); *Crossover Mkt. LLC v. Newell*, 2022 WL 1797359, at *1 (W.D. Tex. Jan. 12, 2022) (finding "delay in seeking injunctive relief" alone "fatal"). Multiple courts have found that the failure to challenge a final rule promptly following its promulgation, and sufficiently in advance of its effective date, undercut a finding of irreparable harm. *See, e.g., AARP v. EEOC*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016); *S. Ute Indian Tribe v. Dep't of the Interior*, 2015 WL 3862534, at *1 (D. Colo. Jun. 22, 2015).

Plaintiffs' unexplained delay in seeking relief here demonstrates a lack of irreparable harm. Plaintiffs did not file suit until January 26, 2023—over two months after the Investment Duties Rule was signed on November 21, 2022, and mere days before its effective date of January 30, 2023. *See* 87 Fed. Reg. at 73886. They waited nearly another month to file their motion for a preliminary injunction, *see* ECF Nos. 31-1, 39, at which point the majority of the Rule had already gone into effect. Plaintiffs had ample notice as to what the Rule might contain, given that the NPRM was issued more than a year before. Plaintiffs could have easily sought an injunction before the Rule's effective date.

Now, however, the new regulation has been in effect for months, and this request for a preliminary injunction would "alter the status quo" and is thus held to an "even higher standard." *Texas v. Ysleta del Sur Pueblo*, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018). Plaintiffs' delay in challenging the Rule and their request to upend the status quo are alone sufficient for the Court to deny the motion.

Even if the Court were to move past Plaintiffs' delay, their various alleged harms are speculative, remote, not attributable to the Rule, or otherwise not cognizable. Plaintiffs principally rely upon the assertions of Liberty Services and Western Energy Alliance that they are harmed due to unspecified "additional monitoring costs" they will allegedly voluntarily undertake to "protect against improper collateral considerations." Mot. 39. They also assert harm from the alleged potential for "reduction in interest from investors" in their or their members' stocks and reduced "access to capital." *Id.*; *see also, e.g.*, Sgamma Decl. ¶¶ 7–8, ECF No. 39-2. But these alleged monitoring costs are self-inflicted and cannot constitute irreparable harm.[9] *See, e.g.*, *Salt Lake Trib. Pub. Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable[.]"); 11A Wright, Miller, & Kane, *Federal Practice & Procedure* § 2948.1 (3d ed.) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."). They are also speculative and poorly explained: Plaintiffs provide no detail about what kind of monitoring they might undertake, how much it might cost, or how it differs from their normal activities.

Moreover, Plaintiffs' alleged injuries from monitoring or from their companies' reduced attractiveness to investors cannot be attributed to the Department. Theories of injury that "rest on speculation about the decisions of independent actors" are insufficient to demonstrate standing, let alone irreparable harm. *Clapper*, 568 U.S. at 409, 414. The Rule states over and over that investment

---

[9] Because the regulation does not *mandate* monitoring, this situation is distinguishable from that in *BST Holdings LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), in which a regulation required businesses to undertake monitoring of employee vaccinations and testing. *Contra* Mot. 38–39.

decisions are subject to the duty of prudence, and that it does not require fiduciaries to select ESG-focused investments. *See, e.g.*, 87 Fed. Reg. at 73831 ("A fiduciary . . . remains free under the final rule to determine that an ESG-focused investment is *not* in fact prudent."); *id.* at 73842 ("the selection of investment options must be grounded in the fiduciary's prudent risk and return analysis"); *id.* at 73854 ("The final rule does not require fiduciaries to consider ESG factors[.]").  The Rule expressly avoids putting a thumb on the scale in favor of or against any type of investment.  *See id.* at 73831.  And although the Rule recognizes that "[r]isk and return factors may include the economic effects of climate change and other [ESG] factors," it leaves fiduciaries to prudently determine when that is the case.  *Id.* at 73885.  Investment selections, and their results, are thus solely attributable to fiduciaries.

To the extent Plaintiffs claim they must undertake voluntary additional monitoring to protect plan financial gains, those are amply protected by the current regulation.  Consistent with ERISA, the regulation requires that fiduciaries act "solely in the interests of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries."  29 C.F.R. § 2550.404a–1(a).  It mandates that investment selections be based on factors that "are relevant to a risk and return analysis," *id.* § 2550.404a–1(b)(4); instructs that "[a] fiduciary may not subordinate the interests of participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives"; and forbids fiduciaries from "sacrific[ing] investment return or tak[ing] on additional risk to promote [unrelated] benefits or goals," *id.* § 2550.404a–1(c)(1).  Only where fiduciaries "prudently conclude[]" that investments "equally serve the financial interests of the plan over the appropriate time horizon" may they consider "collateral benefits other than investment returns" as part of a tiebreaker.  *Id.* § 2550.404a–1(c)(2).  But fiduciaries *cannot* "accept expected

reduced returns or greater risks to secure such additional benefits." *Id.*[10]

Finally, for the same reasons the State Plaintiffs lack standing, they also have failed to demonstrate irreparable harm.[11]  *See supra* pp. 14–18.

**B.   Plaintiffs Have Not Demonstrated a Substantial Likelihood of Success on the Merits.**

**1.   The Rule Falls Within DOL's Statutory Authority.**

a.   The Rule is within DOL's broad regulatory authority to carry out ERISA.

The 2022 Investment Duties Rule is squarely within DOL's regulatory power to carry out ERISA and entirely consistent with the Act's statutory language.  Congress delegated authority to the Department to prescribe regulations under ERISA in a manner that gives it broad flexibility by empowering the Secretary to "prescribe such regulations as he finds necessary or appropriate to carry out the [relevant] provisions" of ERISA.  29 U.S.C. § 1135.  Congress's use of the phrase "such regulations as he finds necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tx. v. FCC*, 569 U.S. 290, 296 (2013).  In an exercise of this discretion, DOL promulgated a regulation that assists fiduciaries in interpreting the gap in ERISA's statutory language and that is consistent with the Department's longstanding positions.

ERISA section 404 provides, in relevant part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," and "for the exclusive

---

[10] Plaintiffs' insinuation that harm from an alleged ERISA violation is irreparable due to the Act's stated goals holds no water.  *See* Mot. 39–40.  As Plaintiffs' own cited case explains, "injunctions sought under ERISA are subject to the traditional equity analysis, including a finding of irreparable harm"—which Plaintiffs have not shown.  *See Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1221 (7th Cir. 1989); *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378 (5th Cir. 2008).

[11] Similarly, Plaintiff Copland's claim that he is harmed because the Rule is purportedly "contrary to the clear intent of the exclusive benefit rule," Mot. 39, is not particularized enough even to support standing.  *See, e.g., Lujan*, 504 U.S. at 575–78 (no standing to vindicate "the public interest in proper administration of the laws").

purpose of providing benefits to the participants and their beneficiaries" while "defraying reasonable costs of the plan." 29 U.S.C. § 1104(a)(1).  The regulation, updated by the Rule, restates this language, *see* 29 C.F.R. § 2550.404a–1(a), and elaborates upon it.  It forbids fiduciaries from "subordinat[ing] the interests of the participants and beneficiaries in their retirement income or financial benefits . . . to other objectives," or from "sacrific[ing] investment return or tak[ing] on additional risk to promote goals unrelated to the interests of the participants and beneficiaries in their plans."  29 C.F.R. § 2550.404a–1(c)(1).  It also prohibits fiduciaries from "accept[ing] expected reduced returns or greater risks to secure [collateral] benefits."  *Id.* § 2550.404a–1(c)(2).  The Rule thus perpetuates the letter and spirit of section 404 by making plain that plan participants' financial interests must be paramount.

The Rule also recognizes what section 404's text does *not* address: a situation in which a fiduciary is presented with two investment courses of action that are economically equivalent.  In that circumstance, the fiduciary's duty to act "for the exclusive purpose of providing benefits" to plan participants does not provide the answer as to which of two equivalent investments to select; each is equally beneficial from an economic perspective.  *See* 87 Fed. Reg. at 73836.  Acknowledging this gap in the statute, DOL has, for nearly three decades and across five presidential administrations, including in the 2020 Rule, advised fiduciaries that ERISA does not prohibit looking to collateral benefits where competing investment alternatives are equally beneficial financially.  *See supra* pp. 4–6, 7.

The Rule continues this long history by explaining that where "a fiduciary prudently concludes that competing investments, or competing courses of action, equally serve the financial interests of the plan over the appropriate time horizon," that a fiduciary "is not prohibited from" selecting one of the competing investments "based on collateral benefits other than investment returns."  29 C.F.R. § 2550.404a–1(c)(2).  When applying the tiebreaker, the fiduciary must act in accordance with the duties of prudence and loyalty, *see* 29 U.S.C. § 1104(a), and cannot engage in prohibited transactions, *see id.* § 1106.  The need to break a tie may never arise for some fiduciaries.  It is necessary, however,

23

in certain circumstances, such as where two or more investment alternatives "equally serve the financial interests of a plan" and investing in more than one would entail additional costs—such as "transactional or monitoring costs"—that would "offset the benefits" of selecting multiple investments.[12] 87 Fed. Reg. at 73836.  Fiduciaries have relied upon the tiebreaker to select investments in appropriate situations for at least thirty years; its use is in line with the "settled expectations of fiduciaries." 87 Fed. Reg. at 73836.  And as the Department noted, it is "not aware of plan fiduciaries struggling with the concept of permissible collateral benefits." *Id.* at 73837.

        b.  The plain language of ERISA does not preclude the Department's interpretation.

Plaintiffs argue that the plain language of ERISA forecloses the tiebreaker portion of the Rule. Mot. 18–24.[13]  This argument is irreconcilable with DOL's decades-long endorsement of the tiebreaker test, including in the 2020 Rule, without challenge.  The tiebreaker does not alter fiduciaries' exclusive focus on providing financial benefits to participants, consistent with section 404's plain language, because it is only available where two competing investments stand to financially benefit plan participants equally.  *See* 87 Fed. Reg. at 73836.  The tiebreaker protects plan participants' interests in their retirement income and assists fiduciaries in a situation that section 404 does not address.  *Id.*

As explained, ERISA's duty of loyalty requires fiduciaries to act "solely in the interest of . . . participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." 29 U.S.C.

---

[12] Plaintiffs are thus incorrect that the solution to a tie is always to "invest in both to diversify the portfolio." Mot. 24.  Plaintiffs admit that this argument "put[s] aside . . . transaction costs." *Id.*

[13] Plaintiffs also contend, briefly, that the decision not to adopt proposed language relating to proxy voting violates ERISA by permitting fiduciaries to base exercises of shareholder rights on non-financial factors. Mot. 23.  But the regulation states unequivocally that in exercising shareholder rights, "plan fiduciaries must act solely in accordance with the economic interest of the plan and its participants and beneficiaries." 29 C.F.R. § 2550.404a–1(d)(2)(ii)(A).  Proxy voting policies must also be "designed to serve the plan's interests in providing benefits." *Id.* § 2550.404a–1(d)(3)(i).  As the Rule explains, these provisions sufficiently communicate "that ERISA prohibits plan fiduciaries from expending trust assets to promote myriad public policy preferences." 87 Fed. Reg. at 73848.

§ 1104(a)(1).  The Supreme Court in *Dudenhoeffer* held that the term "benefits" in section 404 refers to "*financial* benefits (such as retirement income)" and "does not cover nonpecuniary benefits."  573 U.S. at 421.  Thus, *Dudenhoeffer* confirms that providing financial benefits is ERISA plan fiduciaries' sole purpose.  This holding aligns with both DOL's longstanding instruction regarding tiebreaker situations and with the Rule at issue here, which restricts the use of the tiebreaker to situations where competing investments "equally serve the financial interests of [a] plan," and emphasizes that fiduciaries may neither "subordinate the interests of participants and beneficiaries in their retirement income," "sacrifice investment returns," nor "take on additional investment risk" in order "to promote benefits or goals unrelated to [these] interests."  29 C.F.R. §§ 2550.404a–1(c)(1), (2).

Nor is the common law in any way incompatible with the tiebreaker test.  The common law duty of loyalty requires that a trustee act "solely in the interest of beneficiaries" and "strictly prohibit[s]" trustees from "engaging in transactions that involve self-dealing or that otherwise create a conflict between the trustee's fiduciary duties and personal interests."  Restatement (Third) of Trusts § 78(1), (2) (2007).  The commentary explains that "social investing" is inconsistent with the duty of loyalty "if the investment activity entails sacrificing the interests of trust beneficiaries—for example, by accepting below market returns—in favor of the interests of persons supposedly benefitted by pursuing the particular social cause."  *Id.* § 78, cmt. f (quoting Uniform Prudent Investor Act § 5).  The Rule is entirely aligned; it "emphatically addresses potential loyalty breaches by forbidding subordination of participants' financial benefits."  87 Fed. Reg. at 73853.

c.  The Department's reasoned interpretation is entitled to deference.

Under *Chevron v. NRDC*, 476 U.S. 837 (1984), where Congress has not "directly spoken to the precise question at issue," and "the statute is silent," courts move to *Chevron* step two, *id.* at 842–43.  At this step, "if the agency action carries the force of law, courts defer to the agency's interpretation of the governing statute," provided that its interpretation is a "permissible construction."  *W&T*

25

*Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 234 (5th Cir. 2019) (quoting *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 392 n.10 (5th Cir. 2014)).  Agency action has the force of law where, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law" and the agency interpretation was "promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).  In such circumstances, courts "must uphold" the agency action "as long as it is a permissible construction of the statute"—even if that construction "differs from how the court would have interpreted the statute in the absence of an agency regulation." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013) (quoting *NCTA v. Brand X Internet Serv.*, 545 U.S. 967, 980 (2005)).

As explained, ERISA is silent as to what standard fiduciaries should use to guide their investment decisions where two investment courses of action are financially equivalent.  The Court should thus defer to the agency's reasonable—and longstanding—use of the tiebreaker standard.

### d.  The major questions doctrine does not apply.

Lastly, the major questions doctrine is inapplicable here.  It has been invoked only in "certain extraordinary cases," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022), which the Supreme Court has described as involving "decisions of vast economic and political significance," *id.* at 2605; assertions of "extravagant statutory power over the national economy," *id.* at 2609; or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted," *id.*  This Rule—which confirms the Department's longstanding interpretation of a statute it is charged with carrying out, while mandating no affirmative action—does not present such a case.

Saliently, the Rule does not represent a significant departure from the Department's decades-old stance, nor does it require ERISA fiduciaries, who are always bound by the duties of prudence and loyalty, to act in a way that diverges from their historical practices.  As explained, the Department has historically emphasized, and continues to emphasize, that fiduciaries must act solely in the interests of participants and beneficiaries, and for the exclusive purpose of providing them financial benefits in

26

their retirement plans. *See, e.g., supra* pp. 22–23. Consistent with this requirement, DOL has supported a version of the tiebreaker rule since the early 1990s, and provided guidance aligned with the principle even before that. *Supra* pp. 4–5, 7. Similarly, the Department has, since at least 2015, including in the 2020 Investment Duties Rule, opined that the economic effects of ESG factors were appropriate considerations in ERISA fiduciaries' evaluation of investments. *Supra* pp. 5–6, 8. And the Department has also long recognized that fiduciaries' duties extend to the management of proxy voting and other exercises of shareholder rights, subject to the duties of prudence and loyalty. *Supra* pp. 6–7.

What is more, the Rule imposes no new mandatory action on anyone; it instead provides guidelines that clarify ERISA fiduciaries' preexisting duties. The Rule leaves any action taken under it to fiduciaries' reasoned decisionmaking, tailored to the facts and circumstances, and subject to the duties of prudence and loyalty, to act in the financial interests of plan participants. *See, e.g.*, 87 Fed. Reg. at 73831, 73879. Thus, although ERISA certainly applies to thousands of employee benefits plans, the Rule aligns with "settled expectations" and imposes no new mandates. *See id.* at 73836.

The Rule, therefore, does not represent a novel exercise of agency authority, nor does it impose a mandate like those that prompted the Supreme Court to apply the major questions doctrine in prior cases. For example, in *NFIB v. OSHA*, 142 S. Ct. 661 (2022) (per curiam), the Court found that OSHA, an agency charged with promoting workplace safety by regulating "occupational hazards," could not, for the first time in its history, impose a vaccine mandate or weekly testing requirement for "84 million Americans," *id.* at 665. The Court concluded that permitting the agency to regulate the "hazards of daily life"—"simply because most Americans have jobs and face those same risks while on the clock"—would "significantly expand OSHA's regulatory authority without clear congressional authorization." *Id.* Similarly, in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), the Supreme Court found that the FDA had reversed a more than 75-year history of representing that it had no authority to regulate tobacco products by determining that nicotine was a "drug" and that

cigarettes and smokeless tobacco were "devices" subject to FDA's regulation—despite the fact that Congress had done nothing to counter FDA's previous understanding of its authority, *id.* at 159–60.

In contrast, the Rule concerns an area DOL has regulated since 1979, comports with decades of prior Department guidance, and implements clarifying standards, rather than affirmative mandates. It is in no way the kind of "transformative expansion of . . . regulatory authority" to which the major questions doctrine might apply. *See West Virginia*, 142 S. Ct. at 2610.

### 2. The Rule Is the Product of Reasoned Decisionmaking.

Agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this "highly deferential standard," *Sierra Club v. United States Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (quoting *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010)), the "court is not to substitute its judgment for that of the agency," *id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)).  Rather, the agency's decision is presumed valid, and a court considers only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  The Rule meets this deferential standard.

#### a.  The Rule adequately explains its departure from 2020 Rules.

First, Plaintiffs summarily assert that the Rule is arbitrary and capricious because it "fails to rebut" statements in the 2020 Rules indicating that "strict regulations are necessary to protect participants and beneficiaries from financial harm."  Mot. 27 (quoting 85 Fed. Reg. at 72847, 72850). Plaintiffs' assertion has no basis.

28

The Rule describes the need for its clarifications in light of the flaws of the 2020 Rules. It concludes that, rather than protect participants and beneficiaries, the 2020 Rules chilled "ERISA fiduciaries' consideration of climate change and other ESG factors in investment decisions, even in cases where it is in the financial interest of plans to take such considerations into account." 87 Fed. Reg. at 73826; *see also id.* at 73870 (summarizing literature indicating that "ESG [factors] can have a beneficial impact on investing in many circumstances"). Indeed, that uncertainty "deter[red] fiduciaries from taking steps that other marketplace investors take in enhancing investment value and performance or improving investment portfolio resilience." *Id.* at 73826. Thus, the point of the 2022 Rule is that the "strict regulations" in the 2020 Rule were *not* "necessary to protect participants and beneficiaries," Mot. 27; instead, they created the potential to inflict financial harm upon participants and beneficiaries. The Rule analyzes in detail each individual change made for the purpose of "clarify[ing] the application of ERISA's fiduciary duties of prudence and loyalty" in response to "the chilling effect and other potential negative consequences caused by the [2020 Rules]." 87 Fed. Reg. at 73826–28 (summarizing changes in Rule); *see also id.* at 73828–55 (explaining changes in Rule in detail). Plaintiffs' assertion that the Rule somehow fails to provide a "'detailed justification' for its decision," Mot. 28 (quoting *Fox*, 556 U.S. at 515), is thus untethered from the text of the Rule itself.

b.   <u>The Rule is consistent with its stated rationale.</u>

Plaintiffs next assert that the Rule "'cannot be adequately explained' by its alleged justification." Mot. 29 (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019)). Plaintiffs do not explain the alleged "mismatch between the decision . . . and the rationale." *Dep't of Com.*, 139 S. Ct. at 2575. Instead, they attempt to discredit the Rule's references to "chill" and "confusion" because they say DOL "never identified who specifically was confused, what the source of confusion was, or that any such confusion or negative perceptions reduced *financial* returns for participants and beneficiaries." Mot. 28.

29

The Rule expressly describes the potential for financial harm to plan participants and beneficiaries caused by the confusion and deterrent effect that the 2020 Rules created for fiduciaries. *See supra* pp. 9–10; *see also* 87 Fed. Reg. at 73860 (responding to comment that NPRM did not sufficiently articulate the confusion or who was confused).  In particular, the Rule concluded that "the terms and tone" of the 2020 Rules "could deter plan fiduciaries from: (a) taking into account climate change and other ESG factors when they are relevant to a risk and return analysis, and (b) engaging in proxy voting and other exercises of shareholder rights when doing so is in the plan's best interest." 87 Fed. Reg. at 73855–56.  The Rule's "clarification of the relevant legal standards is intended to address these negative [financial] impacts." *Id.*

Plaintiffs also argue that the Rule is "internally inconsistent" because the Department deleted certain proposed text referencing ESG factors to avoid the "misimpression" that the Rule favored ESG factors, but simultaneously "left other references to ESG" in the Rule.  Mot. 29.  Plaintiffs' premise is nonsensical:  The reference or lack of reference to ESG factors is not determinative of a rule's overall bias against or in favor of ESG factors.  Rather, the Rule must be read in context and as a whole.  And in any event, the Rule specifically explains these choices.  87 Fed. Reg. at 73830–31.

### c.   The tiebreaker provision is reasonable.

Plaintiffs assert that the Rule's tiebreaker standard—which the Department has supported in some form for three decades—is unreasonable because the Department does not provide a "financial reason" for including it.  Mot. 30–31.  Plaintiffs' argument ignores both the text of the Rule and the realities of fiduciary decisionmaking.

As explained, the novel tiebreaker standard in the 2020 Rules—requiring that fiduciaries be "unable to distinguish" among competing investments based on "pecuniary factors alone"—"caus[ed] a great deal of confusion, given that no two investments are the same in each and every respect."  87 Fed. Reg. at 73837.  That standard was thus "both impractical and unworkable."  *Id.* at 73836.  The

Rule highlighted public comments emphasizing that this tiebreaker standard "effectively subvert[ed] the fiduciary's best judgment in favor of a standard that is virtually impossible to meet." *Id.* at 73835.

In response to this confusion, the Department considered simply "eliminating the tiebreaker test." *Id.* at 73878.  But ultimately it chose to revert to the traditional tiebreaker test.  A workable tiebreaker test provides fiduciaries with a solution when they must decide between equally appropriate investments.  DOL has long recognized the need for such a solution because, in some cases, diversifying investments among equally strong options might "entail[] additional costs (such as transactional or monitoring costs) that offset the benefits of investing in two (or more) investments." *Id.* at 73836.  Given that ERISA does not address how to make such a choice, the Rule "leave[s] that decision in the hands of fiduciaries." *Id.*  Moreover, "some version of the tiebreaker test has appeared in the CFR since 1994," and thus the Rule aligns "with the settled expectations of fiduciaries and others." *Id.* at 73836; *see also id.* at 73878.  Indeed, Plaintiffs themselves recognize the financial benefit of "stay[ing] with a framework with which [entities] are familiar." Mot. 37.

Contrary to Plaintiffs' assertions, *see* Mot. 30–31, the Rule expressly addresses "concerns that the tiebreaker provision might be subject to abuse or not be part of a prudent fiduciary process," 87 Fed. Reg. at 73826.  It confirms that "fiduciaries utilizing the tiebreaker provision remain subject to ERISA's prudence requirements," as well as "the explicit prohibition against accepting expected reduced returns or greater risks to secure such additional benefits." *Id.*  The Rule's safeguarding provisions also prevent abusive or imprudent behavior by plan fiduciaries.  These factors "sufficiently protect participants' and beneficiaries' retirement benefits." *Id.*

> d.   Authorizing fiduciaries to consider participants' preferences is reasonable.

Plaintiffs next object to the Rule's provision that a fiduciary "does not violate the duty of loyalty . . . solely because the fiduciary takes into account participants' preferences" in a manner consistent with the duty of prudence. 87 Fed. Reg. at 73885.  Plaintiffs summarily assert that "[t]here

is no permissible justification for this change." Mot. 32.  But there is no "change."  The preamble to the 2020 Investment Duties Rule similarly stated: "Nothing in the final rule precludes a fiduciary from looking into certain types of investment alternatives in light of participant demand for those types of investments." 85 Fed. Reg. 72864.

Regardless, Plaintiffs entirely ignore the Rule's explanation of this provision.  As the Rule states, if it "will lead to greater participation and higher deferral rates," and therefore to "greater retirement security," "accommodating participants' preferences" can be "relevant to furthering the purposes of the plan." 87 Fed. Reg. at 73842.  Indeed, comments from both asset managers and individual participants confirmed that "increased participation and increased deferral rates follow from accommodating such preferences," and individuals may "roll their savings out of ERISA-protected plans if the plans cannot satisfactorily accommodate their preferences." *Id.* at 73841.  The Rule also confirmed that "plan fiduciaries may not add imprudent investment options to menus just because participants request or would prefer them." *Id.*

Plaintiffs take issue with the fact that the Rule does not "provide a uniform approach" for determining participant preferences.  Mot. 32.  But it was a considered choice to "decline[] to mandate a uniform methodology." 87 Fed. Reg. at 73842.  The Rule explains that "[n]o commenter had persuasive answers or recommendations" for a uniform methodology, and it is best to "leave[] these questions to be decided by plan fiduciaries" given that "ERISA's fiduciary obligations could compel plan fiduciaries to disregard participants' preferences to the extent they are imprudent." *Id.*

  e. <u>It was reasonable not to adopt proposed language that imposed additional costs on proxy voting without any added benefit.</u>

Plaintiffs argue that the Department "did not rely on any permissible factors" in deleting a phrase from the NPRM after receiving feedback that the phrase unintentionally imposed a costly

affirmative duty with no added benefit to plan participants.[14]  Mot. 32–33.  As the Rule explains, the intended purpose of the deleted clause was "to ensure that a fiduciary does not exercise proxy voting and other shareholder rights with the goal of advancing nonpecuniary goals" *if* that exercise "result[ed] in increased costs to the plan or a decrease in value of the investment."  87 Fed. Reg. at 73848.  But commenters noted that even "where a particular exercise of a shareholder right would not directly affect shareholder value, the [deleted clause] could be read to prohibit such exercise."  *Id.* at 73847. Other commenters observed that the deleted clause could be read to require that fiduciaries "undertake a burdensome economic analysis before" exercising such shareholder rights.  *Id.*

In response, the Department acknowledged that the deleted clause was "easily misconstrued as suggesting or implying an affirmative duty on plan fiduciaries."  *Id.* at 73848.  Moreover, the intended purpose of the clause was "already served" by two other paragraphs: the requirement that fiduciaries act "solely in accordance with the economic interests of the plan" and the requirement that fiduciaries "not [] subordinate the interests of participant and beneficiaries . . . to any other objectives." *Id.* at 73847–48.  Thus, the Department removed the clause because it "serve[d] no independent function . . . that is not already served" and indeed could be misinterpreted as imposing an additional, unintended duty and concomitant "costs and potential for litigation."  *Id.* at 73848.

f.   It was reasonable to eliminate the tiebreaker documentation requirement.

Likewise, the Department acted reasonably in removing the 2020 Rules' special documentation requirement for the tiebreaker test.  The Department rescinded the requirement because it was "very likely to chill and discourage plan fiduciaries from using the tiebreaker test."  87 Fed. Reg. at 73837–38.  The tiebreaker test is useful because it enables plan fiduciaries to carry out

---

[14] The NPRM proposed: "When deciding whether to exercise shareholder rights and when exercising shareholder rights, plan fiduciaries must . . . [n]ot subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to any other objective, *or promote benefits or goals unrelated to those financial interests of the plan's participants and beneficiaries.*"  86 Fed Reg. at 57303.  The Rule did not adopt the italicized clause.  87 Fed. Reg. at 73847.

their investment duties under ERISA when deciding between equal competing investments. *See supra* pp. 12–13, 30–31. Imposing a new specific documentation requirement risked discouraging its use in appropriate situations and created needless increased transaction costs on plans. *Id.* at 73871.

Moreover, the Department found that existing duties sufficiently protected plan beneficiaries. The terms of the tiebreaker test itself protect plan participants because it "applies only where competing investments equally serve the financial interests of the plan." *Id.* at 73838. ERISA's duty of prudence also renders the documentation requirement "unnecessary" given that "[f]iduciary documentation of their investment activities already is a common practice." *Id.* Indeed, "no commenter provided contrary evidence demonstrating that ERISA's general obligations of prudence are deficient in protecting the interests of plan participants and beneficiaries in this context." *Id.* It was thus harmful to plan participants to mandate documentation that resulted in "increased transaction costs for no particular benefit to plan participants." *Id.*

Plaintiffs argue that "'increased transaction costs for no particular benefit to plan participants'" not only are acceptable but even *preferable*, because "fiduciaries would simply be required by their duties of prudence and loyalty not to use the tiebreaker rule." Mot. 33 (citing 87 Fed. Reg. at 73838). That argument lacks merit. As DOL concluded, if pointless transaction costs render the tiebreaker test too costly to use, the solution is to remove those costs. Plaintiffs provide no response, instead asserting that because there is allegedly "no cognizable interest in using the tiebreaker rule," no "burden on using that rule" could be a "cognizable factor." Mot. 33. But this falls far short of establishing that the Department was arbitrary and capricious in removing the documentation requirements.

       g.   <u>It was reasonable to eliminate the documentation requirements for proxy voting.</u>

Plaintiffs incorrectly argue that, in removing the 2020 Rules' recordkeeping requirement for proxy voting and other exercises of shareholder rights, the Department failed to "weigh[]" competing "objectives" and did not "attempt[] to show[] that the[] costs are worth the benefits." Mot. 34. To

the contrary, the Department weighed competing objectives and made a reasoned decision. The Department acknowledged "the need for proper documentation of fiduciary activity," but ultimately "agree[d] with" commenters' concerns that the 2020 Rules' recordkeeping requirement for proxy voting "could be viewed by some as treating proxy voting and other exercises of shareholder rights differently from other fiduciary activities," and thus "may create a misconception that proxy voting and other exercises of shareholder rights are disfavored or carry greater fiduciary obligations, and therefore greater potential liability, than other fiduciary activities." 87 Fed. Reg. at 73846. The Rule concluded that, despite the benefits of documentation, "this misperception could be harmful" because "it could potentially chill plan fiduciaries from exercising their rights or result in excessive expenditures as fiduciaries over-document their efforts." *Id.* Indeed, the Rule estimated a savings of $6.1 million per year relative to the 2020 proxy-voting documentation requirements. *Id.* at 73874–75.

        h.  <u>It was reasonable to remove the 2020 Rules' specific restrictions on QDIAs.</u>

Plaintiffs assert that removing the 2020 Rules' specific restrictions on QDIAs was "inconsistent and unreasonable." Mot. 34–35. To the contrary, commenters "overwhelmingly" agreed that the specific restrictions on QDIAs were themselves unreasonable. 87 Fed. Reg. at 73842. Rather than protect plan participants, these restrictions "effectively preclude[d] fiduciaries from considering QDIAs that include ESG strategies, even where they were otherwise prudent or economically superior to competing options." 87 Fed. Reg. at 73843. In particular, the restrictions "disallow[ed] a fund to serve as a QDIA if it, or any of its component funds . . . , has investment objectives, goals, or principal investment strategies that include, consider, or indicate the use of non-pecuniary factors in its investment objectives, even if the fund is objectively economically prudent from a risk-return perspective or even best in class." *Id.* The Rule also explained that while QDIAs do warrant "special treatment," QDIAs maintain sufficient special treatment through the protections of the QDIA regulation. 87 Fed. Reg. at 73843.

i.   It was reasonable not to adopt the collateral benefit disclosure requirement.

Plaintiffs incorrectly assert that the Rule "does not clearly state why" it did not adopt the collateral benefit disclosure requirement that appeared in the NPRM.  Mot. 35.  Once again, Plaintiffs ignore the text of the Rule, including the Rule's express conclusion, lengthy discussion of commenter concerns, reference to other decisions in the Rule, and reference to ongoing SEC rulemaking.

There was "limited support for the proposed disclosure requirement" in contrast to "substantial concerns with the proposed disclosure requirement."  87 Fed. Reg. at 73839. Commenters' "limited support" focused on general desire for transparency, and was largely conditional on adding additional clarifications and requirements.  *Id.*  In contrast, commenters' concerns were significant and wide-ranging.  Commenters noted ambiguity regarding whether the required disclosure was focused on objective or subjective rationales.  87 Fed. Reg. at 73839–40.  Some considered the disclosure requirement unnecessary because it had no economic significance.  *Id.* at 73840.  Others noted that it could interfere with existing disclosure regulations.  *Id.* at 73840.  Still others expressed concern that it singled out certain factors and strategies, contrary to the principle of neutrality.  *Id.* at 73840.  Many commenters pointed out the possible litigation risk, including inadvertent imposition of a per se breach of disloyalty for violating the requirement.  *Id.* at 73840–41.

The Rule ultimately concludes that "a disclosure emphasizing matters collateral to the economics of an investment may not be in the best interests of plan participants."  *Id.* at 73880.  The Rule reached this conclusion based on commenters' concerns.  *Id.* at 73841.  It also cited "reasons similar to those underlying the decision to remove the documentation requirements from the" 2020 Rules, *id.*, which the Rule discussed at length, *id.* at 73837–38; *see also supra* pp. 13, 33–34.  Finally, the Rule noted that DOL was monitoring the SEC's ongoing rulemaking on disclosures intended to "allow[] investors to make more informed decisions, including as they compare various ESG investments," and that the Department "may revisit the need for collateral benefit reporting or

36

disclosure depending on the findings of that agency."  87 Fed. Reg. at 73841.

Plaintiffs assert that the removal of the collateral benefit disclosure requirement is "internally inconsistent."  Mot. 36.  As support, Plaintiffs argue that the Rule elsewhere concludes that a different provision is beneficial because it "may 'lead to greater participation and higher deferral rates.'"  Mot. 36.  But merely because a particular benefit accrues under two different provisions does not mean DOL must reach the same conclusion regarding both.  For the collateral benefit disclosure requirement, the Rule concluded that despite commenter support indicating that "information about collateral benefits . . . may impact participant behavior, such as whether to participate," 87 Fed. Reg. at 73839, concerns with the requirement outweighed that and other benefits, *id.* at 73841.

j.   <u>Sub-regulatory guidance would not have cured defects in the 2020 Rules.</u>

Plaintiffs assert that the Department failed to consider "leaving 29 C.F.R. § 2550.404a-1 unchanged from its 2020 amendments, and simply issuing sub-regulatory guidance to cure any alleged chill or confusion."  Mot. 37.  But "[w]hile an agency must consider and explain its rejection of 'reasonably obvious alternative[s],' it need not consider every alternative proposed nor respond to every comment made."  *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)).  "Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives."  *Id.* (quoting *Nat'l Shooting Sports Found., Inc.*, 716 F.3d at 215).

The core problem with the 2020 Rules is that they "create[d] uncertainty and [had] the undesirable effect of discouraging ERISA fiduciaries' consideration of climate change and other ESG factors in investment decisions, even in cases where it is in the financial interest of plans to take such considerations into account."  87 Fed. Reg. at 73826.  This confusion was not merely due to ambiguous phrasing that could have been assuaged by guidance.  It was instead caused by contradictory statements in the preamble, *see, e.g., id.* at 73826; overly stringent language that effectively precluded certain

37

conduct, *see, e.g.*, *id.* at 73833–34; and mandating documentation that "increased transaction costs for no particular benefit to plan participants," *see, e.g.*, *id.* at 73939. Thus, sub-regulatory guidance—which, in contrast to legislative rules, "do[es] not have the force and effect of law," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)—could not have cured the chilling effect of the 2020 Rules. And the Department is not required to explain why it rejected alternatives that are obviously untenable. *See 10 Ring Precision*, 722 F.3d at 724.

k.   <u>Plaintiffs cannot impose a novel procedural requirement in excess of the APA.</u>

Finally, Plaintiffs argue that the Rule is unlawful because the Department allegedly "had already decided what to do in this rulemaking before it reviewed the public comments." Mot. 38. But the Supreme Court has already expressly rejected a variation of Plaintiffs' "prejudgment" test. Mot. 37. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020), emphasized the impropriety of imposing procedural requirements in excess of the APA's mandates. *See id.* at 2385. The only relevant consideration when analyzing agency action under the APA is "whether the [agency] satisfied the APA's objective criteria." *Id.* at 2386. Thus, the Court rejected an "'open-mindedness' test" that would require an agency to "maintain[] an open mind throughout the [rulemaking] process." *Id.* at 2385.

Contrary to Plaintiffs' contentions, Mot. 38, it is irrelevant whether the Rule "echoes [the Department's] earlier description of its stakeholder outreach, announced before its review of comments." *See Little Sisters of the Poor*, 140 S. Ct. at 2385; *see also Biden v. Texas*, 142 S. Ct. 2528, 2534 (2022) ("[T]his Court has previously rejected criticisms of agency closemindedness based on an identity between proposed and final agency action."). DOL provided adequate notice and opportunity for comment before promulgating the Rule and included "a concise statement of [its] basis and purpose." *Id.* That is all the APA requires. And in any event, the Rule reflects significant engagement with comments and includes changes to the NPRM reflecting commenters' concerns. The Rule also

discusses and rejects possible alternatives to rescinding the 2020 Rules.  87 Fed. Reg. at 73883–84.

## C.  A Preliminary Injunction Would Not Serve the Public Interest.

Finally, granting Plaintiffs' requested injunction would not serve the public interest, and the balancing of the harms strongly favors the government.  The Department promulgated the Rule to protect the interests of American workers in their hard-earned retirement savings.  A wide range of stakeholders—from "asset managers, labor organizations and other plan sponsors" to "consumer groups, service providers, and investment advisors"—expressed concern about the potential negative impacts of the 2020 Rules.  87 Fed. Reg. at 73825–26.  By "appearing to single out ESG investing for heightened scrutiny," the 2020 Rules "ha[d] been interpreted as putting a thumb on the scale against the consideration of ESG factors, even when those factors are financially material." *Id.* at 73826; *see also, e.g., id.* at 73854.  ERISA fiduciaries, however, must be able to consider *all* potentially financially material factors when selecting investments. *See id.*  Any action that discourages consideration of the economic effects of climate change or other ESG factors could inappropriately disadvantage ERISA plans by "deterring fiduciaries from taking steps that other marketplace investors would take in enhancing investment value and performance, or improving investment portfolio resilience against the potential financial risks and impacts" of climate change or other ESG factors. *Id.*  Because the Rule removes the perceived thumb on the scale against consideration of ESG factors, and clarifies that fiduciaries' investment decisions must be based on any factors relevant to a risk and return analysis, the Rule is in the interest of ERISA participants and beneficiaries, and the public at large.

Moreover, the Rule reaffirms standards that ERISA fiduciaries have relied upon for years in making investment decisions. *See id.* at 73878, 73879.  By altering certain of those standards and utilizing new language found nowhere in ERISA, the 2020 Rules sowed confusion and risked creating a chilling effect on appropriate investment activity. *See id.* at 73825–26.  Dissipating this confusion and providing proper standards to govern ERISA fiduciaries' actions, consistent with their settled

expectations, is also in the public interest.

Plaintiffs point only to their merits arguments to assert that the public interest favors an injunction. Mot. 40. Because those arguments fail, the balance of harms weighs against Plaintiffs.

## III. Any Relief Granted Should Be Appropriately Limited.

Should the Court see fit to grant any portion of Plaintiffs' requested injunction—which it should not—any remedy should be appropriately limited. *First*, if the Court were to determine that any portion of the Rule is invalid as to any Plaintiff, it should give effect to its severability clause, *see* 87 Fed. Reg. at 73886, and tailor any relief narrowly to allow the remainder of the Rule to remain in effect. *See, e.g., Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019).

*Second*, any relief granted should apply only to Plaintiffs with standing—which excludes the Plaintiff States. *See supra* pp. 14–18. Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff 's remedy must be tailored to redress the plaintiff 's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). When a court orders "the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied. At a minimum, any relief granted should apply only to any portion of the Rule found invalid, and only to Plaintiffs who have demonstrated standing.

Dated: March 28, 2023

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

40

BRAD P. ROSENBERG
*Special Counsel*
Federal Programs Branch

/s/ *Leslie Cooper Vigen*
LESLIE COOPER VIGEN
*Senior Trial Counsel*
CASSANDRA M. SNYDER
*Trial Attorney*
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-0727
leslie.vigen@usdoj.gov

*Counsel for Defendants*

41

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 28, 2023, I electronically filed this brief with the Clerk of the

Court for the United States District Court for the Northern District of Texas by using the CM/ECF

system. Counsel in the case are registered CM/ECF users and service will be accomplished by the

CM/ECF system.

/s/ *Leslie Cooper Vigen*
LESLIE COOPER VIGEN
U.S. Department of Justice
